**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**–Northern Division–**

MARSHALL TODMAN, *et al.*,

*Plaintiffs*

–v–

THE MAYOR AND CITY COUNCIL OF BALTIMORE, *et al.*,

*Defendants.*

Case No.: 1:19-cv-03296-GLR

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE INVALIDITY OF BALTIMORE CITY CODE ART. 13, § 8A-4 UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

Joseph S. Mack
(D. Md. Bar No. 29021)
THE LAW OFFICES OF JOSEPH S. MACK
PO Box 65066
Baltimore, MD 21209
(443) 423-0464
joseph@macklawonline.com

Conor B. O'Croinin
(D. Md. Bar No. 28099)
Ariella E. Muller
(Admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 332-0444
cocroinin@zuckerman.com

## Table of Contents


TABLE OF AUTHORITIES ........ II

INTRODUCTION ........ 1

STANDARD ........ 2

FACTS AND BACKGROUND ........ 3

I. BACKGROUND OF RESIDENTIAL EVICTIONS IN MARYLAND 3

II. THE 2007 CHANGE TO BALTIMORE CITY EVICTION PROCEDURES. ........ 4

A. THE 2007 "CLEAN STREETS BILL." ........ 4

III. PLAINTIFFS' EVICTION ........ 10

ARGUMENT ........ 19

A. PLAINTIFFS POSSESSED A PROPERTY INTEREST IN THEIR EVICTION CHATTELS. ........ 20

B. BALTIMORE CITY DEPRIVED PLAINTIFFS OF THEIR PROPERTY INTEREST IN THE EVICTION CHATTELS WITHOUT DUE PROCESS. ........ 23

C. THE CITY'S FAILURE TO PROVIDE POST-DEPRIVATION HEARING ALSO VIOLATES DUE PROCESS. ........ 27

D. THE CITY'S ORDINANCE ALSO VIOLATES THE DUE PROCESS CLAUSE'S INCORPORATION OF THE FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEIZURES. ........ 29

E. THE CITY'S ORDINANCE ALSO VIOLATES SUBSTANTIVE DUE PROCESS. ........ 33

CONCLUSION ........ 35

## Table of Authorities

**CASES**

*111 Scherr Lane, LLC* v. *Triangle General Contracting, Inc.*, 233 Md. App. 214, 163 A.3d 248 (2017) ... 31

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ... 3

*Associates Commercial Corp.* v. *Wood*, 22 F. Supp. 2d 502 (D. Md. 1998) ... 23, 24

*Bouchat* v. *Baltimore Ravens Football Club, Inc.*, 346 F.3d 514 (4th Cir. 2003) ... 3

*Calder* v. *Bull*, 3 U.S. 386, 388 (1798) ... 33

*Collins* v. *City of Harker Heights, Tex.*, 503 U.S. 115 (1992) ... 33

*County of Sacramento* v. *Lewis*, 523 U.S. 833 (1998) ... 33

*Fuentes* v. *Shevin*, 407 U.S. 67 (1972) ... 28

*Hinton v. Sealander Brokerage Co.*, 917 A.2d 95 (D.C. 2007) ... 22

*Jo* v. *JPMC Specialty Mortg., LLC*, 131 F. Supp. 3d 53 (W.D.N.Y. 2015) ... 22

*Khan* v. *Heritage Prop. Mgmt.*, 584 N.W.2d 725 (Iowa Ct. App. 1998) ... 22

*Knight* v. *M.H. Siegfried Real Estate, Inc.*, 647 S.W.2d 811 (Mo. Ct. App. 1982) ... 22

*Lavan* v. *City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012) ... 24, 25, 30

*Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422 (1982) ... 20, 27

*Loginter S.A. Y Parque Indus. Agua Profunda S.A. Ute* v. *M/V NOBILITY*, 177 F. Supp. 2d 411 (D. Md. 2001) ... 3

*Mapp* v. *Ohio*, 367 U.S. 643 (1961) ... 29

*Mathews* v. *Eldridge*,
424 U.S. 319 (1976) .......... 24

*Meachum* v. *Fano*,
427 U.S. 215 (1976) .......... 33

*Mombro* v. *Louis Capano & Sons, Inc.*,
526 F. Supp. 1237 (D. Del. 1981) .......... 25

*Mullane* v. *Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) .......... 23

*Nickens* v. *Mount Vernon Realty Grp., LLC*,
429 Md. 53, 54 A.3d 742 (2012) .......... 20, 21

*Opperman* v. *Littlejohn*,
54 So. 77 (Miss. 1911) .......... 22

*Ringler v. Sias*,
428 N.E.2d 869 (Ohio Ct. App. 1980) .......... 22

*Scott* v. *Harris*, 550 U.S. 372 (2007) .......... 3

*Soldal* v. *Cook Cty., Ill.*, 506 U.S. 56 (1992) .......... 29, 30

*Steinbraker* v. *Crouse*,
169 Md. 453 182 A. 448 (1936) .......... 21, 30

*Taft Broad. Co.* v. *United States*, 929 F.2d 240 (6th Cir. 1991) .......... 3

*Todman* v. *Mayor & City Council of Baltimore*, 488 F. Supp. 3d 218 (D. Md. 2020) .. 2

*Torres* v. *Madrid*, 141 S. Ct. 989 (2021) .......... 29

*U. S. Mfg. Co.* v. *Stevens*,
17 N.W. 934 (Mich. 1883).......... 22

*United States* v. *Jacobsen*, 466 U.S. 109, 113 (1984).......... 29

*Washington v. Harrison*,
682 S.E.2d 679 Ga. Ct. App. 2009) .......... 22

*Wolf* v. *People of the State of Colo.*, 338 U.S. 25, 27–28 (1949) .......... 29

*Zissu* v. *IH2 Prop. Illinois, L.P.*,
157 F. Supp. 3d 797 (N.D. Ill. 2016) .......... 22

