**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| **MARSHALL TODMAN**, *et al*., | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | )   **Civil Action No.: 19-cv-3296-GLR** |
| **MAYOR AND CITY COUNCIL** | ) |
| **OF BALTIMORE**, *et al*., | ) |
| | ) |
| **Defendants.** | ) |

**DEFENDANT MAYOR AND CITY COUNCIL
OF BALTIMORE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' PARTIAL MOTION
FOR SUMMARY JUDGMENT**

Defendant, Mayor and City Council of Baltimore (the "City"), through undersigned

counsel, submits this Memorandum of Law in support of its Motion for Summary Judgment and

Opposition to Plaintiffs' Partial Motion for Summary Judgment [ECF 94].

Respectfully submitted,

JAMES L. SHEA (00142)
City Solicitor

*/s/ Renita L. Collins*
_____
RENITA L. COLLINS (28637)
Chief Solicitor
BALTIMORE CITY LAW DEPARTMENT
100 N. Holliday Street
City Hall Baltimore, MD 21202
Phone: 410-396-3930
Fax: 410-547-1025
Renita.Collins@baltimorecity.gov
*Counsel for Defendant Mayor and City
Council of Baltimore*

# TABLE OF CONTENTS

I.      Introduction………………………………………………………………...1

II.     Statement of Facts……………………………………………………………2

III.    Legal Standard……………………………………………………………....24

IV.     Argument………………………………………………………………...24

      A.      Section 8A-4 Does Not Violate Plaintiffs' Fourth Amendment Right To Be Free Of Unreasonable Seizures…………………………………………...24

      B.      Plaintiffs' Procedural Due Process Claims Fail As A Matter Of Law Because They Failed to Exhaust Their State Court Remedies…………………………26

      C.      Plaintiffs Were Afforded Procedural Due Process……………………………28

      D.      Section 8A-4 Does Not Violate Substantive Due Process………………..…33

V.      Conclusion…………………………………………………………………35

## I.       INTRODUCTION

This case arises out of a constitutional challenge filed pursuant to 28 U.S.C. § 1983, seeking monetary damages and the invalidation of a nearly 14-year-old ordinance passed by the Mayor and City Council of Baltimore.  Balt. City, Md. Hous. and Urban Renewal Code, art. 13 [City Housing Code], § 8A-1, *et seq*. (hereinafter, the "Eviction Chattel Law"). Specifically, Plaintiffs are challenging a provision in the law that deals with the disposition of personal property that remains in or around a dwelling after a judicially ordered eviction.  In bringing this action, Plaintiffs are seeking to restrict one of the most powerful rights of any state or local government— its police power to protect the general welfare.

The concept of "the general welfare" is as broad as the ethos that defines our nation.  "The values it represents are spiritual as well as physical, aesthetic as well as monetary," and "[i]t is within the power of the [government] to determine that the community should be beautiful as well as healthy, spacious as well as clean, well balanced as well as carefully protected."  *See Berman v. Parker*, 348 U.S. 26, 33 (1954) (citations omitted).  However, in landlord-tenant law, the general welfare goals of a legislature are complicated by competing, and some may argue, conflicting property interests of both the landlords and tenants.  These competing interests are those of tenants, who have been judicially ordered to vacate a property, and those of their landlords, who own the premises and to whom the court has returned rightful possession of their real property, regarding the personal property of the tenants that remains therein.  In Maryland, this entire process occurs against the backdrop of a State statute that requires, under certain circumstances, that actual possession of the real property be immediately transferred back to landlords where the tenants

have been in wrongful possession of that property in violation of the law and after months of notice and judicial process have occurred, *e.g.*, in holdover tenant and breach of lease actions.[1]

The case at bar is the perfect illustration of a local government utilizing its discretion and all the human capital available to it to accomplish its goals of promoting the general health and welfare of all citizens while balancing the property interests of landlords and tenants.

Throughout this litigation, Plaintiffs have sought to demonize and penalize everyone involved in this process from the landlord, to the City, to local interest groups, when the ultimate responsibility for Plaintiffs' actions (or inaction, as was the case here) and decisions rests with them. They even partially survived motions to dismiss filed against them with their baseless and unsupported claims. However, discovery has now concluded and the truth is clear: Plaintiffs were afforded ample notice and due process in state court and elected to ignore both. It was not until their own actions caused them temporary loss of access to their property that the finger pointing began and they ran to this federal court seeking damages under 28 U.S.C. §1983. As detailed below, Plaintiffs' property rights were properly adjudicated in state court and this new attempt to seek relief in Federal Court should be rejected.

## II.   STATEMENT OF FACTS

### A.   Evicted Tenant Property Before the Eviction Chattel Law

The tension between the possessory property rights of landlords and tenants is not new and has been an ongoing issue in the City of Baltimore, like most municipalities, for decades. One constant issue that results from this tension is the disposition of a tenant's personal property left in the dwelling after the landlord has judicially obtained the right to retake possession of the real

---

[1] Plaintiffs are not challenging the validity or constitutionality of the Maryland Real Property Article the governs landlord-tenant matters.

property; the resolution too often was for the landlords to simply dump the evicted tenant's private property in nearby streets or alleyways.[2]  The City of Baltimore sought to address this issue in a number of ways to no avail.  In 1991, City ordinance 91-951 modified the Baltimore City Code to allow tenants to store their property with the Department of Public Works ("DPW").  *See* Declaration of Records Custodian attached hereto and incorporated herein as Exhibit 1 and the Department of Public Works Legislative Report for City Council Bill 07-0665, attached thereto as Exhibit A ("DPW Report").  DPW even inventoried, collected, and transported the belongings to a DPW-operated yard for the tenants.  *See id*.

This imposed a significant cost to the City, as it bore the entire expense to transport, store, and ultimately dispose of this now abandoned property; however, it did little to address the issue. *See id.* and Deposition of Jason Hessler, attached hereto and incorporated herein, in pertinent part, as Exhibit 2, 91-93.  On average, less than one percent of former tenants requested storage and few reclaimed their possessions from the City; meanwhile landlords continued to dump their former tenant's property onto the streets.  *See* DPW Report at 1.  DPW was responsible for collecting and disposing of this orphaned tenant property as well, at the City's expense.

In fiscal years 2005 and 2006, the years immediately preceding the passage of the City ordinance under attack in this case, there were an average of 7,033 evictions requiring DPW to collect a total of 5,775 tons of orphaned tenant property from the streets, at an average cost to the City of **$823,243.50** per year.

---

[2] *A System in Collapse:  Baltimore City suffers from an overwhelmingly high caseload of tenant evictions.  Hurt in the process are tenants, landlords, the City of Baltimore and its neighborhoods*.  (The Abell Report, Baltimore, MD), March 2003. https://abell.org/sites/default/files/publications/arn303.pdf (last accessed June 27, 2021).  The Abell Report mainly relates to failure to pay rent actions, but its commentary on the disposal of tenant property is instructive.

In most cases, by the time the sheriff arrives to effectuate the evictions, "the tenants are gone…[m]any times they have removed the belongings they want and only left behind things they no longer need."[3]

### B.    A City-Wide Problem, A City-Wide Solution

In light of these facts, the City Council introduced Bill 07-0665.  After an introductory draft, the Baltimore City Law Department began working with local tenant, community, and landlord organizations to propose amendments agreed upon by these groups (the "Work Group"). *See* Declaration of Records Custodian at, Exhibit 1 at Exhibit B, Hearing Notes 07-0665, June 19, 2007.   This diverse group included representatives from prominent tenants' rights groups, including *inter alia*, the Abell Foundation,[4] the Citizens Planning and Housing Association ("CPHA"),[5] the Community Law Center,[6] and the Public Justice Center ("PJC"), and other community advocates.[7]  Landlord advocacy groups like the Maryland Multi-Housing Association, Inc. ("MMHA") and the Property Owners Association of Greater Baltimore ("POA"), also participated.[8]  *See id.*  Members of the Work Group collaborated over bill amendments, met over a series of months, and testified before the public and City Council subcommittees.  *Id.*

---

[3] Laura Vozzella, *In Baltimore, Evictions Are Quick, Common*, Baltimore Sun, October 19, 2003. https://www.baltimoresun.com/news/bs-xpm-2003-10-19-0310190081-story.html (last accessed June 29, 2021).
[4] https://abell.org/brief-history (last accessed June 27, 2021).  The Abell Foundation is a private foundation that focuses on systemic social, economic, and environmental challenges encountered by those living in poverty.  *See, id.*
[5] https://www.cphabaltimore.org/what-we-do/ (last accessed June 27, 2021).  The CPHA assists local citizens with a number of projects including, *inter alia*, providing assistance to tenants and advocating on their behalf through policy research and legislative pressure.  *See, id.*
[6] https://communitylaw.org/about-clc/mission-vision-values/ (last accessed June 27, 2021).  The Community Law Center is a non-profit law firm that partners with neighborhood-led organizations and small nonprofits in Maryland.
[7] https://www.publicjustice.org/en/what-we-do/ (last accessed June 27, 2021).  The PJC, inter alia, "challenges oppressive practices and policies through legal advocacy."  *Id.*  This includes work on behalf of tenants.  *Id.*
[8] https://www.mmhaonline.org/ and https://www.baltimorereia.com/poa/ (last accessed June 27, 2021).  The MMHA will file an amicus curiae brief in this matter.