**STATUTES**

34 R.I. GEN. LAWS ANN. § 34-18-50 ........ 22

68 PA. STAT. AND CONST. STAT. ANN. § 250.505a ........ 22

ALA. CODE § 35-9A-423 (14 days) ........ 21

ALASKA STAT. ANN. § 34.03.260(b) ........ 21

ARIZ. REV. STAT. ANN. § 33-1370(F) ........ 21

ARK. CODE ANN. § 18-60-310(c) ........ 21

COLO. REV. STAT. ANN. § 13-40-122 ........ 22

CONN. GEN. STAT. ANN. §47a-42(c) ........ 21

DEL. CODE ANN., tit. 25, § 5715(e) ........ 21

FL. ST. § 83.62 ........ 22

GA. CODE ANN. § 44-7-55(c) ........ 22

HAW. REV. STAT. ANN. § 521-56 ........ 21

IDAHO CODE ANN. § 6-311C (2007) ........ 22

IND. CODE ANN. §§ 32-31-4-2 to 32-31-4-5 ........ 22

KAN. STAT. ANN. § 58-2565(d) ........ 22

LA. CODE CIV. PROC. ANN. ART. 4734 ........ 22

MASS. GEN. LAWS ANN. ch. 239 § 4 ........ 22

MD. CODE ANN., REAL PROP. § 8-208 ........ 11

MD. CODE ANN., REAL PROP. § 8-216 ........ 3

MD. CODE ANN., REAL PROP. § 8–401(d)(1)(i), ........ 4, 5

MD. CODE ANN., REAL PROP. § 8-402 ........ 27

ME. STAT. tit. 14, § 6013 ........ 22

MINN. STAT. ANN. § 504B.365 ........ 22

MONT. CODE ANN. § 70-24-430 ........ 22

N.C. GEN. STAT. ANN. § 42-36.2 ........ 22

N.D. CENT. CODE ANN. § 47-16-30.1 ........ 22

N.H. REV. STAT. ANN. § 540-A:3(VII) ........ 22

N.J. STAT. ANN. §§ 2A:18-72 through 2A:18-84 ........ 22

N.M. STAT. ANN. §47-8-34.1(6)(C) ........ 22

NEB. REV. STAT. ANN. § 69-2303 ........ 22

NEV. REV. STAT. Ann. § 118A.460 ........ 22

OKLA. STAT. tit. 41, § 130 ........ 22

OR. REV. STAT. ANN. § 90.425 ........ 22

S.C. CODE ANN. § 27-40-710 ........ 22

S.D. CODIFIED LAWS § 43-32-26 ........ 22

TENN. CODE ANN. § 29-15-124 ........ 22

TEX. PROP. CODE ANN. § 24.0061 ........ 22

UTAH CODE ANN. §§ 78B-6-812 (3)(b) and 78B-6-816 ........ 22

VA. CODE ANN. § 55.1-1255 ........ 22

VT. STAT. ANN. tit. 12, § 4854a ........ 22

W. VA. CODE ANN. § 55-3A-3(h) ........ 22

WASH. REV. CODE ANN. § 59.18.312 ........ 22

WIS. STAT. ANN. § 799.45 ........ 22

WYO. STAT. ANN. § 1-21-1210 ........ 22

**OTHER AUTHORITIES**

52A C.J.S. Landlord & Tenant § 749 ........ 21

Balt. City, Md., Code of Pub. Local Laws art. 4, § 9-6 ........ 4

BALTIMORE CITY CODE art. 13, § 5-4 ........ 11

BALTIMORE CITY CODE art. 13, § 8A-4 ........ 15

BALTIMORE CITY CODE art. 13, § 8A-4 .......... 2, 4, 8, 18, 30, 35

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. IV .......... 29, 33

U.S. CONST. amend. XIV .......... 2, 19, 26, 27, 28, 29, 33, 35

Plaintiffs submit this memorandum in support of their motion for partial summary judgment.

**INTRODUCTION**

Plaintiffs challenge the constitutionality of a Baltimore City ordinance that, without providing warning of when an eviction will occur, transfers at the time of eviction all of a tenant's personal belongings "in or about" the leased premises to the tenant's landlord. The overwhelming majority of States require landlords to store a tenant's property for some amount of time after an eviction or follow the common law rule that imposes a duty of care on the landlord to make reasonable efforts to keep the property safe and return it to the tenant. Yet Baltimore City has implemented a barbaric and unnecessary procedure: declaring all personal property abandoned, without notice, for the purpose of instantaneously transferring ownership of that property to the tenants' landlord. Baltimore City's ordinance distorts the concept of "abandonment" to cover instances when (as in this case) it is clear that the tenants desired to maintain possession of their valuable personal property and to move that property out of the leased premises.

As is apparent by the face of the ordinance, the reach of the City's law has no limits. It covers anything and everything: prescription medicine in the medicine cabinet, prescribed health aids, intellectual property, firearms, pets, a car in a garage, treasured family photos and irreplaceable keepsakes (priceless to the tenants, yet worthless to strangers), tools of the tenants' trade (otherwise exempt from judgment collection), vital records, and so on. The ordinance doesn't just apply to the tenants' property; if an unrelated third party asks a friend to watch his dog in his absence,

and that friend is evicted, the dog now belongs to the landlord so long as the dog was present at the moment all property is transferred to the ownership of the landlord.

The City's ordinance makes a mockery of the Fourteenth Amendment. Aside from operating without notice to the tenant in multiple types of eviction cases, the ordinance provides no exceptions for circumstances where it is clear that there is no intent by the tenants to abandon property. Nor does the destruction of tenants' interests in their property serve any valid public purpose. It merely effects a transfer of property from one private party to another. If that were not enough (it is), the ordinance affords no opportunity for any tenant in any form of eviction case to challenge the forfeiture at any time.

The constitutionality of § 8A-4 is a central issue in this case and both Defendants assert its validity as a basis for their defense. While there are some factual disputes in this case, they have no bearing on this motion. The central facts demonstrating the unconstitutionality of the City's ordinance are not in dispute, and are as alleged in the First Amended Complaint that this Court has already ruled to have "adequately allege[d] that § 8A-4 violates their procedural due process rights" and substantive due process rights. *Todman* v. *Mayor & City Council of Baltimore*, 488 F. Supp. 3d 218, 226 (D. Md. 2020).

## Standard

Under Federal Rule of Civil Procedure 56(a), a party may seek summary judgment as to a claim or defense, or a part of a claim or defense. A district court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *Id*. "A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat* v. *Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (internal quotations omitted). The court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," but a factual issue must be both genuine and material in order to defeat a motion, with materiality determined by substantive law. *Scott* v. *Harris*, 550 U.S. 372, 378 (2007) (internal quotations omitted); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "When both parties file motions for summary judgment, the court applies the same standards of review." *Loginter S.A. Y Parque Indus. Agua Profunda S.A. Ute* v. *M/V NOBILITY*, 177 F. Supp. 2d 411, 414 (D. Md. 2001) (*citing Taft Broad. Co.* v. *United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

## Facts and Background

### I. Background of Residential Evictions in Maryland

As this Court has previously summarized:

> Maryland law prohibits non-judicial evictions for residential tenancies. See Md. Code Ann., Real Prop. ["RP"] § 8-216. As such, "a landlord may take possession of a dwelling unit from a tenant or tenant holding over" only "[i]f the tenant has abandoned or surrendered possession of the dwelling unit" or "[i]n accordance with a warrant of restitution issued by a court and executed by a sheriff or constable." *Id*. § 8-216(b)(2).
>
> To receive a warrant of restitution, the landlord must "make [a] complaint in writing to the District Court of the county where the property is located." *Id*. § 8-402(b)(1)(i). Upon receipt of the landlord's written complaint, the district court will direct "any constable or sheriff of the county entitled to serve process ... to notify the tenant, assignee, or subtenant to appear ... before the court to show cause why restitution

> should not be made to the landlord." *Id.* § 8-402(b)(1)(ii). The sheriff typically must "serve the summons on the tenant, assignee, or subtenant on the property," but if the tenant cannot be located, the sheriff may "affix an attested copy of the summons conspicuously on the property." *Id.* After a hearing, the district court may enter "judgment for the restitution of the possession of [the] premises" in favor of the landlord and, upon the landlord's request, "issue [a] warrant [of restitution] to the sheriff" of the relevant county. Id. § 8-402(b)(2)(i). In Baltimore City, a landlord must file a petition for warrant of restitution within sixty days after the district court enters judgment in favor of the landlord. Balt. City, Md., Code of Pub. Local Laws art. 4, § 9-6.

*Todman*, 488 F. Supp. 3d at 221-22.

## II. The 2007 Change to Baltimore City Eviction Procedures.

In 2007, Baltimore City modified the eviction process under § 8–401(d)(1)(i).

Baltimore City Code Art. 13, § 8A-4 now provides:

> § 8A-4. Unclaimed property is abandoned.
>
> (a) In general.
> All property in or about the leased premises at the time that the warrant of restitution is executed is abandoned.
>
> (b) No liability.
> Neither the landlord nor someone acting on the landlord's behalf is liable for any loss or damage to abandoned property.

### A. The 2007 "Clean Streets Bill."

Each year, in Baltimore City, there are over 100,000 eviction filings. April 14, 2021 Dep. of Jason Hessler (attached hereto as Exhibit 1) ("City Dep."), at 38. Those filings lead to an average of 6,000 to 7,000 actual evictions in Baltimore City every year. *Id.* at 35. That's more than 19 evictions per day. *Id.* at 36.

All evictions in Maryland are subject to Maryland Code, § 8-401(d) of the Real Property Article. That statute provides that a court may issue a warrant directing a county official to place a landlord back in possession of the leased premises and "for

that purpose ***to remove*** from the property, by force if necessary, all the furniture, implements, tools, goods, effects or other chattels of every description whatsoever belonging to the tenant." RP § 8–401(d)(1)(i) (emphasis added).

For many years before 2007, Baltimore City landlords would comply with RP § 8–401(d)(1)(i) by removing their tenants' property during eviction, but then placing that property on the nearest sidewalk. Exhibit 1 (City Dep.), at 42. Tenants could request that the City store their property, but very few ever did. *Id*. at 92. (Tenants would have had to have called 311 even to learn about the option.) *Id*. at 93.