The meetings of the Work Group were public record and their work sessions were also made available to the public.  *See* Declaration of Records Custodian at, Exhibit 1 at Exhibit C, Work Session Notes 07-0665, June 26, 2007.   The members of the Work Group provided comments on bill drafts and each had the power to advocate for their respective positions on all aspects of the proposed bill.  *See* Ex. 2, 157-158.

The Baltimore City Council introduced the Eviction Chattel legislation with amendments at City Council meetings that were open to the public.[9]  *See* Bill 07-0665 Legislation Details, attached hereto and incorporated herein as Exhibit 3.  The bill received an initial introduction, a first reading at a City Council meeting, Committee Consideration, a Public Hearing Schedule, Committee Consideration after proposed amendments were included, a second reading,[10] and finally a third reading.  *See* Baltimore City Council Legislative Process, attached hereto and incorporated herein as Exhibit 4.[11]  This process was published and open to the public—any person who opposed the proposed Work Group amendments could have voiced their concerns to the City Council prior to the law's passage.  Nearly a month elapsed between the addition of the Work Group amendments and bill's final passage; the City's bill file does not note any opposition to the bill as amended.  *See* Exhibit 3.

On or about August 14, 2007, then-Mayor Sheila Dixon signed the bill into law as part of her "Clean Streets" initiative.  It was incorporated into City Housing Code, § 8A-1, *et seq*.  The law was a great step forward for the City, but not unique.  Local governments of similar population size to the City, like Baltimore County and Prince George's County, have enacted laws strikingly

---

[9] The Bill 07-0665 Legislation Details are publicly available
https://baltimore.legistar.com/LegislationDetail.aspx?ID=2175575&GUID=1153923C-CDAA-4367-944B-E5817B6E956E&Options=ID|Text|&Search=07-0665 (last accessed June 27, 2021).
[10] The second reading actions are detailed on July 16, 2007.
[11] The Baltimore City Council Legislative Process is publicly available
https://www.baltimorecitycouncil.com/legislative-process (last accessed June 27, 2021).

5

similar to that of the City. *See* Baltimore County, Md. Code § 35-3-103 (2021)[12] and Prince George's County, Md. Code § 13-164 (2021).[13] And, unlike the statutes cited in Plaintiffs' motion, they buttress the Maryland Real Property article, as does the City's statute.

Plaintiffs spend a great deal of time in their motion combing through the emails and personal correspondence of landlord representatives in an attempt to find "gotcha" content about a benign, normal legislative process. *See* Plaintiffs' Motion for Summary Judgment at p. 6-8. However, they cannot dispute the fact that the final version of this law was properly considered, voted on, and passed by the City Council in an open and constitutionally-permissible manner.

---

[12] Baltimore County, Md., Code § 35-3-103 states:

§ 35-3-103. - PLACEMENT OF PERSONAL PROPERTY IN CASE OF EVICTION.
(a)   *In general.*
(1)   A designated authority executing a warrant of restitution shall place the property of the tenant that has been removed from the leased premises:
      (i)   On the landlord's property; and
      (ii)   1.   In a place designated by the landlord; or
          2.   If no place is designated by the landlord, in a place as near as possible to the leased premises.
(2)   The property of the tenant may not be placed on a public highway, a public right-of-way, or public property.
(3)   Property removed from the leased premises in accordance with a properly issued warrant of restitution shall be considered abandoned.
(b)   *Mobile home or trailer.*
(1)   When the tenant's property to be removed is a mobile home or a trailer as defined under § 8A-101 of the Real Property Article of the Annotated Code of Maryland, the landlord may direct the property to remain at its existing location.
(2)   The mobile home or trailer may not be placed on a county highway or right-of-way or on any public property other than a land disposal site.
(3)   The landlord shall post the mobile home or trailer as evicted property while it remains on the landlord's property.
(c)   *Penalty.* A person who violates this section is subject to a civil penalty of $1,000.

[13] Prince George's County, Md., Code § 13-164 provides:

Sec. 13-164. - Evictions; Placement of abandoned property.
(a)   After a warrant of restitution is executed, the landlord shall dispose of the property of a tenant. In no event may any of the tenant's property be placed on a public right-of-way or on any public property. Any property removed from the leased premises pursuant to a properly issued warrant of restitution shall be deemed abandoned.
(b)   If the tenant or the tenants' agent is present at the time the warrant of restitution is executed, the tenant shall be permitted to salvage and transport the tenant's property removed from the leased premises, after the warrant of restitution is executed, for a reasonable period of time, not to exceed four hours.
(c)   This section shall not apply to County owned property.

Former City Solicitor George Nilson was not a City Council member, nor was any other member of the Law Department, landlord advocacy group, or the Work Group.[14]  Their opinions about the law have no bearing on the ordinance's constitutionality and validity—only the votes cast by City Council members matter.  And there is no evidence in this record that the City Council was unduly influenced by anyone.  All evidence indicates the City Council passed this law to advance the City's goals, with input from representatives from *all* interested groups, including those who advocate for tenants like Plaintiffs.  Plaintiffs' attempts to "highlight" the hopes and wishes of advocacy groups, which, like anyone, are permitted to make their views on legislation known to City officials, actually places a spotlight on the desperation of the Plaintiffs[15] while utterly failing to show any misconduct on the part of the City Council.

Accordingly, as the City Council created and amended the ordinance, and as per the ordinance's legislative history, the purpose of the Eviction Chattel Law is "providing for the disposition of certain eviction chattels, requiring certain notice prior to execution of a warrant of restitution; providing for a tenant's right to reclaim property with a certain period, prohibiting the placement of eviction chattels in certain public ways; defining certain terms; imposing certain penalties; and generally relating to the removal and disposition of property from leased dwellings."  As detailed below, the ordinance rationally promotes the objectives of the City—personal emails by and between non-members of the City Council will not and cannot change that.

---

[14] Plaintiffs also reference some e-mail correspondence from Housing Authority of Baltimore City ("HABC") general counsel Jan C. Goslee.  It is important to note that the HABC is not a City agency.  Instead it is a public body corporate politic, separate and distinct from the City, established by the Maryland General Assembly pursuant to MD. CODE ANN., HOUS. & CMTY. DEV. §12-201.

[15] Plaintiffs also appear to be concerned that a member of the Work Group asked that an erroneous Mayor's report about the new ordinance be taken down.  *See* Plaintiffs' Motion, p. 10.  To the extent comment is required on that matter, the City sees nothing improper about a member of the public requesting that erroneous information about laws affecting City residents not be disseminated to the public.  That the Plaintiffs would be opposed to this is shocking.

C.      **The Aftermath – Success.**

The public reaction to the law was immediate and positive, including kudos from tenant advocates.  The Abell Foundation published a statement praising the PJC and CPHA for their work on the legislation.[16]  John Nethercut, Executive Director of the Public Justice Center said at the time, "[t]he Clean Streets bill was an historic compromise between landlords, tenants, communities, and the city…[i]t represents the power of building coalitions between interest groups that often do not work together."[17]  Dan Pontious of the CPHA said "[a]lready we can see that this new policy has been a relief to neighborhoods across Baltimore…[w]hile we need to be vigilant in enforcing the law, Mayor Dixon and the entire city council should be proud of enacting an ordinance that brings greater dignity and cleaner streets to Baltimore City."[18]  The City, PJC, and other Work Group members then worked with District Court judges, clerks, and the sheriff's office to ensure compliance and educate tenants and landlords about their rights and responsibilities under the new ordinance.[19]  As will be detailed below, this includes the amendment of District Court Orders to reflect the change in the law and provide notice to tenants about their rights and responsibilities regarding the same, including the disposition of their personal property after an eviction.