In 2007, the City considered a bill to address the problem of landlords placing tenants' personal property on the street. The original bill required the landlord to allow a tenant to reclaim his or her property within three days of the eviction. See June 12, 2007 Letter from G. Nilson to City Council (attached hereto as Exhibit 2), at CITY0029. If the tenant failed to claim the property at the conclusion of three days, the property would be deemed abandoned. *Id.* The original bill contained notice provisions to ensure that tenants were notified of their reclamation rights. *Id.* It required three forms of notice: (1) first-class mail; (2) certified mail; and (3) posting. *Id.* The bill did not treat the various forms of evictions differently.

Residents supported the bill. Contained with the City's "official" bill file are letters from City residents and tenant associations explaining that the practice of City landlords casting tenants' belongings into the street was humiliating for families. *See* Letter from J. Johnson (attached hereto as Exhibit 3). It turned other residents into "scavengers." *Id.* Evicted residents lost important personal property

through this practice. June 19, 2007 Letter from M. Benelli to Councilman Harris (attached hereto as Exhibit 4). One resident explained how "children's clothing, books, toys, etc. [were] left on the side of the street for anyone to rummage through." June 18, 2007 Letter from M. Garner (attached hereto as Exhibit 5). Highlighting deficient notice provisions, a Reverend wrote to the City to relate a story of a tenant who did not seem to know about his pending eviction. June 19, 2007 Testimony of Rev. F. Smith to City Council (attached hereto as Exhibit 6).

**B. The Tenant Eviction Work Group ("Working Group").**

After the original bill was proposed by a member of the City Council, the City Solicitor assembled a working group to revise the bill. Exhibit 1 (City Dep.), at 19. The working group was headed by then City Solicitor George Nilson and a former attorney in the law department named Suzanne Sangree. *Id*. at 67. Active members included Kathleen Kelly Howard, who participated on behalf of the Maryland Multi-Housing Association ("MMHA") and Jan Goslee, the general counsel of the Housing Authority of Baltimore City. *Id*. at 71.

On behalf of the MMHA, Ms. Howard suggested sweeping revisions to the Clean Streets Bill. May 29, 2007 E-mail from Ms. Howard to the Working Group (attached hereto as Exhibit 7). At one point during the legislative process, former Solicitor Nilson complained to Ms. Howard about the revisions proposed by "Representatives of the landlord community." April 26, 2007 E-mail from Mr. Nilson to the Working Group (attached hereto as Exhibit 8). Those revisions eliminated any period for a tenant to reclaim his or her property. *Id.* Mr. Nilson explained that "notice and brief retention is, of course, the guts of the proposed bill." *Id*. Despite his

concerns, Mr. Nilson assured Ms. Howard that he could "close this deal to your 'satisfaction.'" Exhibit 1 (City Dep.), at 85; June 8, 2007 E-mail from Mr. Nilson to Ms. Howard (attached hereto as Exhibit 9).

Ms. Goslee also suggested significant revisions. Although one of the two main objectives of the bill was to provide tenants with notice of an eviction, Exhibit 1 (City Dep.), at 106, and robust advance notice provisions were added to offset the elimination of the reclamation period, Ms. Goslee proposed exempting certain kinds of evictions from all notice provisions. *Id*. at 131-32; May 31, 2007 E-mail from Ms. Goslee to Mr. Nilson (attached hereto as Exhibit 10). Ms. Goslee suggested, and the working group agreed, to exempt certain evictions from the notice requirements even though the nature of an eviction has nothing to do with the nature of the tenant's personal property in the dwelling. Exhibit 1 (City Dep.), at 134. When asked for an explanation of why tenant holding over cases or breach of lease cases would be excluded from the notice requirements, the City could not provide an explanation. *Id*. at 137.

**C. The Final Product: The Abandonment Ordinance.**

The ordinance was signed by Mayor Sheila Dixon on August 14, 2007. See Signed Copy of Council Bill 07-0665 (attached hereto as Exhibit 11). The official version of the ordinance is the one signed by the City Council members, the City Council President, and the Mayor. Exhibit 1 (City Dep.), at 22. This version contains a purpose statement, which explains the overall purpose of the law. *Id*. at 24. The expressed purpose of the Ordinance is to, among other things, provide for:

(1) "disposition of certain eviction chattels"; (2) "a tenant's right to reclaim property within a certain period"; and (3) a process by which "unclaimed property is deemed abandoned under certain circumstances." Exhibit 11.

The City views this purpose statement as accurate. Exhibit 1 (City Dep.), at 58-59. It is not. The final version of the Eviction Chattels Law or Abandonment Ordinance does not actually address "eviction chattels," because there can be no such thing under the Abandonment Ordinance. Nor does the ordinance having anything to do with "unclaimed property" or a "tenant's right to reclaim property."

***Disposition of Eviction Chattels.*** Eviction Chattels is defined in § 8A-1 as "property removed from a leased dwelling under a warrant of restitution." Exhibit 11. Property is not considered "Eviction Chattel" until it has crossed the threshold. Exhibit 1 (City Dep.), at 28. That definition is consistent with State law. RP § 8–401(d)(1)(i). But under § 8A-4, all property is "abandoned" as soon as the landlord reestablishes possession over the leased premises. Exhibit 1 (City Dep.), at 123. That is accomplished instantaneously (before any of the tenant's property is removed) by changing the locks. *Id*. at 42, 118. So under the terms of the Abandonment Ordinance, there can never be "eviction chattels"—all of the tenants' belongings are transferred to the landlord before anything leaves the rental property.

***Tenant's Right to Reclaim.*** There is no dispute that the ordinance provides no right of reclamation.

***Unclaimed Property.*** The real purpose of the ordinance is not to deem "unclaimed property abandoned," but is to transfer possession and ownership of the

tenants' personal property to the landlord. Exhibit 1 (City Dep.), at 60. While Section 8A-4 is titled "Unclaimed property is abandoned," the provision itself does not deal with "unclaimed property." Nor does it pertain to "abandoned" property in any sense of that phrase. As the City has explained, the tenants' property is deemed abandoned only momentarily. *Id*. at 123. Possession, in the City's words, "shifts immediately over to the landlord at the execution of the warrant" and the tenant's belongings become, at that moment in time, "the property owner's property." *Id*. at 123-24. Abandonment, therefore, is a legal device intended by the City to transfer ownership of the tenants' property to the landlord—and to do so instantaneously. *Id*. at 44.

Said another way: the real purpose of the law is not to deem unclaimed property abandoned. Rather, it is to transfer ownership of property from A (the tenant) to B (the landlord). *Id*. at 44, 47. As soon as the landlord changes the locks on the dwelling, everything "in or about" the property becomes his property. *Id*. at 61. At that point in time, the landlord can do whatever he likes with the property, except place it on public property. *Id*. The landlord can take it to a pawn shop. *Id*. at 62. He can attempt to sell it back to the tenants. *Id*. If a landlord is owed back rent, he can hold onto the tenants' personal property and exchange it for the back rent owed (otherwise known as "distress for rent").[1] *Id*.

Although the City received numerous reports about the original Clean Streets Bill and letters from constituents, no hearings were held on the version of the bill

---

[1] In this respect, the Ordinance is inconsistent with Maryland Code, § 8-302 of the Real Property Article. That statute provides that "[d]istress for rent is an action at law and shall be brought as provided in this section."

created by the working group, which eventually become the Abandonment Ordinance. *Id*. at 156. And as shown by an erroneous publication by the Mayor's Office, there was deep confusion about the law the work group had in fact devised.