**In the nearly fourteen (14) years since the Eviction Chattel Law was enacted, the City has noted no complaints, concerns, or grievances that were directed to it about the law in general or the provision Plaintiffs now challenge.**  *See* Exhibit 2, 147-148.

D.      **The Eviction Chattel Law**

---

[16] *Abell Salutes:  The Public Justice Center (PJC) and Citizens Planning and Housing Association (CPHA) Eviction Reform Initiative*  https://abell.org/publications/abell-salutes-public-justice-center-pjc-and-citizens-planning-and-housing-association (last accessed June 27, 2021).
[17] *Id.*
[18] *Id.*
[19] *Id.*

The Eviction Chattel Law ("ECL"), or City Housing Code, § 8A-1, *et seq*., governs several issues related to the disposition of tenant property after a judicially-ordered residential eviction. It governs "Eviction chattels," which are "property removed from a leased dwelling under a warrant of restitution." § 8A-1(b). A "warrant of restitution" is the eviction order issued by the District Court of Maryland and executed by the sheriff to allow a landlord to take possession of a dwelling from an evicted tenant. *See Hall v. Greystar Management Services, LP*, 28 F.Supp.3d 490, 492 (D. Md. 2014) and Md. Code Ann., Real Prop.. ["RP"], § 8-216(b)(2) (2019). It also governs other property left in a dwelling that has yet to be removed. *See* ECL § 8A-4. The ordinance was enacted to, *inter alia*, prevent the property of former tenants from being thrown onto the streets and alleyways of the City after an eviction proceeding and provide landlords, who obtained the legal right to possess their properties, the ability regain full possession and to re-lease those dwellings in a timely and efficient manner after an eviction. It dictates the rights and responsibilities of both the landlord and tenant *vis-a-vis* property left in a dwelling after the warrant of restitution is executed by the sheriff. *Id*. § 8A-4. Specifically, it defines when and how personal property left in a dwelling after an eviction is determined to be abandoned and the landlord's duties regarding that property. *Id*. §§ 8A-4 - 8A-6. It prohibits landlords from simply dumping the property onto the street and instead forces them to dispose of the property by transporting it to a landfill, donating it to charity, or by some other legal means. *Id*. § 8A-5. It also imposes penalties on any person, including landlords, who violate the ordinance's provisions related to the disposal of eviction chattel. *Id*. § 8A-9.

Importantly, the law absolves the City from the position and expense of removing, storing, or disposing of the personal property and places those responsibilities solely with the landlord—

saving the City nearly a million dollars a year and placing the burden and expense on the business who reaped the financial reward of the tenancy in the first place—the landlord.

Plaintiffs' challenge focuses on two aspects of the law:  § 8A-2(a)(2) and § 8A-4.  *See* Amended Complaint, *passim*.  [ECF 26].  Generally, § 8A-2(a)-(b) require that once the District Court[20] has entered a judgment in favor of the landlord for possession of the dwelling, the landlord notifies the tenant of the date the warrant of restitution will be executed by the sheriff.  However, pursuant to § 8A-2(a)(2), there are exceptions to this notice requirement for classes of landlord tenant judgments including, *inter alia*, tenant holding over and breach of lease actions filed under RP §§ 8-402 and 8-402.1, respectively.  Specifically, under State law, absent a motion to stay the enforcement of the judgment or an appeal, it is required that the landlord be placed back in actual possession of its property upon entry of the judgment.  No delay is permissible.

In their motion, Plaintiffs present the false narrative that the ordinance somehow transfers ownership of the personal property to the landlord.  *See* Plaintiffs' Motion, p. 9.  Nothing could be further from the truth.  No such language in the ordinance states as much, and it is not true in practice either.  In fact, the deposition transcript of the City's designee witness explains the disposition of the abandoned property clearly.  Jason Hessler from the City Department of Housing and Community Development testified as follows:

> Q:  I got it.  Okay.
>      And how does the landlord take possession of the personal property or the tenant's property or whatever property might be in the leased dwelling?
>
> A:      At that point, when the sheriff determines the eviction has occurred and they've taken control of the leased property, the remaining personal property of the tenant is abandoned.

---

[20]Here, the term "District Court" means the District Court of Maryland which has exclusive original jurisdiction over landlord tenant disputes issues under Maryland law.  *See* MD. CODE ANN., CRTS. & JUD. PROC. ART. § 4-401 (2010).

> …
>
> Q:    So I'm trying to understand how the transfer of possession goes from the tenant to the landlord.  So let me try to ask a clearer question there.
>
> You said the landlord changes the locks on the leased dwelling in order to retake possession of the leased dwelling.  All right?   How does the possession of the contents of the leased dwelling transfer from A, the tenant, to B, the landlord?
>
> A:    By possessions still being there at the time of the execution of the warrant of restitution.

*See* Exhibit 2, 43-44.  Therefore, Plaintiffs' representation about the City's response is incorrect.  At no time did the City testify nor does it claim that the subject ordinance transfers ownership of an evicted tenant's possession.  Its designee simply stated the logical conclusion that once the landlord is in lawful possession of the dwelling, s/he is also in possession (but not ownership) of the abandoned property contained therein.  Plaintiffs' conjecture to the contrary cannot change the facts.

Plaintiffs claim that the ordinance is inconsistent with RP § 8-302 related to distress rent actions.  *See* Plaintiffs' Motion, p. 9.  However, that law only relates to tenant property.  Under the subject City ordinance, the landlord would be selling *abandoned* property.

### E.    Maryland Landlord-Tenant Possessory Actions

Misstatements of the applicable law and facts are repeated throughout Plaintiffs' Motion for Summary Judgment.  Plaintiffs' attempt to explain possessory actions under State law is a perfect example.  On page 4 of their motion, Plaintiffs make the false claim that "[a]ll evictions in Maryland are subject to Maryland Code § 8-401(d) of the Real Property Article." Instead of taking the position that this was an intentional misrepresentation to the tribunal, the City will assume Plaintiffs are simply misinformed about landlord-tenant possessory actions in this state.

11

In truth, there are three main means of repossessing rented property from tenants in this state. Contrary to Plaintiffs' assertion, RP § 8-401, *et seq.* only relates to failure to pay rent actions—this is made clear in RP § 8-401(a). In addition, RP § 8-402, *et seq.* governs tenant holding over actions and RP § 8-402.1, *et seq.* governs breach of lease actions. The distinction and Plaintiffs' misstatement are important because of these three, *only* failure to pay Rent actions filed under RP § 8-401 offers the tenant the right of redemption, *i.e.*, the ability to remain in the real property despite a judgment for possession being entered against the tenant. The tenant retains this right up to and including the moment before the sheriff arrives to effectuate the eviction. *See* RP § 8-401(e)(1). In failure to pay rent actions, it is imperative that the tenant be given advance notice of when the sheriff will arrive as they have the option to redeem the property, *i.e.*, "pay and stay." Thus, because of this State law requirement, § 8A-2(a)-(b) of the subject City ordinance requires that these tenants be afforded advance notice of the eviction date to allow for redemption of the dwelling. This distinction is also addressed in Subtitle 9 of the Code of Public Local Laws of Baltimore City ("BC LL"). BC LL §§ 9-2 through 9-7 related to the tenant's right of redemption are exclusively for failure to pay rent actions.

However, the same provisions are not applicable to tenant holding over and breach of lease defendants in actions filed under RP § 8-402 and RP § 8-402.1. There, the tenant has no right of redemption and must vacate the landlord's property voluntarily after a judgment is entered or upon eviction. *See, e.g.*, RP § 8-402(b)(2)(i) ("the court shall thereupon give judgment for the restitution of the possession of said premises and shall **forthwith** issue its warrant to the sheriff or a constable in the respective counties commanding the tenant or person in possession **forthwith** to deliver to

the landlord possession thereof…") (emphasis added).[21]  Therefore, any local ordinance requiring the landlord to provide a reclamation period or advise the tenant of some future date of when the sheriff could arrive conflicts with the state law that requires the landlord be placed back in the immediate possession of his/her real property.  There is no need to provide notification of the eviction date because the holdover tenant has no right to redeem the real property and has been ordered to vacate the same.  Without the imposition of a stay, the landlord could and should be placed back in possession of his property shortly after the hearing.