**D. The Erroneous Dixon Report.**

After Mayor Dixon signed the bill in August 2007, she released a report on her website praising the new ordinance. See September 28, 2007 E-mail from Ms. Howard to Mr. Nilson (attached hereto as Exhibit 12). The report indicated that the new law was enacted because under the former practice "Tenants are left with little chance to claim their belongings. . . ." *Id.* To bring dignity to the eviction process, the Mayor's Office believed that the new law would provide a "five-day advance notification and [would] have the opportunity to keep their belongings in covered storage for three days after the eviction for a modest cost." *Id.*

Mr. Nilson, who agreed to remove the reclamation provisions at the request of City landlords, promptly advised the Mayor's Office to rescind the erroneous notice. Exhibit 1 (City Dep.), at 146.

**III. Plaintiffs' Eviction**

Plaintiffs were residential tenants of a property belonging to Defendant Collins. *See* Affidavit of Plaintiff Todman (attached hereto as Exhibit 13), at ¶ 2. The property is located at 4214 Ridgewood Ave, 1st Floor, Baltimore, MD 21215 (the "Property"). *Id*. Defendant Collins is a "full time" landlord and manages and owns at least twelve residential rental properties in Baltimore City. Excerpts from the April 5, 2021 Deposition of Defendant Collins (attached hereto as Exhibit 14), at 7; Excerpts from the April 23, 2021 Deposition of Defendant Collins (attached hereto as Exhibit

15), at 36-37. Although under RP § 8-208(a)(1), "any landlord who offers 5 or more dwelling units for rent in the State may not rent a residential dwelling unit without using a written lease," Defendant Collins did not offer Plaintiffs a written lease for the Property. Exhibit 15 (4/23/21 Collins Dep.), at 39-40. Moreover, Defendant Collins did not hold the license required to rent the Property in Baltimore City. *Id*. at 42. The collection, acceptance or retention of rent for an unlicensed rental property in Baltimore City is a criminal misdemeanor. Article 13, §§ 5-4(a)(2) and 5-26 of the Baltimore City Code.

On May 13, 2019, Defendant Collins filed a tenant holding over action against Plaintiffs in the District Court of Maryland, Case No. 010100110942019 (the "Tenant Holding Over Action"). Plaintiffs were served in the Tenant Holding Over Action via posting on the Property, rather than in-person service. See Proof of Service in Tenant Holding Over Action (attached hereto as Exhibit 16).

A hearing was held in the Tenant Holding Over Action on July 2, 2019 (the "Hearing"). Transcript of July 2, 2019 Hearing in Tenant Holding Over Action (attached hereto as Exhibit 17). Despite having potential defenses to the Tenant Holding Over Action based on the prematurity[2] and staleness of the notice to quit, the lack of written lease and the lack of a rental license, Plaintiffs wanted to leave the Property. Plaintiffs explained to the judge that they needed to remain in their home until August 2, 2019. *Id.* at 7-8. Seeing grounds for a potential settlement, and recognizing that she was powerless to stay her judgment absent agreement, the

[2] Under RP § 8-208 (a)(2), a residential rental where there is no written lease is presumed to be for one full year, although it can be terminated with one month notice by the tenant.

Judge explored with Defendant Collins whether Defendant Collins would be willing to agree to a stay of any judgment to give Plaintiffs enough time to move out of their home. *Id.* at 10-15.

Defendant Collins expressed a concern about timing, worrying aloud that a stay of a judgment of possession until August 2, 2019 would delay his ability to schedule an eviction if Plaintiffs later refused to vacate by August 2, 2019. *Id.* at 10. The Judge then asked Defendant Collins if "hypothetically" in his experience, if he were to "file for an eviction" in two weeks, that the eviction would occur at least two weeks from that date. Defendant Collins responded "correct." *Id.* at 10-11. Accordingly, the Judge then asked Plaintiffs:

> So understanding that, would you -- understanding that what Mr. Collins has just agreed, if the stay of execution was for two weeks and the eviction would be scheduled for at least two weeks from that point -- so if I granted the consent judgment and I granted a stay of execution until July 16th and then if he had to file for an eviction, it still wouldn't be for at least another two weeks after that. That would still give you the four weeks. Would you still be consenting to a judgment understanding all of that?

*Id.* at 11. Plaintiff Todman—understanding that Plaintiffs would have sufficient time to move out of their home—replied "Yes, I would." *Id.* at 11. The Judge then asked Defendant Collins if he would agree. Defendant Collins continued to express concerns over timing. He stated that if he agreed to a stay until July 16, 2019, then an eviction could not be scheduled by August 2, 2019. He explained: "The way that the sheriffs have run it, if you push it out two weeks, it's not going to be August 2nd." *Id.* Eventually, Defendant Collins agreed to the proposed stay until July 16, 2019. *Id.* at 15. Accordingly, the Judge summarized to Plaintiff Todman:

> [M]y understanding is that Mr. Todman and Ms. Gattis are consenting to a judgment. And the stay of execution will be until the 16th of July at which point it would still take at least two weeks to -- at least -- and I wouldn't -- at least two weeks to schedule an eviction. Therefore, you would still have your full month before you would be able to do it. Is that correct?

*Id*. at 15. Plaintiff Todman again agreed. *Id*. At the conclusion of the Hearing, Defendant Collins had the following exchange with the Judge:

> MR. COLLINS: But on the 16th, I can actually file the warrant, correct?
>
> THE COURT: I think you should talk to the clerks about whether it's the 16th or the 17th.
>
> MR. COLLINS: I'll do it the 17th. Okay.
>
> THE COURT: All right.

*Id*. at 18.

Despite representing that he would petition for a warrant of restitution on July 17, 2019, Defendant Collins instead petitioned for warrant of restitution two days earlier, on July 15, 2019. See Petition for Warrant of Restitution in Tenant Holding Over Action (attached hereto as Exhibit 18). Defendant Collins filed his petition using Form DC-CV-081, District Court's state-wide form. The warrant of restitution issued on July 16, 2019. *Id*.

Typically, when the District Court issues a warrant of restitution, the clerk's office mails copies to the landlord and to the tenants by first class mail. The parties dispute whether Plaintiffs received a copy of the executed warrant of restitution. *See* Exhibit 13 (Todman Affidavit), at ¶ 6. For the purposes of this motion, Plaintiffs assume that this dispute is resolved in Defendants' favor.

The notice consists of the Petition of Warrant of Restitution on Form DC-CV-081 with the bottom portion, the Order, stamped as having been approved by a judge. *See* the Signed Petition for Warrant of Restitution on Form DC-CV-081 (attached hereto as Exhibit 19). The Order provides: "The Sheriff/Constable of this Court is ordered to deliver the premises to the Plaintiff (or the Plaintiff's agent or attorney) and, unless local law requires otherwise, to remove from the premises, by force if necessary, all property of the Defendant(s) and any other occupant." *Id*. There is also a box, entitled "Notice of Eviction." It states:

> The Court has ordered that you be evicted. If the property is in Baltimore City there are special procedures that apply. See the notice on the back of this form for the special procedures in Baltimore City and for general information related to evictions from properties that are not in Baltimore City. THERE WILL BE NO FURTHER NOTICE."

*Id*.

The back of the form, in fine print, then lays out certain information relating to evictions in Maryland. The top portion states in bold that it "DOES NOT APPLY TO BALTIMORE CITY." It indicates that "The Court has ordered enforcement of the judgment for possession which has been entered against you. This means that you can be forcibly removed from the premises at any time after the date of this order, **without warning!** THERE WILL BE NO FURTHER NOTICE." *Id*.

In contrast, the section of the form dealing with evictions occurring in Baltimore City does not warn that the eviction could happen any time after the date of the order without warning or further notice. Instead, it begins: "The landlord in a failure to pay rent case must provide notice to the tenant of the first scheduled

eviction date in two separate ways…." *Id*. The form goes on at length regarding the notice provisions for failure to pay rent cases. But it does not indicate that those notice provisions are inapplicable in other forms of eviction, such as tenant holding over cases. The form further states:

> **On eviction day any personal property left in or around the rental unit is considered abandoned.** When the sheriff the sheriff returns possession of the rental property to the landlord, any of the tenant's personal property left in or around the rental unit is considered abandoned. The tenant has no right to the property.