Pursuant to State law, the only way a tenant holding over is not required to give the landlord immediate possession of the real property after entry of judgment is if an appeal and bond are filed pursuant to RP § 8-402(b)(2)(iii) or the District Court judge elects to stay enforcement of the judgment.  However, the tenant must vacate once the stay period expires by operation of law or when the appeal is resolved.

Another important distinction between these three types of actions is that in both tenant holding over and breach of lease actions, the landlord is required to give the tenant advance written notice that the landlord desires to regain possession of the leased property before filing suit.  *See* RP § 8-402(b)(1)(ii) and RP § 8-402.1(a)(1)(i).[22]  Under Subtitle 9 of the Code of Public Local Laws of Baltimore City, a landlord must provide a tenant with sixty (60) days advance notice before filing an action in District Court.  *See* BC LL §§ 9-12, 9-14.  "Such notice, without any additional notice, shall entitle the landlord to the benefit of law providing for the speedy recovery of the possession of lands or tenements held over by tenants."  *See* BC LL § 9-19.

---

[21] "Forthwith" is defined as "without any delay" or "immediately."  https://www.merriam-webster.com/dictionary/forthwith (last accessed June 27, 2021).

[22] Plaintiffs' citation to RP § 8-401(d)(1)(i) at p. 5 is also puzzling as that provision too only relates to failure to pay rent actions.  There is no evidence in the record or plausible reason that a Tenant Holding Over or Breach of Lease landlord would "comply" with that provision when it has no relation to their action.

The same is not true for failure to pay rent actions where the landlord may file a District Court action immediately upon the nonpayment of rent.  *See* RP § 8-401(a).  Thus, hold over tenants in Baltimore City have been provided with at least two months' notice of the landlord's desire that they vacate the leased premises with their possessions and that they refuse to leave before the landlord can file a District Court action.  By the date of judgment, they have had months to prepare to vacate the subject property.

F.      **Plaintiffs' Tenancy and Eviction**

1.      Plaintiffs' Property Rental.

Plaintiffs are Marshall Todman[23] and his longtime girlfriend Tiffany Gattis.  *See* Amended Complaint, *passim*.  Mr. Todman is employed at FedEx; he formerly was employed at the University of Maryland.  *See* Deposition of Tiffany Gattis, attached hereto and incorporated herein as Exhibit 5, 54.  *See also* Deposition of Marshall Todman, attached hereto and incorporated herein as Exhibit 6. 7, 11.  Ms. Gattis earned an Associate's degree in nursing and worked for several years as a nurse.[24]  Ex. 5, 9-12.  Subsequently, she worked in the fraud division of Bank of America's corporate office.  Ex. 5, 201.  Therefore, both Plaintiffs are learned people.

Further, Ms. Gattis is no stranger to evictions and the process that surrounds them.  During her deposition, she admitted that she was evicted from an apartment complex in Wicomico County, Maryland.  Ex. 5, 201, 206.  She also testified that she could not answer the question of exactly

---

[23] Pursuant to Fed. R. Civ. Pro. 56(c) the City objects to the Affidavit of Marshall Todman filed as Exhibit 13 to Plaintiffs' Motion [ECF 94].  In it Mr. Todman purports to testify about information and experiences within the knowledge of Ms. Tiffany Gattis at paragraphs 7, 8, 10, and 13.  The testimony is inadmissible speculation and potentially hearsay.  It must be stricken.  *See Larkin v. Perkins*, 22 Fed.Appx.114, 115 (4th Cir. 2001)(affirming a District Court's determination that a "self-serving affidavit containing conclusory assertions and unsubstantiated speculation" was "insufficient to stave off summary judgment").

[24] Ultimately, Ms. Gattis nursing license was revoked after accusations of medication diversion.  See Exhibit 5, 13-16.
http://lookup.mbon.org/verification/%2Fpublicorders%2Fgattis.tiffany%2Clp46494.defaultorder.revocation.feb.22.2017.websiteorder.pdf (last accessed June 28, 2021).

14

how many times she had been evicted in the past nor could she remember why she was evicted. Ex. 5, 202-205, 211, 215-216.  Although she was raised in Wicomico County, she also claimed not to know where Dorchester and Caroline Counties were located.  However, she admits to having relied on her past eviction history in this case.  *Id.* at 48.  Mr. Todman claims he does not remember if he had ever been evicted before.  Ex. 6, 24.

Against this backdrop, in the summer of 2017, Plaintiffs desired to rent a property in the Baltimore area and approached Defendant Brock Collins ("Collins" or the "landlord").  Ex. 6, 30-31.  Initially, the couple executed a written lease with Mr. Collins for a condo in Baltimore County in July 2017.  Ex. 6, 34-37.  The lease was for a one-year term.  *Id.*  However, shortly thereafter, Ms. Gattis desired to move to another property owned by Mr. Collins because she preferred the kitchen in that property.  Ex. 6, 41.  The new property was a single family dwelling located at 4214 Ridgewood Road, First Floor, Baltimore, Maryland  (the "Property").[25]  Ex. 6, 26.  Plaintiffs abandoned their one-year written lease; however, the terms of their tenancy at the Property were the same as the old except there the rent was raised by $50 per month.  Ex. 6, 44.  According to Mr. Todman, he expected the changes to the tenancy to simply include the new rental address and updated payment amount.  *Id.* at 42-43.  The deposit the Plaintiffs paid for the Baltimore County condo transferred for their tenancy at the Property.  *Id.* at 44.  Therefore, at the very least, the Plaintiffs had a month-to-month tenancy for the Property or a continuation of their prior one-year lease term.

### 2.  Notice to Quit and Refusal to Vacate.

---

[25] Plaintiffs only rented the first floor of the Property.  Their living space consisted of one bedroom, one bathroom, a kitchen, and a living room.  *See* Ex. 5, 151-153.  It is in this area that Plaintiffs claim they maintained two 65-inch televisions and two 55-inch televisions.  See Ex. 6, 122-124.

Beginning in the fall of 2018, Mr. Collins requested that the Plaintiffs vacate the Property; Plaintiffs originally agreed to move, but reneged on that promise.  *See* First Deposition of Brock Collins, attached hereto and incorporated herein in pertinent part as Exhibit 7, 105 and Ex. 8, 54-55.  The situation grew tense when on Sunday, September 9, 2018, Ms. Gattis sent Mr. Collins a text that read "[s]ince u want to be nasty…bring me a court order…I am NOT the one… and I never paid your ass late… and know that I have pics of EVERYTHING…"  *See* Plaintiffs' Responses to Request for Admissions to the First and Second Set of Requests for Admissions From Defendant Mayor and City Council of Baltimore, attached hereto and incorporated herein in pertinent part as Exhibit 9 at TODMAN10069-10070.

On or about September 12, 2018, Defendant Collins served Plaintiffs with a "Landlord's Notice to Vacate" (the "Notice to Vacate").  *See* Ex. 9, 107 and Plaintiffs' Responses to the Requests for Admissions from Defendant Collins (Todman Responses), attached hereto and incorporated herein as Exhibit 10, at Collins Bates 15.  Pursuant to the Notice to Vacate, the Plaintiffs' had a month-to-month tenancy with Mr. Collins.  *See, id*.  Further, Mr. Collins requested that Plaintiffs vacate the Property over two months later--by November 30, 2018.  However, Plaintiffs continued with their refusal to vacate the Property.  *See* Ex. 9, Responses to Requests 7-9 and Ex. 7, 105.

Therefore, on or about May 13, 2019, Mr. Collins filed a tenant holding over action pursuant to RP § 8-402 against Plaintiffs in the District Court of Maryland for Baltimore City under case number 010100110942019 (the "Eviction Case").  *See* Court Docket for the Eviction Case, attached hereto and incorporated herein as Exhibit 11 and Ex. 9 at TODMAN 10010-10011, 10016.  A court hearing was scheduled for July 2, 2019.  *Id*.