*Id*. (emphasis in form). This fine-print notice is the only warning that Defendants claim Plaintiffs had that their belongings would be deemed abandoned if they were not removed from the Property by the time of the eviction. There is no dispute that Plaintiffs were not provided the notices that Baltimore City requires be provided to tenants in failure to pay rent cases under Baltimore City Code Art. 13, § 8A-2 (B) before deeming their belongings abandoned at the time of the eviction. Exhibit 13 (Todman Affidavit), at ¶ 7.

After Defendant Collins filed the Petition for Warrant of Restitution two days earlier than he said he would, the eviction scheduling process moved faster than he had indicated at the Hearing. There is no dispute that Plaintiffs were not provided with any notice from the court or sheriffs that the eviction was being scheduled two days earlier than they had been told was possible at the Hearing. *Id*.

Defendant Collins claims, and Plaintiffs dispute, that on some date that Defendant Collins cannot recall after the eviction had been scheduled but before the eviction, while he was at the Property mowing the lawn, Defendant Collins saw

Plaintiff Todman and orally informed Plaintiff Todman that the eviction had been scheduled for July 31, 2019. Exhibit 14 (4/5/2021 Collins Dep.), at 222-235. Plaintiff Todman denies this conversation having had occurred. Exhibit 13 (Todman Affidavit), at ¶ 7. But, again, for the purposes of this motion that factual assertion must also be assumed to have been true. Defendant Collins maintains that this interaction ended with yelling. Exhibit 14 (4/5/2021 Collins Dep.), at 222-235.

On July 30, 2019, Plaintiff Todman reserved a moving truck for use on Thursday, August 1, 2019. July 30, 2019 Confirmation Email from UHaul to Plaintiff Todman (attached hereto as Exhibit 20). On the morning of Wednesday, July 31, 2019, Plaintiffs left their home to go to work as normal. Exhibit 13 (Todman Affidavit), at ¶ 10. Ms. Gattis' mother, Sheila Chaney, who had been living with Plaintiffs at the Property after she suffered a stroke, was at home at the Property. *Id*. Defendant Collins appeared at the Property with a Sheriff's deputy. *Id*. The deputy directed Ms. Chaney to leave the Property. Defendant Collins took possession of the Property and purportedly instantaneously acquired ownership over Ms. Chaney's and Plaintiffs' personal property that was "in or about" the Property. Defendant Collins then composed and sent the following text message to Plaintiff Todman:[3]

> They took pics of the bike today. Because as of this Morning everything in and on the property are my possession per Balt city law. They wanted the vin number so it can be traced if it's moved

[3] The text message exchange between Plaintiff Todman and Defendant Collins has numerous typographical errors. Rather than note each error or attempt to correct the error, Plaintiffs are quoting the text messages as written.

> without my permission. Even without a title it's officially mine until the balance owed to me is satisfied.

*See* Collection of Text Messages between Plaintiff Todman and Defendant Collins (attached hereto as Exhibit 21).

At 3:23 PM the same day, Plaintiff Todman wrote to Defendant Collins: "I'm waiting on a total I trying to get u ur money." *Id*. Defendant Collins responded at 5:30 PM that same day, in relevant part:

> I'm at 5800 that's what I need from u. Not going to argue . I just want what y'all cost me and that's not even the full amount but I'm willing to accept that if it can be done by Saturday.
>
> Please don't make this worse by going bk to / in the house or trying to steal the bike . They have the vin so it's attached now.
>
> Let me know something. I will have everything brought out of the house by my guys to the yard and you can get from there[.]

Plaintiff Todman responded by text message later that day. He inquired as to how Defendant Collins came up with the $5,800 figure. *Id*. Defendant Collins responded that same day by writing: "Let me know whn u will have 5800 cash before Saturday and we're done with each other as long as there are no more problems." *Id*.

On Friday, August 2, 2019, Plaintiff Todman texted Defendant Collins that he could not come up with $5,800 in a day, writing that he was just trying to pay Defendant Collins and get his belongings back. *Id*. Defendant Collins responded by text the same day, asking when Plaintiff Todman would have more money. *Id*. Plaintiff Todman responded the next day: "That's all I got I'm tapped out I trying to get my things and be done." *Id*. Defendant Collins responded in relevant part: "I'm willing to accept a payment today until you get the rest of it but I hve to have it today

. Let me know this morning because I'm losing money every day that stuff is on there." *Id*. Plaintiff Todman responded the next morning, August 3, 2019: "Look got 3100 that's all I have I'm trying to give you that and get my stuff. I can come up with no more I been trying." *Id*. Defendant Collins responded by asking how much more, between Plaintiffs and Ms. Chaney, Plaintiff Todman could come up with "this coming week" but also insisted on a payment that day. *Id*.

Unwilling to make a payment without a promise of the return of their belongings, Plaintiffs were ultimately unable to come up with the $5,800 demanded by Defendant Collins for the return of their belongings. Their communications ended on August 9, 2019 following a text message from Plaintiff Todman to Defendant Collins: "I need my belongings today if I owe u money we can figure that out on the back end but need my belongings." *Id*. Defendant Collins did not respond. Exhibit 13 (Todman Affidavit), at ¶ 12.

While it is true that the parties have a number of disputes regarding what belongings of Plaintiffs were still at the Property at the time of the eviction, there is no question that there were at least some of Plaintiffs' personal belongings at the Property at the time of the eviction and that Defendant Collins asserted ownership over them as a result of § 8A-4. For example, Defendant Collins agrees that there was a large, curved flat-screen television at the Property at the time of the eviction.[4]

---

[4] Defendant Collins claims that there was a break-in at the Property at some point after the eviction where that television and other items went missing. Exhibit 14 (4/5/2021 Collins Dep.), at 33-36. Defendant Collins speculates that Plaintiff Todman was responsible for that break-in, although he has no evidence to support that assertion other than an unsupported assertion that Plaintiff Todman allegedly has a reputation for similar actions. *Id*. Such

Exhibit 14 (4/5/2021 Collins Dep.), at 33. Further, in January of 2020, in response to this lawsuit, Defendant Collins returned various items to Plaintiffs, including Plaintiff Todman's motorcycle, some shoes, pots and pans and some dining room furniture. *See* Defendant Collins' Answers to First Set of Interrogatories (attached hereto as Exhibit 22).

Thus, there is no dispute that, as a result of § 8A-4, Plaintiffs were deprived of at least some of their belongings for at least five months. However, Plaintiffs will testify that they lost far more than that as a result of § 8A-4 and have been permanently deprived of the majority of their personal belongings, including expensive electronics and clothes and irreplaceable family heirlooms like the ashes of Plaintiff Gattis' great grandfather, original (and sole copies) of family photos, and the American flag presented to Plaintiff Gattis's family at her grandfather's funeral. Exhibit 13 (Todman Affidavit), at ¶ 13.

**Argument**

The City's ordinance, which deprives tenants of notice that their personal property is at risk and which deems their property to be abandoned without any opportunity to contest that presumption, violates the Due Process Clause of the Fourteenth Amendment in numerous respects. The Due Process Clause of the Fourteenth Amendment provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As

---

speculation is inadmissible conjecture. *Felty* v. *Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) ("[u]nsupported speculation is not sufficient to defeat a summary judgment motion").

Justice Blackmun stated for a unanimous Supreme Court, "[t]o put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982). That simple, but powerful, proposition dooms the City's ordinance.

### A. Plaintiffs Possessed a Property Interest in their Eviction Chattels.

There can be no question that Plaintiffs possessed a property interest in their belongings at the time of their eviction. At common law, landlords were required to keep a tenant's belongings safe after an eviction and make reasonable arrangements to allow a tenant to retrieve them, unless the landlord could meet the high burden of showing that the tenant's conduct manifested an intent to abandon the property. *Nickens* v. *Mount Vernon Realty Grp., LLC*, 429 Md. 53, 79, 54 A.3d 742, 758 (2012). Although statutory changes have modified those duties, the Court of Appeals of Maryland has nevertheless confirmed that a tenant retains a protected property interest in their belongings even through an eviction.