　　　3.  <u>Tenant Holding Over Hearing</u>

16

On July 2, 2019, the Plaintiffs and Mr. Collins appeared before District Court of Maryland Judge Catherine Chen for a tenant holding over hearing.  *See* Possession of Real Property/Rent Escrow Docket attached hereto and incorporated herein as Exhibit 12 and Ex. 9 at TODMAN 10012.  Pursuant to the court records, all parties appeared on that date and entered into a judgment by consent.  *See id*.  Judge Chen entered judgment in favor of Mr. Collins for possession of the Property but stayed the enforcement of her judgment until July 16, 2019.  *Id*.  Judge Chen also ordered that if Plaintiffs wished to appeal her judgment, they were required to post bond in the amount of $2,500.  *Id*.

Although Plaintiffs requested to remain in the Property until August 2, 2019, Judge Chen did not grant their request and affirmed that she was only willing to stay the execution of her judgment until July 16, 2019; however, she did warn Plaintiffs that the sheriff would probably arrive within two weeks of that date to execute the warrant of restitution.  Judge Chen said "[m]y understanding is that **[Plaintiffs] are consenting to a judgment and a stay of execution will be until the 16th day of July**, at which point it would still take at least two weeks to schedule an eviction[,] therefore you would be evicted, is that correct?"  Amended Complaint ("Compl.") ¶29 (emphasis added).  Plaintiffs and Mr. Collins agreed.  *Id*.  Mr. Collins asked the judge when he should file for the warrant of restitution and the judge directed him to the clerk's office.  Compl. ¶ 30.

Judge Chen's order is confirmed not only by her handwritten and signed Possession of Real Property/Rent Escrow Docket form,  *see* Exhibit 12 and Ex. 9 at TODMAN 10012, but also by the clerk's entry of the judgment onto the docket.  *See* Exhibit 11 and Ex. 9 at TODMAN 10010.  *See* Maryland Rule 3-601 (judicial orders are official when entry is made onto the electronic docket).  Therefore, as a result of the Eviction Hearing, Plaintiffs were ordered to return possession of the

17

Property to Mr. Collins and the stay of their requirement to do so expired on July 16, 2019. Plaintiffs did not appeal Judge Chen's judgment order.  *See* Ex. 10, Response 3.

Thereafter, on July 16, 2019, Judge Joan B. Gordon of the District Court of Maryland For Baltimore City entered an order for a warrant of restitution in the Eviction Case.  *See* Ex. 9 at TODMAN 10010, 10014 and Ex. 11.  Pursuant to that order, "[t]he judgment of possession may not be redeemed."  In short, Judge Gordon confirmed RP § 8-402(b)(2).  Although Plaintiffs both now claim they were unaware the stay would be lifted on July 16, 2019, the court record is clear. *See* Ex. 6, 70-71 and Ex. 5, 43.

In their Motion for Summary Judgment, Plaintiffs appear to argue that somehow the timing of Mr. Collins' filing of the Petition for Warrant of Restitution affected the timing of their eviction. However, Plaintiffs admitted under oath they did not know if any action by Mr. Collins violated Judge Chen's order or affected the eviction.  *See* Ex. 6, 175-176 and Ex. 5, 42-43. And, indeed the record is devoid of any evidence that the date when Mr. Collins filed his petition affected the eviction proceedings.  In the end, Plaintiffs were not evicted until over two weeks after the stay was lifted—just as Judge Chen warned them on July 2, 2019.

> 4.  The Notice – The Court Order

According to the docket in the Eviction Case, the clerk mailed Plaintiffs the warrant of restitution on July 17, 2019 via first-class mail to their address of record at the Property.  *See* Ex. 9 at TODMAN 10010-10011 and Ex. 11.  *See also* Maryland Rule 1-324.  The record is devoid of any evidence that the warrant of restitution was returned as undeliverable by the U.S. Postal Service.  *See id*.  By that point, the stay had expired along with any alleged time limit Plaintiffs claim was placed on Mr. Collins' petition filing.  Two days later, around the time when the mail carrying the notice would have arrived, Ms. Gattis began to send angry text messages to Mr.

Collins.  *See* Ex. 9, at TODMAN10070 and Ex. 5. 174-177, 187-188, 257-258.  When asked why she was angry, Ms. Gattis claimed not to know.  *See, id*.  Prior to the morning of July 19, 2019, Ms. Gattis had not sent Mr. Collins a text message since she demanded he "bring [her] a court order."  The only logical conclusion to draw is that Ms. Gattis was "angry" at Mr. Collins because she received the warrant of restitution mailed by the court two days earlier.

In Maryland, warrant of restitution orders are issued on form DC-CV-081.[26]  DC-CV-081 is a carbonless multi-part form of which there are two slightly different versions:  one version is maintained in the court file, sent to the landlord, and the sheriff, and posted on the property at the time of the eviction and another that is mailed to the defendant tenants by the District Court clerk.  *See id*.  The one mailed to tenants is unique because it provides Baltimore City tenants subject to eviction with conspicuous notice on the front and back pages about their eviction and the ramifications thereof, *i.e.*, it notifies them about the ECL.  The other version only includes the notice on the back.  However, that version too provides notice about the ECL and the potential effect of the abandonment provisions contained therein.  The front of the mailed form includes the warning:

> **NOTICE OF EVICTION**
>
> The Court has ordered that you be evicted.  If the property is in Baltimore City there are special procedures that apply. See the notice on the back of this form for the special procedures in Baltimore City and for general information related to evictions from properties that are not in Baltimore City.
>
> **THERE WILL BE NO FURTHER NOTICE**

Further, the back of each version contains this conspicuous notice:

---

[26] https://www.courts.state.md.us/sites/default/files/court-forms/district/forms/civil/dccv081np.pdf/dccv081np.pdf (last accessed June 28, 2021).

**BALTIMORE CITY ONLY**
**IMPORTANT NOTICE TO DEFENDANTS**

The landlord in a failure to pay rent case, must provide notice to the tenant of the first scheduled eviction date in two separate ways:
• Mail notice to the tenant by first-class mail with a certificate of mailing at least 14 days in advance of the first scheduled eviction date; and
• **Post the notice on the premises at least 7 days** in advance of the first scheduled eviction date.
• The day of mailing or posting is Day 1. Day 14 must be no later than the day before the scheduled date of eviction. Count holidays and weekends.

The tenant may challenge whether the notices were properly given. If the tenant challenges the notices or if the sheriff has doubt that the notices were properly given, the sheriff will refer the issue to the judge for decision. If the judge determines that the landlord did not comply with the notice requirements, the eviction will be vacated/cancelled and the landlord will be required to apply for a new Warrant of Restitution.

If the notice challenge is determined in the landlord's favor, the sheriff will execute the eviction immediately.

The landlord is <u>strictly prohibited</u> from putting the abandoned property in the street, the sidewalk, alleys, or on any public property. Anyone who illegally dumps abandoned property from an eviction is guilty of a misdemeanor, subject to a penalty of up to $1,000 for each day of unlawful dumping. The landlord may dispose of the abandoned property by transporting it to a licensed landfill or solid waste facility, donating it to charity, or some other lawful means.

**On eviction day any personal property left in or around the rental unit is considered abandoned.** When the sheriff returns possession of the rental property to the landlord, any of the tenant's personal property left in or around the rental unit is considered abandoned. The tenant has no right to the property.

In their Motion for Summary Judgment, Plaintiffs argue that these notices constitute "fine print." *See* Plaintiffs' Motion, p. 15. Nothing could be further from the truth. The notice includes a box, bold faced type, and capitalized letters. The notification about the effects of the ECL abandonment language are in bold. "**On eviction day any personal property left in or around the rental unit is considered abandoned.**" There is nothing "fine" about this print.

For a tenant holding over or breach of lease defendant, this is and should be their final warning to vacate the landlord's property or risk having their private property considered abandoned. Pursuant to State law, they no longer have the right to be present in the dwelling and neither do their belongings. *See* RP § 8-402(b)(2)(i). In fact, they are trespassers and have been for some time. *See Donnelly Advertising Corporation of Maryland v. Flaccomio*, 216 Md. 113, 127-28, 140 A.2d 165, 171-72 (1958)("[b]y operation of law, the tenant holding over became a trespasser, in the sense of being wrongfully in possession…regardless of the wishes of the tenant.") *See also* 2 *Friedman on Leases* § 18:4 at 18-40 (5th ed. 2006)("Under common law rule, if a tenant remains in possession of leased quarters, after the expiration of the term and without agreement with the landlord, landlord may elect to treat him either as a trespasser, and begin proceedings

against him, or treat the tenant as having commenced a new tenancy").   Here, Mr. Collins expressed his clear intention to treat Plaintiffs as trespassers by serving them with a Notice to Vacate, filing the Tenant Holding Over action against them, and filing the Petition for Warrant of Restitution.