In *Nickens*, the Court explained that under the common law, a landlord evicting tenants had an obligation to take reasonable care with the tenant's belongings after an eviction, and can be sued for conversion if the belongings are not returned to the tenant. The Court confirmed that a tenant's personal property that was present in a home at the time of a post-foreclosure eviction was not automatically deemed abandoned, but required an analysis of whether "the owner of the personalty manifested an intent to walk away 'with no intention to again claim [the personalty]

or exercise' his rights of ownership over his personal property." *Id*. at 78, 54 A.3d at 757 (quoting *Steinbraker* v. *Crouse*, 169 Md. 453, 458, 182 A. 448, 450 (1936)). Accordingly, under common law, in the absence of such manifestation, "[d]isposition of the personalty found [in a home after an eviction] is also held to a standard of reasonableness, and those actors may be liable for the disposition of the personalty that is not accomplished in a reasonable way." *Id*. *Accord* 52A C.J.S. Landlord & Tenant § 749.

In Maryland, as in many states, this common law duty of a landlord has been supplanted by statute. The applicable statute provides that the tenants' belongings are to be removed from the premises at the time of the eviction. MD. CODE ANN., REAL PROP. § 8–401(d)(1)(i). But as the Court of Appeals recognized, under this statute, tenants do not lose their interest in any personal belongings left at their home after being evicted. *State* v. *Boone*, 284 Md. at 8, 393 A.2d at 1365 (a tenant who still has belongings in an apartment at the time of his eviction does not relinquish his possessory rights).

That is true, as best Plaintiffs can tell, of every other state in the nation. Thirty-four states have statutes requiring that tenants' belongings must be stored for a certain amount of time after an eviction and allowing the tenant to retrieve those belongings.[5] At least four more states and the District of Colombia still follow the

---

[5] See ALA. CODE § 35-9A-423 (14 days); ALASKA STAT. ANN. § 34.03.260(b) (at least 15 days); ARK. CODE ANN. § 18-60-310(c) (24 hours); ARIZ. REV. STAT. ANN. § 33-1370(F) (14 days); CAL. CIV. PRO. CODE §1174(e)-(f) (30 days); CONN. GEN. STAT. ANN. §47a-42(c) (stored in a publicly maintained storage facility for at least 15 days); DEL. CODE ANN., TIT. 25, § 5715(e) (7 days); HAW. REV. STAT. ANN. § 521-56 ("Before selling or donating such personalty,

common law.[6] Two additional states do not appear to have a statute or modern case law on the topic, but presumably follow the common law.[7] Finally, the remaining nine States, like Maryland generally, provide that a tenant's belongings are set out upon an eviction.[8]

---

the landlord shall make reasonable efforts to apprise the tenant ..."); IDAHO CODE ANN. § 6-316(2) (3 days); IND. CODE ANN. §§ 32-31-4-2 to 32-31-4-5 (landlord must obtain court order to remove tenants' belongings, and then belongings are moved to storage for at least 90 days); KAN. STAT. ANN. § 58-2565(d) (30 days); ME. STAT. TIT. 14, § 6013 (at least 7 days); MASS. GEN. LAWS ANN. CH. 239 § 4 (officer takes tenants' belongings to public storage, which must keep the belongings up to 6 months); MINN. STAT. ANN. § 504B.365 (60 days); MONT. CODE ANN. § 70-24-430 (at least 10 days); NEB. REV. STAT. ANN. § 69-2303 (at least 7 days); NEV. REV. STAT. Ann. § 118A.460 (30 days); N.J. STAT. ANN. §§ 2A:18-72 through 2A:18-84 (30 days); N.H. REV. STAT. ANN. § 540-A:3(VII) (7 days); N.M. STAT. ANN. §47-8-34.1(C) (3 days); N.C. GEN. STAT. ANN. § 42-36.2 (7 days); N.D. CENT. CODE ANN. § 47-16-30.1 (28 days); OKLA. STAT. tit. 41, § 130 (30 days); OR. REV. STAT. ANN. § 90.425 (15 days); 68 PA. STAT. ANN. § 250.505a (10 days from notice with ability for tenant to request an additional 30 days); 34 R.I. GEN. LAWS ANN. § 34-18-50 (belongings removed by sheriff can be recovered upon paying costs of moving them); S.D. CODIFIED LAWS § 43-32-26 (30 days); TENN. CODE ANN. § 29-15-124 (moved to public storage facility at option of tenant); UTAH CODE ANN. §§ 78B-6-812 (3)(b) and 78B-6-816 (at least 15 days); VT. STAT. ANN. tit. 12, § 4854a (15 days); WASH. REV. CODE ANN. § 59.18.312 (30 days); W. VA. CODE ANN. § 55-3A-3(h) (30 days); WIS. STAT. ANN. § 799.45 (moved to public storage or stored by landlord); WYO. STAT. ANN. § 1-21-1210 (7 days).

[6] DC - *Hinton v. Sealander Brokerage Co.*, 917 A.2d 95, 107 n.20 (D.C. 2007); IL - *Zissu* v. *IH2 Prop. Illinois, L.P.*, 157 F. Supp. 3d 797, 802 (N.D. Ill. 2016); MS - *Opperman* v. *Littlejohn*, 54 So. 77, 78 (Miss. 1911); MO - *Knight* v. *M.H. Siegfried Real Estate, Inc.*, 647 S.W.2d 811, 814 (Mo. Ct. App. 1982); NY - *Jo* v. *JPMC Specialty Mortg., LLC*, 131 F. Supp. 3d 53, 56-57 (W.D.N.Y. 2015).

[7] Kentucky and Michigan, but Michigan does have a 136-year-old case following the common law approach that still appears to be good law. *U. S. Mfg. Co.* v. *Stevens*, 17 N.W. 934, 936 (Mich. 1883).

[8] COLO. REV. STAT. ANN. § 13-40-122; FLA. ST. ANN.§ 83.62; GA. CODE ANN. § 44-7-55(c) (*see also Washington v. Harrison*, 682 S.E.2d 679, 683 (Ga. App. 2009) (landlord liable for conversion if landlord does not set out tenant's belongings); *Khan* v. *Heritage Prop. Mgmt.*, 584 N.W.2d 725, 730 (Iowa Ct. App. 1998); LA. CODE CIV. PROC. ANN. ART. 4734; *Ringler v. Sias*, 428 N.E.2d 869 (Ohio Ct. App. 1980); S.C. CODE ANN. § 27-40-710 (set out property must be left for at least 48 hours or until normal trash pickup, and notice of eviction must inform tenant of this); TEX. PROP. CODE ANN. § 24.0061 (officer has discretion to move belongings to a container and then dispose of them after a reasonable time is given to the tenant to retrieve them, otherwise belongings are set out); VA. CODE ANN. § 55.1-1255 (set out for at least 24 hours).

Thus, in Maryland generally, and the other 49 states and the District of Columbia, a landlord is not permitted to keep a tenant's belongings at the time of the eviction without any ability for the tenant to recover them. Accordingly, it is clear that tenants maintain a property interest in personal property even through an eviction. Baltimore City's unique approach results in the termination of tenants' property rights without due process.

### B. Baltimore City Deprived Plaintiffs of Their Property Interest in the Eviction Chattels Without Due Process.

Baltimore City cannot twist the concept of abandonment to forfeit personal property where no indicia of abandonment are present. Even if the City had that power, it cannot exercise it without giving tenants' *some* opportunity to contest the abandonment presumption. Particularly when there is no warning of when an eviction would occur, the effect of the Baltimore City ordinance that declares such property abandoned offends Due Process.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950) (citations omitted).