Although Plaintiffs now claim that they did not receive the court-mailed warrant of restitution with the applicable notice provisions, it is undisputed that Mr. Collins found the mailed defendant tenant's version of the warrant in the Property after the eviction, in an open envelope, on the top of the refrigerator.  *See* Ex. 8, 31-36.  A true and correct copy of the warrant of restitution that Mr. Collins found in the Property when he took possession is attached hereto and incorporated herein as Exhibit 14.  Mr. Collins attempted to return the warrant back to Plaintiffs in January 2020, but they refused to accept the document along with other items of personal property.  *See* Ex. 8, 33-35.  Mr. Collins produced the notice in discovery.

Therefore, there can be no dispute that Plaintiffs received actual notice of the Eviction Chattel law and its abandonment provisions; **the notice was discovered in the Property** at or near the time the sheriff arrived.  Plaintiffs received the notice after the expiration of Judge Chen's stay order.   Nevertheless, Plaintiffs still refused to vacate the Property or remove their personal property.

Finally, the City would be remiss if it did not make the Court aware the Plaintiffs have yet again misrepresented the law and facts in their Motion for Summary Judgment.  At page 11, Plaintiffs claim that Defendant Brock Collins ("Collins"), the landlord in this matter, improperly failed to provide the tenants with a written lease pursuant to RP § 8-208(a)(1) because he offered "five or more dwelling units for rent in the State" and City Housing Code §§ 5-4(a)(2) and 5-26 because he rented property without a required license.  First, there is no evidence in the record that

21

Mr. Collins offered five or more dwelling units for rent while the Plaintiffs were his tenants.  At his deposition, Mr. Collins testified that although he owned several properties, he could not identify which, if any, he offered for rent at any given time.  *See* Ex. 8 at 36-39.  Further, Mr. Collins testified he does possess a license for his other Baltimore rental properties.  *See* Exhibit 8, 42.  Plaintiffs' obfuscations of the facts and law applicable to this case are becoming a pattern.

5.  <u>The Notice – Mr. Collins with Witnesses</u>

In addition to receiving notice from the court about the risk of abandonment should the Plaintiffs continue to unlawfully remain in the Property, Plaintiffs also received notice from the landlord.  In July, after the court-ordered warrant of restitution was mailed to and received by Plaintiffs, Mr. Collins verbally notified Mr. Todman the eviction was scheduled for July 31, 2019 for between 9 am and 11 am.  *See* Ex. 7, 222-230.  Further, two non-party witnesses were present at that time and have submitted affidavits attesting that **Mr. Collins gave Mr. Todman advance notice of the eviction, including the time and date**.  *See* Affidavits of Hayes A. Gaines and Armand Bailey attached hereto and incorporated herein as Exhibits 14-15.  Both eyewitnesses state that Mr. Todman retorted to Mr. Collins that he would be out of the Property before the sheriff arrived on July 31, 2019.  *See id*.  Thus, before the eviction, the landlord and courts provided notice of the eviction and the potential abandonment ramifications if they continued with their refusal to remove their possessions from the Property.  Plaintiffs concede this point by stating they assume this dispute will be resolved in "Defendants' favor."  *See* Plaintiffs' Motion, p. 13.

Finally, Plaintiffs appear to place great emphasis on the fact that Mr. Todman reserved a U-Haul truck on July 30, 2019.  Plaintiffs' Motion, p. 17.  Mr. Todman's decision to wait to rent a U-Haul until two weeks after the stay was lifted and after the court sent notice of the eviction does not make the City's ordinance any more or less constitutional.  To the extent that Mr. Todman

22

was under the mistaken belief about when he should move from the Property, that does not and cannot contravene the actual notice he received and the State and local laws applicable to evictions.

   6. <u>The Eviction</u>

  Mr. Collins' notification to Mr. Todman was correct.  On the morning of July 31, 2019, a member of the Baltimore City Sheriff's Department arrived with Mr. Collins to effectuate the eviction.[27]  *See* Ex. 7, 36-37.  Contrary to Plaintiffs' assertions, Mr. Collins claims their items were not "packed in neat boxes."  *Id*.  He described the condition of the Property as "damaged."  *Id*.  According to Mr. Collins, the Property "stank to the high heavens.  It was dirty.  They had bags of trash, um, with like old food and flies."  *See* Ex. 8, 13.

  After the eviction, Plaintiffs returned to the Property.  Although at least one big ticket item, Mr. Todman's motorcycle, was located outside the Property and available for him to retrieve, he refused to do so.  *See* Ex. 6, 253.  When asked why he did not take his motorcycle when it was ready and available to him, Mr. Todman could not provide an answer.  *Id*.  On the day of the eviction, Plaintiffs moved into their new apartment at no additional expense to them.  *See* Ex. 6, 259-60.

  Subsequently, in August 2019, Mr. Collins returned certain items of personal property back to the Plaintiffs at the request of Mr. Todman.  *See* Ex. 8, 15-17.  At that time, Mr. Todman remarked that the rest of the items in the Property were "trash."  *Id*.  Mr. Todman's disposition about his property changed after he filed suit.  After Plaintiffs filed this action, and again at their request, in January 2020 Mr. Collins made the remainder of the contents of the Property available

---

[27] When acting in this capacity, the members of the sheriff's department are acting as agents of the state.  *See, e.g.*, MD. CODE ANN., ST. FIN. & PROC. ART. § 9-108 (2019)(stating that when sheriffs serve process or perform other non-law enforcement functions the State provides them with legal representation and insurance coverage).

to Plaintiffs through an intermediary.  *Id.*  Contrary to Plaintiffs' inferences, Mr. Collins did not

collect money in exchange for returning the Plaintiffs' items.  Ex. 6, 213.

Although Plaintiffs now claim that several high dollar electronics and household items

were not returned to them, at the time of their depositions they could not provide proof of purchase

for these items or describe the same with any specificity.  *See* Ex. 6, 261-62 and Ex. 5, 236-38.

### III.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides, "The court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  To qualify as a "genuine" dispute, the

evidence must be "such that a reasonable jury could return a verdict for the nonmoving

party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "Although the court must

draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on

more than conclusory allegations, mere speculation, the building of one inference upon another,

or the mere existence of a scintilla of evidence."  *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir.

2013) (citing *Anderson*, 477 U.S. at 252).

### IV.    ARGUMENT

#### A.  § 8A-4 Did Not Violate Plaintiffs' Fourth Amendment Right To Be Free of Unreasonable Seizures.

In Plaintiffs' Motion for Summary Judgment they argue for the first time that § 8A-4

violated Amendment IV of the U.S. Constitution.  The claim is absent from their initial Complaint,

Amended Complaint, and any motion they have filed in this matter.  However, if the argument

looks familiar it should be, as this new argument is simply a rehash of the Fifth Amendment takings

claim that this court has now twice rejected.  *See* 488 F.Supp.3d 218, 227-28 (D. Md. 2020) and

2020 WL 7866718, at *1-2 (D. Md. Oct. 22, 2020).  It should be rejected for the same reason.

Specifically, no City actor participated in the alleged "seizure," just as none participated in the alleged "taking."

Plaintiffs concede that it is "less well known" that the Fourth Amendment can apply in the civil context.  This is so because the Fourth Amendment cases cited by Plaintiffs and indeed those the City was able to find in its own research involve a government actor conducting the "seizure." *See Torres v. Madrid*, 141 S. Ct. 989, 997 (2021) (plaintiff shot by police); *Wolf v. People of State of Colo.*, 338 U.S. 25 (1949), *overruled by Mapp v. Ohio*, 367 U.S. 643 (1949)(search and seizure conducted by police); *Mapp v. Ohio*, 367 U.S. 643 (1949) (same); *U.S. v. Jacobsen*, 466 U.S. 109 (1984) (police search for drugs); *Lavan v. City of Los Angeles*, 693 F.3d 1022 (2012) (police department and bureau of street services conducted seizure).