The Due Process Clause has been applied in similar situations to strike down attempts to declare property abandoned and forfeited, including by this Court. In *Associates Commercial Corp.* v. *Wood*, 22 F. Supp. 2d 502 (D. Md. 1998), this Court struck down a Maryland statute which provided that "any person on whose property

a totally inoperable vehicle more than 8 years old has remained for more than 48 hours without the consent of the owner of the property may transfer the vehicle for scrap without a certificate of title or notification." *Id*. at 504. This court reasoned that even if the vehicle could have been considered abandoned, "[a]bandoned property can be of considerable value regardless of its age and whether or not it is in operable condition," and thus, there is a "constitutionally protectable interest" in an abandoned vehicle. *Id.*

Because property owners retain a property interest in their vehicles, this Court explained, the next question is: what process is due. The answer is that the government must provide "notice and opportunity to be heard . . . 'before' the deprivation." *Id.* at 506 (quoting *Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1976)). Because Maryland's statute failed to provide either notice or a hearing, this Court found it to be unconstitutional.

In *Lavan* v. *City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), a group of homeless individuals alleged that the City of Los Angeles had seized and immediately destroyed their personal property that they'd left on public sidewalks. *Id*. at 1025. The Court of Appeals for the Ninth Circuit found that the City of Los Angeles had violated the plaintiffs' due process rights even though there was a local ordinance criminalizing leaving personal property on city streets and warnings were posted that unattended belongings would be destroyed. The court rejected the city's argument that because the property was left in violation of the ordinance, the City of Los Angeles could dispose of it without due process:

> The City demonstrates that it completely misunderstands the role of due process by its contrary suggestion that homeless persons instantly and permanently lose any protected property interest in their possessions by leaving them momentarily unattended in violation of a municipal ordinance. As the district court recognized, the logic of the City's suggestion would also allow it to seize and destroy cars parked in no-parking zones left momentarily unattended.

*Id.* at 1032. The court held that "[b]ecause homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment, the City must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them." *Id.* at 1032.

Finally, although the court did not reach a final determination of the constitutional question at the procedural stage of its opinion, the U.S. District Court for the District of Delaware directly addressed an eviction chattels matter in *Mombro* v. *Louis Capano & Sons, Inc.*, 526 F. Supp. 1237, 1241 (D. Del. 1981). The court addressed a Delaware statute that provided:

> If prior to or upon the tenant's removal (in the course of a summary repossession proceeding) from said premises, the tenant fails to remove his property or possessions, the landlord shall have the right to remove and store same at tenant's expense for up to a period of 30 days. If at the end of such period the tenant has failed to claim said property and to reimburse the landlord for the expense of removal and storage in a reasonable amount, such property shall be deemed abandoned and may be disposed of by the landlord without further notice or obligation to the tenant.

*Id.* at 1239. Although the court did not finally rule on the constitutionality of the statute, it did hold that the plaintiff's claims that the statute "provides constitutionally inadequate procedural safeguards is not insubstantial." *Id.* In particular, the court criticized the statute's lack of notice:

> Even without an affirmative misrepresentation by the landlord, the statute leaves open the possibility that a tenant may "abandon" property in the mistaken belief that his or her landlord will retain the goods until claimed. Nor would such a notice requirement appear to impede the objective of the statute; if anything, it would encourage tenants to remove their belongings more quickly, thereby freeing space for alternative use. Finally, procedures such as notice of the thirty day limitation on storage would not appear to impose a significant fiscal or administrative burden on the State, and would be very likely to prevent erroneous deprivations under Section 5715(d).

*Id.*

Thus, it is clear that the Due Process Clause requires notice before depriving renters of their belongings. While the City undertakes to warn some tenants facing eviction of the time of the eviction and its consequences, the failure to provide any notice before permanently terminating property rights of some renters (tenants holding over) is arbitrary and unconstitutional.

Contrary to Defendants' positions, the tenant holding over action itself does not provide that due process. The tenant holding over action is limited to the question of whether the landlord should be awarded possession of the premises, not all of his tenants' belongings. Indeed, as the judge in that action made clear at the outset, there are only four relevant issues in any tenant holding over action: "if the landlord had at some point been in possession of the premises, so it is his actual property; if a lease has fully expired; if proper notice has been given; and, four, if a person or people in actual possession of the premises refuse to quit the premises." Exhibit 17 (Hearing), at 4. Anything else is necessarily off-limits. As such, nothing about Plaintiffs' personal property was even mentioned during the proceeding. *Id.*

The limited scope of the Hearing, and *in rem* tenant holding over actions, is highlighted by the fact that Plaintiffs were not even personally served in the tenant holding over action, and instead were simply served by posting on the Property. Exhibit 16. The reason that this kind of service is permissible is that tenant holding over actions are limited to the question of whether a warrant of restitution should issue. MD. CODE ANN., REAL PROP. § 8-402 (b)(1)(ii). It is only where there is personal service that a court may award damages against a residential tenant. MD. CODE ANN., REAL PROP. § 8-402 (a)(3)(ii). Accordingly, it is clear that the Hearing and the tenant holding over action in this case only addressed the restitution of the Property, and did not extend to the ownership of the belongings in the Property.

In sum, "[t]o put it as plainly as possible, the State [or local government] may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982). The limited scope of a tenant holding over action does not provide that opportunity for tenants in Baltimore City. Something more is required before the City acts to destroy tenants' property interests. Because the City has failed to provide that opportunity, its ordinance violates the Fourteenth Amendment to the United States Constitution.

**C. The City's Failure to Provide Post-Deprivation Hearing Also Violates Due Process.**

In addition to the City's failure to require notice of an eviction, notice of the threat of deprivation of all of a tenant's personal belongings, and a pre-deprivation hearing to contest the presumption of abandonment, the City has also violated the

Fourteenth Amendment by failing to provide for a post-deprivation hearing to challenge the abandonment presumption.

"The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions." *Fuentes* v. *Shevin*, 407 U.S. 67, 80–81 (1972). The purpose of that right "is to protect [the individual's] use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property, a danger that is especially great when the State seizes goods simply upon the application of and for the benefit of a private party." *Id.* The right derives from our constitutional value that "we place on a person's right to enjoy what is his, free of governmental interference." *Id.*

As discussed at length, the City presumes all possessions to be abandoned without any opportunity to contest that presumption. The presumption applies to property that no person would ever conclude has been abandoned: tickets for an upcoming performance of Hamilton; a book with a bookmark in it; car keys to a new car parked in the garage (not to mention the car itself); cash or an uncashed check for child support; prescription medication for an ongoing condition; dentures. Indeed, the City's ordinance is limitless in its offensiveness. If a neighborhood child leaves her bike in or near the garage of a family facing eviction, she would lose her bike at the moment the landlord changed the locks. Indeed, that same child would lose her family dog if the dog happened to be "in or about" the premises at that fateful moment.

In these circumstances, it's difficult to imagine the landlord even bothering to contest the evidence that tenants or third parties intended to give up their property interests. Yet because the City deprives tenants and third parties of due process, the landlord is unjustly enriched and tenants face the greatest imaginable governmental interference with the right to enjoy what is theirs. While pre-deprivation notice and an opportunity to be heard are required, so is a post-deprivation hearing. Given the interests at stake, property owners are entitled to some ability to claim what is theirs both *before* and *after* the City acts to destroy all of their property interests in conceivably everything they own. In short, a legislative presumption of abandonment without the slightest opportunity to challenge that presumption violates due process.

### D. The City's Ordinance Also Violates The Due Process Clause's Incorporation of the Fourth Amendment Right to be Free of Unreasonable Seizures.

In addition to providing procedural due process rights, the Due Process Clause of the Fourteenth Amendment also incorporates the Fourth Amendment's guarantee of freedom from unreasonable seizures. *Torres* v. *Madrid*, 141 S. Ct. 989, 997 (2021); *Wolf* v. *People of the State of Colo.*, 338 U.S. 25, 27–28 (1949); *Mapp* v. *Ohio*, 367 U.S. 643 (1961). Although less well known, the Fourth Amendment applies in the civil context and serves as an additional bulwark for the protection of individual property rights. *Soldal* v. *Cook Cty., Ill.*, 506 U.S. 56, 67 (1992).

The Supreme Court has explained that the Fourth Amendment applies independently to protect against searches and seizures of property. *United States* v. *Jacobsen*, 466 U.S. 109, 113 (1984). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."