Only *Soldal v. Cook Cty., Ill.*, 506 U.S. 56 (1992) even mentions the presence of private actors and that case involved sheriffs assisting an illegal eviction.  *Compare, e.g., Cofield v. Randolph County Com'n*, 90 F.3d 468 (11th Cir. 1996) (*Soldal* not applicable to cases involving legal evictions) and *U.S. v. Leffall*, 82 F.3d 343, 347 (10th Cir. 1996) (government agent must be direct participant in search and seizure for 4th Amendment claim).  Importantly, no case cited by Plaintiffs involves the enforcement of a legally-valid court order or enforcement of an ordinance.

Plaintiffs cannot rely on the common law definition of "abandonment" to save their claim. In upholding a Baltimore County ordinance nearly identical to § 8A-4, Judge Bredar rejected this same argument and ruled that if the statutory language is clear, as here, "the Court must give it a 'reasonable interpretation.'"  *Hall v. Greystar Management Services, LP*, 28 F.Supp.3d 490, 494 (D. Md. 2014).  Thus, when the plain text of an ordinance provides that in the eviction context, property "shall be considered abandoned" under certain circumstances and those circumstances

are met the statutory provision leaves no room for an exception where a tenant "expresses an 'intention to again claim it or exercise rights of ownership over it.'" *Id.* (citations omitted).

For the remainder of Plaintiffs' Fourth Amendment argument they cherry pick parts of the court-issued notice found amongst their belongings and aspects of the subject ordinance by suggesting "better" or "different" language. *See* Plaintiff's Motion, p. 31-33. The Fourth Circuit has long held that it is not permissible to "legislate from the bench" by adding or changing provisions of a law. *See M.L. Leiman v. Smith*, 867 F.3d 487, 498 (4th Cir. 2017) (suggesting or adding statutory language is a function of the legislature, not the judiciary) and *U.S. v. Luskin*, 926 F.2d 372, 376 (4th Cir. 1991) (same). *See also*, *Henson v. Santander Consumer USA, Inc*., 137 S.Ct. 1718 (2017) (the proper role of the judiciary is to "apply, not amend, the work of the People's representatives."). If Plaintiffs wish to change the wording of the subject ordinance or the notice found in their possession, they need to seek redress with the Baltimore City Council, not this Court.

As it stands, § 8A-4 rationally advances a legitimate City interest of placing landlords back in actual possession of their real property and to have full use and enjoyment of that property with the immediacy that State law requires for holdover tenant actions. Tenants, like Plaintiffs, who receive notice about the laws governing this process and ignore them should not be allowed to upend this goal.

Because § 8A-4 does not involve any seizure or taking of any property by the City of Baltimore—there are no Fourth Amendment implications.

## B. Plaintiffs' Procedural Due Process Claim Fails As A Matter of Law Because They Failed to Exhaust Their State Court Remedies.

Plaintiffs' Amended Complaint seeks monetary recovery under 28 U.S.C. §1983 for an alleged procedural due process violation. *See* Amended Complaint, *passim*. However, it is

26

axiomatic that even if a property right is vested "no §1983 procedural due process violation exists when a party fails to exhaust both administrative and state court remedies…" *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141 (4th Cir. 2018). In analyzing this issue, a court must "consult the entire panoply of predeprivation and postdeprivation process provided by the state." *Tri City Paving, Inc., v. Ashe County*, 281 F.3d 430, 436 (2002)(citations omitted). "[t]the constitutional violation actionable under § 1983 is not complete…unless and until the State fails to provide due process." *Id*. at 437. The existence of State court remedies is relevant to the adjudication of a § 1983 due process claim. *See Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008).

In *Rockville Cars*, the Fourth Circuit upheld the dismissal of a § 1983 procedural due process claim where the Plaintiff failed to file an appeal, failed to seek an injunction, and failed to seek a declaration of its rights regarding its alleged property interest in State court. 891 F.3d at 149.

Here, the Plaintiffs did not appeal the court's decision in the tenant holding over action. After the clerk mailed them the warrant of restitution, which included the notice about the potential abandonment of their private property, Plaintiffs failed to return to the District Court to request that the court use its revisory power under Maryland Rule 3-535 to extend the stay order. After the tenant holding over hearing, Plaintiffs could have requested that the District Court alter or amend its judgment to allow them an additional stay period. *See* Maryland Rule 3-534. They could have requested that the Court continue to stay the enforcement of the judgment against them to acquire additional time to move or leave property they wanted to abandon without the threat of the sheriff serving a warrant of restitution. *See* Maryland Rule 3-632(b) (allowing the District Court to stay enforcement of a judgment pending the disposition of a motion filed under Maryland

Rules 3-534 and 3-535).  If they had done so, Plaintiffs could have requested a hearing pursuant to Maryland Rule 3-311(e) to have the Court consider their revisory motions.

Further, because Plaintiffs each claim their personal property is worth $100,000,  they could have easily filed a declaratory judgment action in the Circuit Court for Baltimore City seeking to have the court declare their rights vis-à-vis any personal property that remained in Mr. Collins' building.  *See* Md. Code Ann. Crts. & Jud. Proc. Art. § 3-401, et seq.  Or, they could have sought a temporary restraining order.

This is just a sampling of the processes available to Plaintiffs in State court.  However, as with their property, they elected to abandon any potential claims.  Plaintiffs were fully aware that the District Court was available to them for a remedy, and in fact, on the day of their eviction, the first place Plaintiffs went to was the District Court.  *See* Ex. 7, 255-256.  They knew their process lay in that court.  But, just a few months after their State court hearing and after the District Court clerk mailed notice of their eviction and potential abandonment, Plaintiffs were in this Court requesting money damages when they could have simply removed their personal items from the Property, requested an additional stay period to dispose of the belongings as they wished, or had a court declare their rights to the property.  As to their State court remedies, Plaintiffs deemed it ``unnecessary even to enter upon, let alone travel the entire length of, that road." *Mora*, 519 F.3d at 230 (citations omitted).  Their procedural due process claim should be dismissed for this reason alone.[28]

### C.  Plaintiffs Were Afforded Procedural Due Process.

---

[28] Plaintiffs will no doubt argue that they were unaware of these remedies because of their *pro se* status. However, the law is clear that the rules of procedure apply equally to *pro se* litigants.  See *Tretick v. Layman* 95 Md. App. 62 (1993).

In addition to these processes that were made available to Plaintiffs (which they elected not to pursue), Plaintiffs were afforded procedural due process in the tenant holding over proceeding. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652 (1950). "Procedural due process is simply a guarantee of fair procedures—typically notice and an opportunity to be heard. *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008) (internal citations omitted). *See also Nelson v. Diversified Collection Services, Inc*., 961 F .Supp. 863, 868 (D. Md. 1997). Further, when a judicial proceeding is made available to a plaintiff and she avails herself of that procedure, she cannot later claim to have been denied due process. *See Snider International Corp. v. Town of Forest Heights*, 906 F. Supp.2d 413, 431 (D. Md. 2012).

The due process in this case turns on notice. The Supreme Court has consistently held that the government must provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane*, 339 U.S. at 313-314 (citations omitted). As such, the Court has expressly rejected "[a] construction of the Due Process Clause which would place impossible or impractical obstacles in the way of the [government]." *Id*. at 313-314 (citations omitted). In fact, the Court has noted that "none of our cases…has required actual notice," instead "we have allowed the [g]overnment to defend the 'reasonableness and hence the constitutional validity of any chosen method…on the ground that it is in itself reasonably certain to inform those affected.'" *Dusenbery v. U.S*., 534 U.S. 161, 169-170 (2002) (quoting *Mullane*, 339 U.S. at 315).

The Supreme Court has consistently held that service by mail is a permissible and effective means to provide notice. *See Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 792

29

(1983)(citations omitted)(holding that "mailed notice to [the affected party's] last known available address is sufficient before the government seeks to "sell real property on which payment of property taxes have been delinquent" (emphasis added)) and *Dusenbery*, 534 U.S. at 173 (mail addressed to prisoner about administrative forfeiture of property seized during his arrest constituted due process).