*Id*. As the Court has explained, "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal*, 506 U.S. at 68.

In addition to finding a due process violation in *Lavan*, the Ninth Circuit held that the practice by Los Angeles's ordinance authorizing destruction of belongings left on streets by the homeless constituted an unreasonable seizure under the Fourth Amendment. The Court explained that even the seizure of unattended belongings left on a city street was subject to the Fourth Amendment's reasonableness requirement. *Lavan*, 693 F.3d at 1029. The Court found that the City's seizure was unreasonable and upheld the district court's injunction requiring that any seized property be held for a period of 90 days.

The destruction of Plaintiffs' property interests in this case is similarly unreasonable. Through the ordinance, the City destroys tenants' entire bundle of rights by deeming "abandoned" any private property "in or about the leased premises at the time that the warrant of restitution is executed." Baltimore City Code art. 13, § 8A-4(a). In Maryland, as elsewhere, "[t]he rule of law with respect to abandoned property is simple. Property is abandoned when the owner walks off and leaves it with no intention to again claim it or exercise rights of ownership over it[.]" *Steinbraker* v. *Crouse*, 169 Md. 453, 458, 182 A. 448, 450 (1936).

There is no dispute in this case that Plaintiffs, or tenants in general, do not abandon property by leaving items on real property which they no longer occupy. To the extent there is any dispute about this concept, it is settled by *111 Scherr Lane,*

*LLC* v. *Triangle General Contracting, Inc.*, 233 Md. App. 214, 236, 163 A.3d 248, 261 (2017) (confirming that personal property left on real property is not deemed abandoned at common law). Particularly in the absence of the type of notice required in tenant holding over cases, which prominently warns on two occasions when the eviction will occur and the consequences of the eviction, § 8A-4's blanket, irrebuttable and unchallengeable deeming of property to be "abandoned" without any of the typical indicia of abandonment is plainly unreasonable.

The City's only justification for the destruction of tenants' property interests is a concern that a landlord might dispose of the tenants' property by placing that property on public property.

Yet the solution for the problem of landlords throwing their tenants' property onto City streets is to prevent landlords from throwing property onto City streets. In fact, the City has done just that. Article 13 § 8A-6 prohibits anyone, including tenants and landlords, from placing personal property in "a public right-of-way or on any public property." And even if the City hadn't already addressed the problem of tenants' property being thrown onto public property, the reasonable answer is not to punish tenants by depriving them of everything they own and unjustly enriching landlords.

Even assuming, as must be done at this procedural posture, that Plaintiffs received the Form DC-CV-081 that was mailed by the Court and were then informed, through a screaming match, by Defendant Collins that the eviction would occur sooner than anticipated, that is insufficient to render the destruction of all of their

property interest "reasonable." Form DC-CV-081 does not sufficiently warn lay-persons of the peril to their property. The relevant warning is buried in fine-print on the back of the notice. Non-lawyer tenants are unlikely to understand the significance of the "failure to pay rent" qualification in the fine print that provides the notice requirements for an eviction in those types of cases. Indeed, Baltimore City's own requirements for failure to pay rent cases require much more prominent, and repeated, warnings of the consequences of the eviction and when it will occur.

The fine print is insufficient to provide meaningful notice to tenants that they stand to forfeit all personal property at the moment of eviction. Nowhere on Form DC-CV-081 is there an explanation that the City designed a process by which all of the tenant's personal property instantaneously transfers to the possession of the landlord. Rather, the form language is reasonably construed as a warning not to inadvertently leave stray items behind. It does not even hint at the real design of the ordinance.

As for the purported notice of the date of the eviction, the reasonableness of the City ordinance irrefutably deeming the items forfeited cannot hinge on a hope that perhaps landlords will voluntarily warn tenants of the eviction dates. There is no evidence that Defendant Collins informed anyone associated with any governmental entity of his purported warning prior to the destruction of Plaintiffs' property interests. So this disputed fact cannot save the ordinance.

And if an enterprising tenant were to consult the ordinance itself, the tenant would gain no more insight into the actual process. The ordinance appears to apply

to property removed from the premises and deems "unclaimed property" to be abandoned. The purpose statement—which again the City continues to endorse—indicates that tenant has a right of reclamation. None of that is accurate.

Nor does the form or the ordinance warn tenants that landlords may hold their property hostage for ransom. And nothing in the ordinance or the form is intended to give notice to third parties that their property too is at risk of becoming the landlord's property.

In short, the ordinance fails the Fourth Amendment's reasonableness requirement incorporated by the Fourteenth Amendment.

**E. The City's Ordinance Also Violates Substantive Due Process.**

The City's ordinance, which deemed Plaintiffs' belongings abandoned and forfeited without notice of when the eviction would occur or its consequences also constitutes the type of arbitrary government action prohibited by substantive due process. As Chief Justice Chase explained more than 200 years ago, the Constitution prohibits certain fundamental deprivations by legislatures, including "a law that takes property from A. and gives it to B." *Calder* v. *Bull*, 3 U.S. 386, 388 (1798)

"The touchstone of due process is protection of the individual against arbitrary action of government." *Meachum* v. *Fano*, 427 U.S. 215, 226 (1976); *County of Sacramento* v. *Lewis*, 523 U.S. 833, 845–46 (1998). When government action is so lacking in justification that it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense," *Collins* v. *City of Harker Heights* , 503 U.S. 115, 128 (1992), it violates the Due Process Clause.

As discussed in more detail in above, the City's ordinance is arbitrary and conscience shocking because of the incredibly harsh and unnecessary result—final termination of property rights without recourse for the tenant—employed in an apparent attempt to prevent inconvenience to landlords. The "solution" arrived at by the City is to trample on tenants' property rights in a manner that is "conscience shocking" and inconsistent with basic expectations of fairness. In short, a city does not have the power to destroy one party's property interests to benefit a segment of the business community.

The City can articulate no rational basis for exempting certain kinds of eviction from the notice requirements in failure to pay rent cases. Nor is there any rational relationship between protecting against landlords' from improperly placing eviction chattels on public property and effecting an instantaneous transfer of all property "in or about" the leased dwelling to the landlord. Indeed, the ordinance is so expansive as to apply to any property left in the common areas of an entire apartment complex at the time of the eviction of one tenant. Exhibit 1 (City Dep.), at 50.

The City cannot articulate a persuasive justification for the ordinance. Instead, the City's blatant overreach leaps off the page. Its abandonment presumption applies to *any* property, not just property that is at risk of being thrown into the street or hindering the landlord from re-renting a place. An "abandoned" flat screen TV, for instance, makes a place easier to rent, not more difficult. An "abandoned" Range Rover parked in the garage might then be parked on the street (now that the landlord has taken possession of it) but was never at risk of being "thrown into the street." The

irony of course is that had Defendant Collins placed Plaintiffs' belongings on the sidewalk, Plaintiffs would have had some ability to maintain their possession over them. But by operation of the City's ordinance, they were deprived of all possessory rights. For these reasons, the City's ordinance is not rationally related to a legitimate public purpose and even if it was, there is no rational relationship between the means and the end.

**Conclusion**

For the reasons stated, Plaintiffs respectfully request that this Court grant their motion for partial summary judgment as to the invalidity of Baltimore City Code Art. 13, § 8A-4 under the Due Process Clause of the Fourteenth Amendment.

Dated: May 28, 2021
Baltimore, Maryland

Respectfully submitted,

*/s/ Joseph S. Mack*
Joseph S. Mack
(D. Md. Bar No. 29021)
THE LAW OFFICES OF JOSEPH S. MACK
PO Box 65066
Baltimore, MD 21209
(443) 423-0464
joseph@macklawonline.com

*/s/ Conor B. O'Croinin*
Conor B. O'Croinin
(D. Md. Bar No. 28099)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 332-0444
cocroinin@zuckerman.com

Ariella E. Muller
(Admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th Floor

New York, NY 10022-5871
(212) 704-9600
amuller@zuckerman.com
*Attorneys for Plaintiffs Marshall Todman, Jr. and Tiffany Gattis*