Here, Plaintiffs were mailed the warrant of restitution complete with notice regarding the potential abandonment of their possessions after they attended a hearing before the District Court and secured a stay of execution of the judgment.  There is no question it was received by them because it was found, opened, on the top of their refrigerator.  Further, by this time, they were no longer in rightful possession of the Property and were trespassers.  *See Donnelly Advertising Corporation of Maryland*, 216 Md. at 127-28.  Thus, Plaintiffs were provided notice and were confronted with the rebuttable presumption that they wished to abandon their personal property. Plaintiffs could have easily rebutted this presumption by seeking an additional stay or simply removing any personal possessions they wished to keep from the Property.  It is not clear why after receiving notice they failed to act.  What is clear is that the method used to provide them with notice was constitutionally sufficient for due process purposes.

This case is clearly distinguishable from *Jones v. Flowers*, 547 U.S. 220 (2006) (citations omitted).  In *Jones*, although the property owner was mailed multiple notices for a pending tax sale affecting his property, the notices were returned by the U.S. Postal Service.  *Id*. at 224.  The Court ruled that because the state was aware that the mailings were being returned, they knew that the taxpayer had not received notice and was denied due process when his property was subsequently sold at tax sale.  *Id*. at 239.  Here, the District Court docket makes clear that the warrant of restitution was not returned as undeliverable.  We know this for a fact because the

warrant of restitution that included the abandonment notice was found on the top of Plaintiffs' refrigerator at the time of the eviction having been mailed weeks before.  They still failed to rebut the presumption of abandonment by removing their property or seeking further redress in State court.

Conversely, in the cases cited by Plaintiffs where the legislative enactment was declared unconstitutional, the plaintiff was not afforded notice or the availability of state court proceedings. *Associates Commercial Corp. v. Wood*, 22 F. Supp. 2d 502 (D. Md. 1998) does not involve a §1983 claim; that plaintiff sued for replevin, detinue, and declaratory relief.  *Id.* at 504.  Further, he was not provided with the opportunity for a hearing or written notice of the potential deprivation of his property rights.  Here, Plaintiffs attended a hearing in the District Court, had the full menu of State court due process open to them including a declaratory judgment action or temporary restraining order related to their property, the opportunity to stay enforcement of the judgment and time to remove their personal property to rebut the presumption of abandonment.  Further, they were given actual notice of the eviction date and time.

Likewise in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), the plaintiffs were not provided with notice of the potential deprivation of their property rights or any court process. Here, Mr. Todman and Ms. Gattis left their notice on the top of the refrigerator and refused to use the court process available to them including moving to alter or amend the judgment to request an additional stay period.

In *Mombro v. Louis Capano & Sons, Inc.*, 526 F. Supp. 1237 (D. Del. 1981), the court did not rule on the constitutionality of the abandonment provision found in Delaware law and only found fault with the fact that the tenants were not afforded an opportunity to remove their personal property after they failed to appear for their eviction hearing.  *Id.* at 1242.  *Mombro* has no

31

relevance to this case, as the court here granted Mr. Todman and Ms. Gattis a lengthy stay period to allow them time to retrieve their belongings after the tenant holding over hearing.

Further, Plaintiffs' argument that they were entitled to a "post deprivation hearing" fails. *See* Plaintiffs' Motion, p. 27-29.  The only case they cite for this proposition is *Fuentes v. Shevin*, 407 U.S. 67 (1972) (citations omitted).  Unlike the plaintiffs in *Fuentes*, Mr. Todman and Ms. Gattis were provided a hearing to determine their right to be present in the Property in the first place; they consented to a judgment wherein they agreed to vacate the Property after a stay period. They were provided with post-hearing notice that informed them about the potential abandonment of their property and they refused to employ the State court processes available to them including, seeking a declaratory judgment, requesting that the District Court use its revisory power to give them additional time to remove their personal property and rebut the presumption of abandonment.

Yet, there is more.  Before Mr. Collins even had the right to file a tenant holding over action, he served Plaintiffs with a Notice to Vacate after Ms. Gattis demanded a court order to leave the Property when her lease term ended—they refused to remove themselves and their property from his dwelling.  After giving them six (6) months to vacate, he then served them with the District Court action rendering them trespassers on his Property—they still refused to remove their property from his dwelling.  After a hearing, the District Court granted them a two week stay to vacate the dwelling and remove their personal items from the Property—they still refused to remove their property.  The District Court mailed them written notice of the eviction and notice that their personal property that remained in the dwelling would be considered abandoned if not removed—they still refused to remove their property.  They failed to return to the District Court seeking any additional stay to rebut the presumption of abandonment.  And then, after all of that,

32

Plaintiffs now say, we want a post eviction hearing to determine what happens to their personal property a year after their lease term ended?  The hubris is astounding.

In the end, Plaintiffs cite to no case that requires the government to provide a post-deprivation hearing when pre-deprivation process was available or require a landlord who is legally entitled to immediate possession of his real property to wait to take full possession of his property until after common law trespassers have been afforded a hearing on their right to remain in the real property with their belongings, the opportunity for more pre-deprivation process, and notice of the potential for abandonment if they fail to act.

> **D.      Section 8A-4 Does Not Violate Substantive Due Process.**

State deprivation of a protected property interest violates substantive due process only if it is "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991). The state action must be "conscience shocking, in a constitutional sense." *Huggins v. Prince George's County*, 683 F.3d 525, 535 (4th Cir. 2012) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)(citations omitted)).

A local government's interest in promoting the health, safety, and welfare of its citizens is not simply substantial—it is compelling.  *See Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017). It cannot be disputed that municipalities have a valid police power interest and the right to regulate landlord-tenant matters.  *See County Council of Montgomery County v. Investors Funding Corp*., 270 Md. 403, 312 A.2d 225 (1973).  Indeed, landlord-tenant law is traditionally the domain of state and local governments and governed by police power interests.  *Perry v. Hous. Auth. of City of Charleston*, 664 F.2d 1210, 1216 (4th Cir. 1981).

There is nothing arbitrary about a process that provides trespassers with notice about the potential disposition of their personal property and the opportunity to employ court processes to provide them with additional time to remove said property from the landlord's premises. The City has a valid interest in making sure that a former tenant's personal property is not deposited onto the streets for a host of public safety and community development, and morale reasons, that it does not bear the significant expense and potential liability of inventorying, transporting, and storing a former tenant's property, and that in accordance with State law landlords with the right to immediate possession of their properties have those rights enforced and are able to make these dwellings available to other City residents. The City has a compelling interest in making sure that dwellings are occupied for a host of police power functions, including rodent abatement, public safety, health, general welfare, and the abatement of urban blight.

As articulated above, tenant holding over and breach of lease cases are clearly distinguishable from failure to pay rent cases in terms of the pre-hearing notice required, the right to immediate possession, and fact that the tenant has no right to redeem the Property.

Section 8A-4 is rationally related to that public interest because it enforces the landlord's rights granted by a State law that Plaintiffs do not challenge. Meanwhile, they ensure that properties are available for rent in clean, safe neighborhoods.

Plaintiffs' baseless claim that the ordinance was passed to only benefit landlords has been proven false. By Plaintiffs' logic, the City passed City Housing Code § 8A-4 and the rest of the ECL to benefit the Community Law Center, the Abell Foundation, and the Public Justice Center. Those groups were a part of the Work Group, provided testimony before the City Council, and had as much influence about the legislation as any other.

In truth, the ordinance was passed to benefit the people of Baltimore, including tenants like Plaintiffs.

## V.   CONCLUSION

For the foregoing reasons, this Court should grant the Mayor and City Council of Baltimore's Motion for Summary Judgment and deny the Partial Motion for Summary Judgment filed by Marshall Todman and Tiffany Gattis [ECF 94].


Date:  July 2, 2021                                      Respectfully submitted,

                                                         JAMES L. SHEA (00142)
                                                         City Solicitor


                                                         */s/ Renita L. Collins*
                                                         _____
                                                         RENITA L. COLLINS (28637)
                                                         Chief Solicitor
                                                         BALTIMORE CITY LAW DEPARTMENT
                                                         100 N. Holliday Street
                                                         City Hall Baltimore, MD 21202
                                                         Phone: 410-396-3930
                                                         Fax: 410-547-1025
                                                         Renita.Collins@baltimorecity.gov
                                                         *Counsel for Defendant Mayor and City*
                                                         *Council of Baltimore*