IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARSHALL TODMAN, *et al.*,            *

     Plaintiffs,                              *

v.                                                 *            Civ. No. DLB-19-3296

THE MAYOR AND CITY COUNCIL          *
    OF BALTIMORE, *et al.*,                 *

     Defendants.

## MEMORANDUM OPINION

On July 31, 2019, plaintiffs Marshall Todman, Jr. and Tiffany Gattis were evicted from the Baltimore City home they rented from Brock Collins.[1]  At the moment of their eviction, all their personal property in and around the home was deemed "abandoned" by a Baltimore City law aimed at keeping public streets and sidewalks free of evicted tenants' belongings.  The law prohibited Collins from moving their possessions onto the street and authorized him to keep the items, including clothes, electronics, and heirlooms.  In this ensuing lawsuit, the plaintiffs claim the law that caused the loss of their personal property, Balt. City, Md., Code art. 13 ("City Housing Code"), § 8A-4, violates the guarantees of due process embodied in the Fourteenth Amendment.  They seek damages for the constitutional violation from the Mayor and City Council of Baltimore (collectively, the "City") pursuant to 42 U.S.C. § 1983.  They also assert state law claims against Collins for conversion, trespass to chattels, and unjust enrichment.

Pending are ripe cross-motions for summary judgment in which the parties ask the Court to rule on the constitutionality of § 8A-4.  ECF 94, 98, 100–102, & 104–107.  Collins additionally

---

[1] After filing suit, the plaintiffs married.  *See* ECF 104-3, ¶ 2.  The Court refers to Mrs. Gattis Todman by her maiden name because that is how she remains identified on the docket.

seeks summary judgment on the state law claims.  The Court heard oral argument on April 11, 2022.  ECF 112.  For the following reasons, the Court grants summary judgment in favor of the plaintiffs as to liability on their § 1983 claim; denies the City's motion for summary judgment; and grants in part and denies in part Collins' motion for partial summary judgment.

## I.      Background

On average, there are between 6,000 and 7,000 evictions in Baltimore City each year.  ECF 94-2, at 36 (35:11–13) (dep. of Jason Hessler, corporate designee of Baltimore City).  This evens out to more than 19 evictions per day.  *Id.* at 36–37 (35:19–36–8).  This case arose from one of these evictions where, as the result of an ordinance meant to keep streets and sidewalks clean, the plaintiffs lost many of their possessions.

### A.  Eviction procedures in Baltimore City

Maryland does not allow landlords to remove tenants from their leased homes without first obtaining a warrant of restitution from a court.  *See* Md. Code Ann., Real Prop. ("RP") § 8-216(b)(2).  A warrant of restitution is a court order, executed by a sheriff, authorizing the landlord to retake possession of the leased premises.  It is the legal instrument that authorizes an eviction.  To receive a warrant of restitution, the landlord must "make [a] complaint in writing to the District Court of the county where the property is located."  *Id.* § 8-402(b)(1)(i).[2]  Upon receipt of the landlord's written complaint, the district court will direct "any constable or sheriff of the county entitled to serve process . . . to notify the tenant, assignee, or subtenant to appear . . . before the court to show cause why restitution should not be made to the landlord."  *Id.* § 8-402(b)(1)(ii).

---

[2] The cited RP provisions concern tenant holding over actions, the kind at issue in this case.  RP § 8-402.  Similar requirements apply in the other types of eviction actions.  *See id.* §§ 8-401, 8-402.1.  The differences between the types of eviction actions, as they bear on this case, are explained below.

The sheriff typically must serve the summons on the tenant, but if the tenant cannot be located, the sheriff may "affix an attested copy of the summons conspicuously on the property." *Id.* After a hearing, the court may enter "judgment for the restitution of the possession of [the] premises" in favor of the landlord and may, upon the landlord's request, "issue [a] warrant [of restitution] to the sheriff" of the relevant jurisdiction. *Id.* § 8-402(b)(2)(i). In Baltimore City, a landlord must file a petition for a warrant of restitution within 60 days after the court enters judgment in favor of the landlord. Balt. City, Md., Code of Pub. Local Laws § 9-6.

In Maryland, there are three primary types of eviction actions: failure to pay rent, tenant holding over, and breach of lease. The plaintiffs were holdover tenants. A holdover tenant is a tenant who "unlawfully hold[s] over beyond the expiration of the lease or termination of the tenancy." RP § 8-402(a)(1). A breach-of-lease tenant is one who has breached the terms of the lease and whose "breach was substantial and warrants an eviction[.]" *Id.* § 8-402.1(b)(1). And a failure-to-pay-rent tenant is one who fails "to pay the rent when due and payable." *Id.* § 8-401(a). Only failure-to-pay-rent tenants have the right of redemption, or the ability to remain in the property despite the entry of a judgment for possession in the landlord's favor. *Id.* § 8-401(g)(1). A failure-to-pay-rent tenant may exercise this right up until the moment of eviction by paying the amount required by the state court's judgment. *Id.* Breach-of-lease and holdover tenants, conversely, must vacate the rented property after a judgment is entered in the landlord's favor or face eviction.

The type of eviction action determines the applicable notice requirements. Before a landlord may file any eviction action, she must provide the tenant with advance notice via a notice to quit tenancy. Failure-to-pay-rent tenants receive 10 days' notice, *id.* § 8-401(c)(1); breach-of-lease tenants receive either 14 or 30 days' notice, *id.* § 8-402.1(a)(1)(i)(2); and holdover tenants

receive between 7 and 180 days' notice depending on the type and term of their lease, *id.* § 8-402(c)(2). In a failure-to-pay-rent action in Baltimore City, after a landlord obtains a judgment for possession of a leased dwelling, the landlord additionally must "notify the tenant of the date on which the warrant of restitution is first scheduled to be executed by the Sheriff." City Housing Code § 8A-2(b). The notice must be mailed by first-class mail at least 14 days before the scheduled eviction date and posted on the premises at least 7 days before the scheduled eviction date. *Id.* § 8A-2(c). The notice also must specify the date of the eviction and "prominently warn the tenant that any property left in the leased dwelling will be considered abandoned and may be disposed of on execution of the warrant of restitution." *Id.* § 8A-2(d)(2), (4). These additional notice requirements in Baltimore City failure-to-pay rent cases do not extend to tenant holding over cases, among other exceptions. *Id.* § 8A-2(a)(2)(iii).

As indicated in the notice provided to failure-to-pay-rent tenants, Baltimore City has taken an aggressive approach towards the disposition of tenants' personal property left on the leased premises at the time of eviction. Section 8A-4 of the City Housing Code provides that "[a]ll property in or about the leased premises at the time that the warrant of restitution is executed is abandoned." The law requires landlords, upon execution of the warrant of restitution, to "dispose of abandoned eviction chattels" by "transporting them to a licensed landfill or solid waste facility," "donating them to charity," or using "some other legal means." *Id.* § 8A-5(a). Landlords may not dispose of "eviction chattels, abandoned or otherwise, [by placing them] in a public right-of-way or on any public property." *Id.* § 8A-6. They are not liable "for any loss or damage to abandoned property." *Id.* § 8A-4(b).

During discovery, the City's designee testified about the intended operation of § 8A. The law does not formally order the transfer of ownership of personal property left on the leased

premises from the tenant to the landlord.  ECF 94-2, at 43–48, 119, 124 (42:12–47:15, 118:18–25, 123:22–25).  However, § 8A-4 declares the personal property abandoned, and § 8A-5 requires the landlord to dispose of it in certain ways.  *Id.* at 60–61 (59:14–60:21).  Among other permissible dispositions, the landlord may keep the abandoned property.  *Id.* at 62–63 (61:21–62:7).  The City designee also testified that § 8A-4 applies to all property remaining in or about the leased premises, regardless of whether it belongs to the tenant or a third party or whether the owner intended to abandon it.  *Id.* at 48–58, 106, 115–16 (47:19 – 57:1, 105:14–17, 114:9–115:19).

**B. The origin of § 8A-4**

Baltimore City passed City Housing Code § 8A-4 after considerable debate and input from various stakeholders.  In 2007, the City wanted to end the common practice of landlords removing evicted tenants' possessions and placing them on the nearest sidewalk.  *Id.* at 59, 107 (58:1–22, 106:13–21).  At the time, the City considered the removal of tenants' property necessary because landlords would not be returned to full possession of the leased premises—possession free from the presence of another's personal property—if tenants' possessions remained inside the home.  *Id.* at 42–43 (41:24–42:5).  The City was responsible for disposing of eviction chattels discarded on public streets and sidewalks.  Balt. City, Md., Code art. 19, § 50-11.  Tenants could request the Department of Public Works to store, at the City's expense, their possessions for up to 10 days.  *Id.* § 50-12 (repealed 2007); ECF 94-2, at 93 (92:10–22); ECF 99-1, at 2.  Less than one percent of tenants requested storage, and of those who did, few ever reclaimed stored property.  ECF 94-2, at 93–94 (92:16–93:14); ECF 99-1, at 2.  Cleanup and storage expenses cost the City over $800,000 each year in 2005 and 2006.  ECF 99-1, at 4.

So, the City considered a bill that eliminated its obligation to store evicted tenants' possessions upon request; required possessions left in the premises at the time of eviction to be

stored in one of several permissible locations for a three-day reclamation period, at which point they would be deemed abandoned and could be disposed of by the landlord; and prohibited landlords from dumping abandoned possessions onto public property.  ECF 94-3.  The initial bill also required notice of an impending eviction be provided to all tenants, regardless of the type of eviction action.  *Id.*; ECF 94-12, at 5–6.  Landlords would have been required to mail the notice at least five days before the eviction and post it on the premises at least two days before.  ECF 94-12, at 6.  In addition to warnings about the impending eviction and the risk of abandonment, the initial bill also required the notice to contain instructions on how to reclaim affected possessions. *Id.*  Residents, community leaders, tenant associations, and the Department of Public Works supported the initial bill.  ECF 94-4; ECF 94-5; ECF 94-6; ECF 94-7; ECF 99-1, at 6.

The bill proceeded through the legislative process.  As part of a working group composed of numerous stakeholders, representatives of the Maryland Multi-Housing Association ("MMHA") and the Housing Authority of Baltimore City proposed considerable amendments. ECF 94-8; ECF 94-9; ECF 94-20; ECF 99-2.  The final bill was substantially more limited.  It afforded tenants no period to reclaim their possessions after the eviction, and it exempted holdover tenants, among others, from the notice requirements.  After numerous meetings open to the public, the bill passed and was signed into law.  The City's records note no opposition to the amended bill.  ECF 98-5.  Despite the narrowing of the bill's notice requirements and the removal of any period for the reclamation of tenants' possessions, the expressed purpose of the ordinance remained:

> [P]roviding for the disposition of certain eviction chattels, requiring certain notice prior to execution of a warrant of restitution, providing for a tenant's right to reclaim property within a certain period, prohibiting the placement of eviction chattels in certain public ways, defining certain terms, imposing certain penalties, and generally relating to the removal and disposition of property from leased dwellings.

6

ECF 94-12; *see also* ECF 94-2, at 25 (24:17–22) (the purpose statement "explains what the overall purpose of the law is"). After the bill was signed into law, the office of then-Mayor Sheila Dixon erroneously announced the law would provide residents facing eviction with a "five-day advance notification" and "the opportunity to keep their belongings in covered storage for three days after the eviction for a modest cost." ECF 94-13, at 6.

### C. The plaintiffs' eviction

Between 2018 and 2019, Todman and Gattis rented part of a house in Baltimore City owned by Collins. ECF 94-14, ¶ 2 (Todman aff.); ECF 102-3, at 14 (53:3–5) (Todman dep.). Collins testified that the arrangement, which did not involve a written lease, was intended to last only until the plaintiffs could move elsewhere, but the plaintiffs refused to move out despite his repeated requests. ECF 102-6, at 28 (106:10 – 109:6) (April 5, 2021 Collins dep.); ECF 102-7, at 11–13 (39:8 – 52:16) (April 23, 2021 Collins dep.). In September 2018, Collins served the plaintiffs with a notice to quit tenancy. ECF 102-7, at 12 (44:24 – 45:11). On May 13, 2019, Collins filed a tenant holding over complaint against the plaintiffs in the District Court of Maryland for Baltimore City. ECF 102-11. The Court scheduled a hearing on the complaint for July 2, and notice of the hearing was posted on the property. ECF 94-17.

At the outset of the eviction hearing, the judge explained to the plaintiffs that the hearing was limited to four issues:

> (1) if the landlord had at some point been in possession of the premises, so it is his actual property; (2) if a lease has fully expired; (3) if proper notice has been given; and (4) if a person or people in actual possession of the premises refuse to quit the premises.

ECF 94-18, at 5 (hr'g tr.). The judge added: "if there are other issues that you would like to raise, they're not relevant to this situation." *Id.* The plaintiffs explained that they wanted to leave the

house, had found another place to live, and could move into their new home on August 2.  *Id.* at

7–8.  Recognizing the potential for settlement, the judge asked whether Collins would agree to a

stay of judgment to give the plaintiffs the opportunity to move out of the house and into their new

home.  *Id.* at 10–15.  Collins expressed a concern that if the stay lasted through August 2 and the

plaintiffs did not vacate on that date, he would not be able to retake possession on that date.  *Id.* at

10.  Collins represented that in his experience it takes at least two weeks for an eviction to occur

after filing for a warrant of restitution.  *Id.* at 10–11.  The judge then asked the plaintiffs:

> So understanding that, would you—understanding that what Mr. Collins has just
> agreed, if the stay of execution was for two weeks and the eviction would be
> scheduled for at least two weeks from that point—so if I granted the consent
> judgment and I granted a stay of execution until July 16th, and then if he had to file
> for an eviction, it still wouldn't be for at least another two weeks after that.  That
> would still give you the four weeks.  Would you still be consenting to a judgment
> understanding all of that?

*Id.* at 11.  The plaintiffs agreed.  *Id.*  After expressing more concerns about delays on the sheriff's

end, Collins also agreed to a stay of judgment until July 16.  *Id.* at 15.  The judge then summarized

the agreement to the plaintiffs:

> [M]y understanding is that Mr. Todman and Ms. Gattis are consenting to a
> judgment.  And the stay of execution will be until the 16th of July, at which point
> it would still take at least two weeks to . . . schedule an eviction.  Therefore, you
> would still have your full month before you would be able to do it.  Is that correct?

*Id.*  The plaintiffs agreed again.  *Id.*  Before the hearing concluded, Collins asked whether he could

file for the warrant on July 16 or July 17.  *Id.* at 18.  The judge told him to "talk to the clerks," and

Collins said: "I'll do it on the 17th."  *Id.*  At no point during the hearing were the plaintiffs notified

that any personal possessions still in the home on eviction day would be deemed abandoned.

The state court issued a judgment by consent and a stay of execution of its judgment.  ECF

98-10, at 10–11.  This meant Collins could petition for a warrant of restitution within 60 days of

the judgment, but the warrant of restitution would not issue until after the stay expired on July 16.

There was no binding agreement or court order preventing an eviction before August 2. Collins testified that he understood the proceeding to have stayed execution of the state court's judgment until July 16, and nothing more. ECF 102-6, at 53 (208:10–16). The plaintiffs did not appeal the state court's ruling. ECF 98-10, at 4; ECF 102-3, at 23 (88:20 – 89:5).

Collins petitioned for a warrant of restitution on July 15. ECF 94-19. The warrant issued on July 16, when the stay expired. *Id.* The next day, the state court mailed the plaintiffs the warrant of restitution, which is the signed, two-sided petition, Form DC-CV-081, used statewide in all types of eviction actions. ECF 102-13. The front of the form includes various fields identifying the parties and the property. *Id.* It also includes a text box that states:

**NOTICE OF EVICTION**

> The Court has ordered that you be evicted. If the property is in Baltimore City there are special procedures that apply. See the notice on the back of this form for the special procedures in Baltimore City and for general information related to evictions from properties that are not in Baltimore City.

THERE WILL BE NO FURTHER NOTICE

*Id.* On the copy of the form mailed to the plaintiffs, the text box is partially obscured by the Court's stamped seal. *Id.* Below the text box, the form directs the "Sherriff/Constable of this Court . . . to deliver the premises to the [landlord] and, unless local law requires otherwise, to remove from the premises, by force if necessary, all property of the [tenants] and any other occupant." *Id.*

The reverse side of the form is divided into four sections: tenants outside Baltimore City, tenants in Baltimore City, tenants in mobile homes, and Spanish-speaking tenants. The section addressing Baltimore City tenants states:

**BALTIMORE CITY ONLY**
**IMPORTANT NOTICE TO DEFENDANTS**

The landlord in a failure to pay rent case, must provide notice to the tenant of the first scheduled eviction date in two separate ways:

- Mail notice to the tenant by first-class mail with a certificate of mailing at least 14 days in advance of the first scheduled eviction date; <u>and</u>
- **Post the notice on the premises at least 7 days** in advance of the first scheduled eviction date.
- The day of mailing or posting is Day 1.  Day 14 must be no later than the day before the scheduled date of eviction.  Count holidays and weekends.

>  The tenant may challenge whether the notices were properly given.  If the tenant challenges the notices or if the sheriff has doubt that the notices were properly given, the sheriff will refer the issue to the judge for decision.  If the judge determines that the landlord did not comply with the notice requirements, the eviction will be vacated/cancelled and the landlord will be required to apply for a new Warrant of Restitution.

>  If the notice challenge is determined in the landlord's favor, the sheriff will execute the eviction immediately.

>  The landlord is <u>strictly prohibited</u> from putting the abandoned property in the street, the sidewalk, alleys, or on any public property.  Anyone who illegally dumps abandoned property from an eviction is guilty of a misdemeanor, subject to a penalty of up to $1,000 for each day of unlawful dumping.  The landlord may dispose of the abandoned property by transporting it to a licensed landfill or solid waste facility, donating it to charity, or some other lawful means.

>  **On eviction day any personal property left in or around the rental unit is considered abandoned.**  When the sheriff returns possession of the rental property to the landlord, any of the tenant's personal property left in or around the rental unit is considered abandoned.  The tenant has no right to the property.

*Id.* (emphasis in original).

The parties dispute whether the plaintiffs received the form.  The state court mailed the form to them on July 17 via first-class mail.  ECF 98-10, at 9; ECF 98-12, at 3.  The plaintiffs testified they did not receive the form and never saw it.  ECF 94-14, ¶ 6; ECF 102-3, at 23 (86:10–19); ECF 102-4, at 51–52, 178 (51:17 – 52:8, 178:5–10) (Gattis dep.).  On July 19, the approximate date the form would have arrived by mail, Gattis texted Collins: "Falsified documents… hope u already filed… I will be filing a grievance on that… so u can produce the lease u don't have… punishable by fine and or jail time…."  ECF 98-10, at 19; ECF 102-4, at 174–82, 254–59 (174:17 – 182:11, 254:8 – 259:7).  Collins testified that after he took possession of the property, he found an opened envelope containing the form on top of the refrigerator.  ECF 102-7, at 9–10 (31:8 –

36:12).   The plaintiffs testified that Collins had access to their mailbox, suggesting Collins retrieved the form before they could.  ECF 102-3, at 23 (88:7–11); ECF 102-4, at 268 (268:1–4).

The parties also dispute whether the plaintiffs were told the date of the eviction.  Collins testified that he told Todman in person that the eviction was scheduled for July 31.  ECF 102-6, at 57–60 (222:5 – 235:10).  Collins could not recall the date this conversation took place, but he said it occurred while he was mowing the property's lawn and ended with Todman yelling he would be moved out by then.  *Id.*  A neighbor, Armand Bailey, and a friend of Collins, Hayes Gaines, testified via affidavit that they witnessed the conversation.  ECF 102-14 (Gaines aff.); ECF 102-15 (Bailey aff.).  Todman denies the conversation took place.  ECF 94-14, ¶ 7; ECF 102-3, at 20 (74:17 – 76:12).  On July 30, Todman reserved a moving truck for use on August 1.  ECF 94-21.

On July 31, the eviction proceeded.  The plaintiffs were at work, and Gattis' mother, Sheila Chaney, was alone at the property.  ECF 94-14, ¶ 10; ECF 104-3, ¶ 7 (Gattis aff.).  Collins arrived with a sheriff's deputy, the deputy told Chaney to leave, and Collins retook possession.  ECF 102-5, at 54–56 (54:5 – 56:7); ECF 102-6, at 10 (36:7–17) (Chaney dep.).  Around 10:40 a.m., Collins texted Todman: "[A]s of this Morning everything in and on the property are my possession per Balt city law."  ECF 94-22, at 4.  The plaintiffs testified they were left with only the clothes on their backs.  ECF 94-14, ¶ 13; ECF 102-3, at 25 (97:9–16).  Chaney testified she grabbed only her medication, telephone, and phone charger before leaving.  ECF 102-5, at 54–55 (54:11 – 55:19).

The parties dispute what personal property was inside the home and whether it was boxed up on July 31.  Gattis and Chaney testified that the plaintiffs' possessions were in boxes in anticipation of the move.  ECF 102-4, at 120 (12:7–10); ECF 102-5, at 42–43, 56–58 (42:12 – 43:1, 56:8 – 58:10).  Collins testified that there were no boxes and that two of the rooms were "practically empty."  ECF 102-6, at 16 (60:15 – 61:10).  There is no dispute that, among other

items, some kitchenware, furniture, clothes, numerous small electronics and electronic media, and a television were in the home and deemed abandoned by the City ordinance.  ECF 94-23 (Collins interrog. resp.); ECF 102-1, at 18–21 (pl. interrog. resp.); ECF 102-6, at 9–10 (33:19–34:4). Todman also had a motorcycle at the time.  Shortly after the eviction, Collins texted Todman: "They took pics of the [motorcycle] today. . . . They wanted the vin number so it can be traced if it's moved without my permission.  Even without a title it's officially mine until the balance owed to me is satisfied." ECF 94-22, at 4.  Todman testified that his motorcycle was on the street when he left for work on July 31.  ECF 102-3, at 46 (179:14–180:15).  He believes Collins dragged the motorcycle onto the rental property so it would be deemed abandoned by § 8A-4.  *Id.* at 46 (178:19–179:2).  Collins testified that he did not move the motorcycle, claiming it was in the back yard when he arrived for the eviction.  ECF 102-6, at 63–64 (249:5 – 250:15).

Over the next week, Todman and Collins texted about several issues relating to the eviction, including payment for outstanding rent and Collins' court costs, allegations of stolen mail, the location of a car title, and a potential return of the plaintiffs' possessions.  ECF 94-22. Collins stated that if the plaintiffs paid him $5,800, "I will have everything brought out of the house by my guys to the yard and you can get [it] from there."  *Id.* at 6.  He provided the car title to an intermediary so Todman could retrieve it.  *Id.* at 8–9.  Collins stated on August 3 that he was "losing money every day that stuff is on [sic] there."  *Id.* at 10.  The conversation, as reflected in the record, ended on August 9, after Todman said, "I need my belongings today if I owe u money we can figure that out on the back end but need my belongings."  *Id.* at 14.

In the following weeks and months, Collins returned some of the plaintiffs' possessions. ECF 94-23; ECF 102-1, at 5–6.  He testified that, following the return of some property in August, Todman told him "everything else in the [property] he considered trash."  ECF 102-7, at 5 (15:2 –

17:24).  The final return occurred on January 3, 2020 and included Todman's motorcycle.  ECF 94-23.  The plaintiffs identify numerous possessions that were never returned to them, including expensive electronics and irreplaceable items like family photos and cremated remains.  ECF 102-1, at 2–4.  Collins described most of this list as items the plaintiffs never had but "want [him] to buy for them."  ECF 102-6, at 42 (162:9–12).  But he admits that he never returned at least some of the plaintiffs' possessions, including a curved flat screen television, *id.* at 9–10 (33:1 – 34:4), some small electronics, clothing, shoes, and furniture, ECF 94-23, at 3.  Collins testified that someone broke into the home a few days after the eviction and that the television and other items went missing at that time.  ECF 102-6, at 9–10 (33:21 – 34:4).  He speculated that Todman was responsible for the break-in.  *Id.* at 10 (34:7 – 36:6).

**D. Procedural history**

The plaintiffs filed an amended complaint in this Court asserting a claim under 42 U.S.C. § 1983 against the City (Count I), a declaratory judgment claim against the City and Collins (Count II), and state law claims for conversion, trespass to chattels, unjust enrichment, and a violation of the Maryland Consumer Debt Collection Act against Collins (Counts III, IV, V, and VI).  ECF 26.  Collins moved to dismiss, ECF 29, and the City followed suit, ECF 30.  The Honorable George L. Russell, III granted the motions in part, dismissing the Consumer Debt Collection Act claim and the plaintiffs' claim that § 8A-4 violated the Takings Clause of the Fifth Amendment.  ECF 45; *Todman v. Baltimore Mayor*, 488 F. Supp. 3d 218 (D. Md. 2020).  The plaintiffs' motion for reconsideration was denied.  ECF 52.

After the completion of discovery, the plaintiffs moved for partial summary judgment on the constitutionality of § 8A-4.  They argue the ordinance violates substantive and procedural due process and the Fourth Amendment's prohibition against unreasonable seizures, both on its face

and as applied to them.  ECF 94.  The City and Collins each filed oppositions and cross-motions for summary judgment.  ECF 98; ECF 101.  The City argues § 8A-4 is constitutional and, as a municipality, it cannot be liable for damages caused by Collins as a private individual.  Collins incorporates the City's arguments on constitutionality and argues he is immune from liability if the Court holds § 8A-4 is constitutional.  Alternatively, Collins argues that, even if § 8A-4 is unconstitutional, he may not be held liable because he reasonably relied on the validity of § 8A-4.  The MMHA filed an *amicus curiae* brief supporting the City and Collins.  ECF 103.

## II.    Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When presented with cross-motions for summary judgment, the Court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997) (citation and internal punctuation omitted)).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations."  *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted).  However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). "Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, 'citing to particular parts of the materials of record.'" *United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(c)(1)(A)).

## III.   Section 1983 Claim

When "a § 1983 claim is asserted against a municipality, two issues must be determined: '(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.'" *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). As to the first issue, the plaintiffs and the City ask the Court to decide, as a matter of law, whether the operation of § 8A-4 violated the plaintiffs' substantive and procedural due process rights. As to the second issue, the City argues that, if there was a constitutional violation, it is not responsible for the violation because Collins—a private citizen and not a municipal employee—

caused the plaintiffs' damages.  Under the circumstances presented here, the Court concludes that the plaintiffs' procedural due process rights were violated and the City is responsible for the violation.[3]

### A.  Procedural due process

"The Fourteenth Amendment prohibits the States from 'depriv[ing] any person of life, liberty, or property without due process of law.'"  *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 145 (4th Cir. 2014) (quoting U.S. Const. amend. XIV).  "Due process contains both substantive and procedural components[,]" and the procedural component "prevents mistaken or unjust deprivation[.]"  *Id.* (citing *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)).  To establish a violation of procedural due process, a plaintiff must satisfy three elements: (1) "a constitutionally cognizable life, liberty, or property interest"; (2) a "deprivation of that interest [] caused by some form of state action"; and (3) "that the procedures employed were constitutionally inadequate."  *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (internal quotation marks and citations omitted); *see also Burch*, 494 U.S. at 125; *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009).

### 1.  Protected property interest

The first element of a procedural due process claim is the existence of "a constitutionally cognizable life, liberty, or property interest."  *Sansotta*, 724 F.3d at 540 (citing *Patterson*, 566 F.3d at 145).  The property interest here is the plaintiffs' ownership interest in their personal belongings.  Household goods fall within the protection of the Due Process Clause.  *Fuentes v. Shevin*, 407 U.S.

---

[3] In light of this finding, the Court does not reach the substantive due process question.  The Court also will not address the plaintiffs' Fourth Amendment claim.  They first raised this claim in their motion for summary judgment, and it is not properly before the Court.  *See Wahi v. Charleston Area Med. Cntr., Inc.*, 562 F.3d 599, 616 (4th Cir. 2009) (stating "a plaintiff may not raise new claims after discovery has begun without amending his complaint").

67, 89–90 (1972).  As the Ninth Circuit stated in a similar context, "this case concerns the most basic of property interests encompassed by the due process clause: [the plaintiffs'] interest in the continued ownership of their personal possessions."  *See Lavan v. City of Los Angeles*, 693 F.3d 1022, 1031 (9th Cir. 2012); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571–72 (1972) (noting "the property interests protected by procedural due process extend well beyond actual ownership of . . . chattels"); *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 146 (4th Cir. 2018) (same, citing *Roth*); *Helton v. Hunt*, 330 F.3d 242, 247 (4th Cir. 2003) (holding due process protections extended to "video gaming machines").  There is no dispute that the plaintiffs owned their possessions that remained on the leased premises at the time of their eviction. *See Nickens v. Mount Vernon Realty Grp., LLC*, 54 A.3d 742, 757 (Md. 2012) (holding, under Maryland common law, that evicted tenants do not relinquish ownership of possessions left on the premises), *other holdings overturned by legislative action*; *State v. Boone*, 393 A.2d 1361, 1365 (Md. 1978) (same).  The first element is satisfied.

### 2.  Deprivation caused by state action

The second element of a procedural due process claim requires a showing that "the deprivation of that interest was caused by 'some form of state action.'"  *Sansotta*, 724 F.3d at 540 (quoting *Patterson*, 566 F.3d at 145).  The Court has no trouble concluding state action caused the deprivation of the plaintiffs' ownership interest in their possessions.  By operation of § 8A-4, the City deemed their personal property abandoned when the sheriff's deputy executed the warrant of restitution.  Collins, in turn, considered the possessions abandoned by virtue of § 8A-4 and took possession of them as the ordinance authorized him to do.  This forced abandonment of the plaintiffs' personal property was a direct and intended consequence of the City's ordinance.  Thus, the deprivation of the plaintiffs' possessions was caused by the City's action.

17

### 3.   Constitutionally inadequate procedures

The third element of a procedural due process claim requires a showing "that the procedures employed were constitutionally inadequate."  *Sansotta*, 724 F.3d at 540 (quoting *Patterson*, 566 F.3d at 145).  "At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard."  *Snider Int'l Corp.*, 739 F.3d at 146 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950)).  The fundamental requirements of notice and an opportunity to be heard are "governed by different standards."  *Snider Int'l Corp.*, 739 F.3d at 146 (citing *Dusenbery v. United States*, 534 U.S. 161, 168 (2002)).

### a.   Notice

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane*, 339 U.S. at 314; *see also Mathews*, 424 U.S. at 348–49 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'") (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171 (1951) (Frankfurter, J., concurring)).  "The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance."  *Mullane*, 339 U.S. at 314; *see also Snider Int'l. Corp.*, 739 F.3d at 146 (stating notice "must be reasonably calculated to convey information concerning a deprivation").  Adequate notice is necessary because the "right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest."  *Id.* (citations omitted); *see also Lavan*, 693 F.3d at 1032

("The government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking.") (quoting *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008)).

The City and *amicus* MMHA argue the notice requirement was partially satisfied by the notice to quit tenancy, by the subsequent complaint Collins filed to initiate the eviction action, and by the notice of the eviction hearing.  There is no dispute that these notices advised the plaintiffs that Collins deemed them holdover tenants and wanted them to leave the premises.  But neither the City nor *amicus* argues these notices (of which only the notice to quit tenancy is in the record) informed the plaintiffs that any personal belongings left in or around their leased home on eviction day would be deemed abandoned.  As a result, even assuming the plaintiffs received these notices, there is no question the notices did not apprise them "of the pendency of the action"—the forced abandonment of their personal possessions on the day of their eviction—or afford them "an opportunity to present their objections" to it.  *See Mullane*, 339 U.S. at 314.  Unless the plaintiffs learned of the risk they would face, they could not prepare for it or guard against it.

The only notice that arguably informed the plaintiffs their possessions would be deemed abandoned is the warrant of restitution, Form DC-CV-081.  A copy of the form was mailed to the plaintiffs after the eviction hearing and the issuance of the judgment of possession.[4]  The City

---

[4] The plaintiffs genuinely dispute that they received the mailed form, but they do not argue this dispute precludes summary judgment or that receipt of the mail is required to satisfy procedural due process.  Their position is sensible.  "The use of mail satisfies the notice element of due process" because it is reasonably calculated to apprise interested parties of the pendency of an action.  *Snider Int'l Corp.*, 739 F.3d at 146 (discussing notice-by-mail cases).  Actual receipt is not required.  There is no dispute that the state court mailed the form to the plaintiffs' address and that the mailing was not returned as undeliverable.  The mailing was sufficient.  Whether the contents of the mailing provided adequate notice is a separate question.

argues the form provided more than adequate notice to the plaintiffs that their property would be considered abandoned on eviction day.

In a remarkably similar case, the U.S. District Court for the Northern District of Mississippi recently held a Mississippi statute, functionally equivalent to § 8A-4, violated the requirements of procedural due process because the state law did not provide tenants with adequate notice of the risk that they would lose their possessions on eviction day. *Conner v. Alltin, LLC*, 571 F. Supp. 3d 544, 553 (N.D. Miss. 2021). The notice at issue in *Conner* stated: "[I]f you do not remove your personal property . . . from the premises before the date and time ordered by the judge, then the landlord may dispose of your personal property without any further legal action." Miss. Code Ann. § 89-7-31(2) (2015) (amended 2022). The court concluded this language was deficient because it failed

> to provide tenants with adequate notice that any and all personal property left on the premises at the time of eviction, including property ordinarily exempted from execution by creditors under Mississippi law, will, in effect, become the personal property of the landlord and that the tenant will have no legal ability whatsoever to compel the return of that property.

*Conner*, 571 F. Supp. 3d at 553. The court reasoned "[t]he acts of seizing and then selling a tenant's property and keeping the proceeds of the sale go far beyond what most tenants would regard as a mere 'disposal' of the property." *Id.* at 554. Because the notice did not fully apprise tenants of what was at stake—"the actual consequences of [the] failure to timely vacate the premises"—the law violated tenants' procedural due process rights. *Id.*

Like the notice in *Connor*, the form sent to the plaintiffs did not satisfy the minimum notice requirements of due process—albeit for slightly different reasons. The form had two fundamental deficiencies. It failed to provide the plaintiffs with adequate notice that the personal property

remaining in their home on eviction day would be deemed abandoned, and it failed to tell them when the eviction would occur.

First, the form suggested the risk of abandonment applied only to failure-to-pay-rent tenants, not holdover tenants like the plaintiffs.  Indeed, the section for Baltimore City tenants did not refer to holdover tenant cases.  That would have posed no problem if the section never distinguished between the types of eviction actions, but it did.  The first paragraph began: "The landlord in a failure to pay rent case . . . ."  ECF 102-13, at 2.  No subsequent reference to either "landlord" or "tenant" was similarly qualified by the type of eviction action, even when it should have been.  For example, the second paragraph began, "The tenant may challenge . . ." and then listed how the tenant may challenge the eviction, but it never informed the reader that only tenants in failure-to-pay-rent cases may lodge the challenge.  *Id.*  Even if the first two paragraphs were intended to be read together, the form did not communicate that the next paragraphs—the warnings about the disposal of eviction chattels and the risk of abandonment of personal property—applied to *all* eviction actions.  From the initial qualifying language "in a failure to pay rent case" and the failure to denote where the qualifier stopped applying, a reasonable reader could have concluded that the qualifier applied not only to the first two paragraphs but also to the risk of abandonment of personal property in the last paragraph.

The confusion did not end there.  Language elsewhere suggested the form clearly distinguished, when necessary, between tenants in failure-to-pay-rent, holdover, and breach-of-lease cases.  The section following the Baltimore City section employed headers to separate clearly a paragraph for failure-to-pay-rent tenants from a paragraph for holdover tenants, even though the content was largely repeated between the paragraphs.  When reviewing the ambiguous Baltimore City section in the context of the entire form, a reader reasonably could have concluded that the

form explicitly identifies when it is providing information relevant only to certain classes of tenants.

Overall, then, it is reasonable to interpret the entire Baltimore City section as concerning only failure-to-pay-rent cases because that is the only type of eviction action the section referenced.[5]  Tenants in non-failure-to-pay-rent cases, such as holdover tenants like the plaintiffs, who adopt this reasonable interpretation do not appreciate that the abandonment warning applied to them, and they therefore do not know to heed it.  Instead, without sufficient indication that "local law requires otherwise" in their case, the plaintiffs were told the sheriff or constable will "remove from the premises . . . all property" belonging to them.  *Id.* at 1.  Ultimately, the form told the plaintiffs that they were being evicted, but it did not reasonably convey that their ownership of their personal belongings was at risk.  For this reason, the Court concludes the form was not "reasonably calculated to convey information concerning" the forced abandonment of the plaintiffs' property.  *See Snider Int'l Corp.*, 739 F.3d at 146.

Second, a separate and more troubling problem arises from essential information the form omitted.  Even if the form reasonably conveyed that the plaintiffs' personal property would be deemed abandoned on eviction day, the form did not tell them when their eviction was scheduled to occur. The only indication that an eviction could occur immediately came in a section that explicitly said it did not apply to Baltimore City tenants: "This [court order] means that you can be forcibly removed from the premises at any time after the date of this order, **without warning!**

---

[5] The serious nature of the risk of abandonment also encourages such an interpretation.   A reader in the plaintiffs' position could reasonably have thought that the risk of losing their personal items did not apply to them because, surely, they would have been notified of that risk sooner and more than once.  On that point, the City offers no reason why tenants are not advised about the risk of abandonment at eviction hearings and in notices of hearings.

THERE WILL BE NO FURTHER NOTICE."  ECF 102-13, at 2.  In the section that *did* apply to Baltimore City tenants, there was no such clear advisement.  Instead, the plaintiffs were vaguely advised by a generally applicable section on the front of the form: "The Court has ordered that you be evicted."  *Id.* at 1.  The "when" was left to the imagination.[6]

The City and *amicus* argue the plaintiffs were not entitled to know when their eviction would occur because they did not have the right of redemption available to failure-to-pay-rent tenants and thus had to leave the premises once the warrant of restitution issued.  Failure-to-pay-rent tenants, the argument goes, must know when their eviction will occur to allow them time to pay the rent and redeem possession of the property.  But just because failure-to-pay-rent tenants need to know the date of their eviction for reasons not applicable to holdover tenants does not mean that holdover tenants do not need notice of the eviction date for other reasons.  Holdover tenants have a strong interest in knowing when their eviction will occur because the forced abandonment of their possessions occurs at that time.  The City has offered no reason why holdover tenants, like failure-to-pay-rent tenants, cannot be advised of the date of eviction—for example, by their landlords, who receive advance notice of the eviction date in all cases.

The City next argues that Collins told Todman the eviction was scheduled for July 31.  That fact is disputed but immaterial.  Collins was not an employee or agent of the City, and as the City admits, he was not required by law to inform the plaintiffs of the eviction date.  *See* ECF 106, at 8 n.5.  So even if Collins did tell Todman when the eviction was scheduled for, that cannot substitute

---

[6] The Court is troubled by the possibility that the form, which is itself the legal instrument that enables an eviction to occur, could arrive after the eviction has taken place.  The form is mailed to tenants, but the City represented at the motions hearing that the state court calls the sheriff once the warrant is ready for execution and that the sheriff may pick up the warrant and execute it immediately, before it could possibly arrive in the tenant's mailbox.  However, this possibility did not befall the plaintiffs, and there is no evidence in the record that it has ever occurred.

for a procedural safeguard.  A serendipitous procedural safeguard is no safeguard at all.  *See Helton*, 330 F.3d at 248–49 (rejecting argument that a statute authorizing the immediate destruction of personal property, without any procedural safeguards, complied with due process because "the general practice . . . is to obtain a court order before any destruction occurs").

The failure to notify the plaintiffs of their eviction date was particularly problematic in this case because it created a void that other information filled.  Without notice of the eviction date, the plaintiffs relied on representations by the judge at their eviction hearing, which led them to reasonably understand that they would not be evicted until August 2.[7]  In accordance with that understanding, Todman reserved a moving truck for use on August 1.  But the eviction happened on July 31, when the plaintiffs were at work.  Collins notified them of the eviction by text message when he arrived at the property with the sheriff's deputy.  When the plaintiffs raced home, they had no legal means to reclaim their possessions.  If the form had, for example, identified the date of the eviction, informed the plaintiffs that the eviction would not happen before a date certain, or required Collins to notify them of the eviction date in writing, the plaintiffs would have been on notice to schedule their move sooner and they would not have lost their possessions.  Instead, the plaintiffs reasonably trusted statements from a state court judge that the eviction would not occur until a later date.  The judge is certainly not to blame for what happened to the plaintiffs' property, and in fact, the judge should be commended for seizing an opportunity to resolve a difficult

---

[7] The defendants argue that the judge never explicitly told the plaintiffs they would have until August 2.  True, but viewing the judge's statements in the context of the entire hearing transcript clearly shows that, whether the judge intended to delay the plaintiffs' eviction until August 2 (and the Court believes the judge did), a reasonable person could understand her statements as having that effect.  The hearing took place on July 2.  The plaintiffs represented they had other housing beginning August 2.  The judge said the stay "would still give you the four weeks" and the plaintiffs "would still have your full month before" the eviction. ECF 94-18, at 11, 15.  In common parlance, a month is four weeks, and August 2 is one month from July 2.

Case 1:19-cv-03296-DLB   Document 121   Filed 09/29/22   Page 25 of 46


situation.  The blame instead lies with the City for failing to officially notify the plaintiffs of when their eviction could occur and when their personal property could be deemed abandoned.

Due process required the City to provide the plaintiffs with adequate notice of the state-ordered abandonment of their personal property to allow them an opportunity to remove their possessions before the eviction or to knowingly relinquish their right to them.  What little notice was provided was inadequate.

### b.  Opportunity to be heard

In addition to notice, due process requires a meaningful opportunity to be heard.  To determine what constitutes a meaningful opportunity to be heard in a particular case, courts engage in the three-part balancing inquiry outlined in *Mathews v. Eldridge* by considering

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

424 U.S. at 335; *see also Snider Int'l Corp.*, 739 F.3d at 146.[8]  Upon balancing the *Mathews* factors, the Court finds that the City did not provide the plaintiffs with any, let alone an adequate, opportunity to be heard on the forced abandonment of their possessions.

---

[8] The parties do not engage with the *Mathews* framework.  Instead, they cite various formulations of the basic requirement of an opportunity to be heard.  This approach seems to assume a set of "core" due process rights apart from those balanced by *Mathews*.  The Fourth Circuit has, at least for now, declined to consider such an approach in lieu of *Mathews*.  *See Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 323 n.12 (4th Cir. 2021) (declining to consider "core" due process arguments and applying *Mathews* but stating "nothing in this opinion . . . should be read as foreclosing ['core' due process] arguments in the future").  *But see Thorpe v. Clarke*, 37 F.4th 926, 944–45 (4th Cir. 2022) (considering procedural due process challenge based on alleged transgression of "the most foundational building blocks of due process" without discussing *Mathews* factors).  Accordingly, the Court will use the *Mathews* framework.

### i.   *Private interest affected*

The first *Mathews* factors is "the private interest . . . affected by the official action[.]"  *Mathews*, 424 U.S. at 335.  The private interest here at stake is substantial.  Section 8A-4 extends to all personal property found on the leased premises at the time of eviction.  It applies without exception, covering even the items Maryland law exempts from levy in distress for rent cases.  *See* RP § 8-307(a) (exempting from levy hand-operated tools and instruments, books and files of physicians and attorneys, and prior perfected security interests).  The plaintiffs suggest § 8A-4 by its plain language would reach tickets for an upcoming show, tools of the tenants' trade, vital records, and even a neighbor's pet that happened to wander in the wrong place at the wrong time.  The Court sees no limitation that would prevent these possibilities.  As for Todman and Gattis, they lost access to at least kitchenware, furniture, clothes, electronic media, a television, and a motorcycle.

The Supreme Court has counseled that "household goods" like the ones the plaintiffs lost are an "important interest" deserving of procedural due process protection.  *Fuentes*, 407 U.S. at 89.  "It is, after all, such consumer goods that people work and earn a livelihood in order to acquire."  *Id.*  The important private interest at stake here is magnified by the nature of the threat to it.  Unlike cases where the potential loss is only temporary, as where an illegally parked car is towed but later may be retrieved, the loss effected by § 8A-4 is permanent.  *Cf. Sutton v. City of Milwaukee*, 672 F.2d 644, 646 (7th Cir. 1982) ("It is not the car itself but the use of the car for a short period, usually a few hours, that is at stake.").  Tenants may not retrieve abandoned property unless the landlord allows them to do so.  Meanwhile, § 8A-6 expressly encourages landlords to dispose of abandoned property by taking it to a dump or donating it to charity.  Disposal can occur immediately, and landlords have no reason to delay; indeed, their financial interests encourage

quick action to return the leased premises to the rental market.  As a result of this state-created system, the plaintiffs lost valuable personal possessions.

The first *Mathews* factor weighs heavily in the plaintiffs' favor.

### ii.  Existing and additional procedural safeguards

The second *Mathews* factor is "the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards[.]"  *Mathews*, 424 U.S. at 335.  "Analyzing the adequacy of process a state affords usually requires courts to 'consult the entire panoply of predeprivation and postdeprivation process provided by the state.'"  *Rockville Cars*, 891 F.3d at 149 (quoting *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002)).  Thus, the Court must "examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law."  *Burch*, 494 U.S. at 126.

The erroneous deprivation that resulted from the operation of § 8A-4 in this case was the forced abandonment of personal belongings that the plaintiffs did not want to abandon.  The ordinance itself does not provide any safeguards against an erroneous deprivation.  It provides no legal mechanism by which tenants may reclaim possessions deemed abandoned or otherwise challenge its operation.  It simply declares by fiat that, upon eviction, tenants' personal property found on the premises is irrevocably abandoned.

Due process "generally requires that a deprivation of property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  *Tri Cnty. Paving*, 281 F.3d at 436 (quoting *Mullane*, 339 U.S. at 313).  The City contends the plaintiffs had several pre-deprivation opportunities to be heard.  It points first to the eviction hearing.  It argues the eviction hearing offered an opportunity to be heard because the state court adjudicated the plaintiffs' rights "to

maintain their personal property in the real estate." ECF 106, at 12–13.  Under Maryland law, the

City argues, the plaintiffs were not allowed to keep their belongings on the premises after the court

ordered possession returned to Collins.  The City's logic is flawed.  While the eviction hearing

may have effectively adjudicated the plaintiffs' right to maintain their personal property in the

leased premises upon the execution of the warrant of restitution, that adjudication did not strip the

plaintiffs of their ownership interest in their belongings.  That issue was not on the agenda.  The

judge began the hearing by expressly limiting it to four issues concerning whether Collins had a

right to possession of the real property—the purpose of the hearing.  She did not alert the plaintiffs

to the fact that their belongings would be deemed abandoned on eviction day, and she was not

required to do so.  "Since the essential reason for the requirement of a prior hearing is to prevent

unfair and mistaken deprivations of property . . . it is axiomatic that the hearing must provide a

real test." *Fuentes*, 407 U.S. at 97.  The eviction hearing in this case provided no test.[9]

---

[9] The Court rejects Collins' argument that, under principles of *res judicata*, the judgment entered
at the eviction hearing precludes the plaintiffs' claims against him here.  *Res judicata*

> bars the relitigation of a claim if there is a final judgment in a previous litigation
> where the parties, the subject matter and causes of action are identical or
> substantially identical as to issues actually litigated and as to those which could
> have or should have been raised in the previous litigation.

*Spangler v. McQuitty*, 141 A.3d 156, 175 (Md. 2016) (quoting *Cochran v. Griffith Energy Servs.*,
43 A.3d 999, 1002 (Md. 2012)).  Normally, to determine whether a claim is precluded by the final
judgment in an earlier action, courts consider whether the claim arises from the same transaction
or series of transactions as the claims litigated in the earlier action.  *Colandrea v. Wilde Lake Cmty.
Ass'n, Inc.*, 761 A.2d 899, 908–09 (Md. 2000); *see also* Restatement (Second) of Judgments § 24
(1982).  However, when a remedy is unavailable in an earlier action, *res judicata* does not preclude
a subsequent action for that remedy even if the actions concerned the same underlying transaction.
*See Esslinger v. Baltimore City*, 622 A.2d 774, 782 (Md. Ct. Spec. App. 1993) ("Part and parcel
of being afforded 'ample procedural means' in an initial action . . . is also being afforded the
opportunity to pursue all of one's *remedies* in that action.") (quoting Restatement (Second) of
Judgments § 26(1)(c) (1982)).  The plaintiffs' eviction hearing was limited to the issue of
possession of the leased premises.  It did not, and could not have, adjudicated any of the plaintiffs'
claims that are now before the Court.

Similar reasoning justified the holding in *Mombro v. Louis Capano & Sons, Inc.*, 526 F. Supp. 1237 (D. Del. 1981).  In that case, Delaware tenants challenged the constitutionality of a law analogous to § 8A-4.  *Id.* at 1240–42.  Delaware's Landlord-Tenant Code § 5715(d) provided that landlords had the right to remove and store tenants' personal property left in leased premises following an eviction.  *Id.* at 1239.  After 30 days, "such property shall be deemed abandoned and may be disposed of by the landlord without further notice or obligation to the tenant."  *Id.*  While the Court did not resolve the constitutionality of § 5715(d), it found "substantial grounds to question its compatibility with the Due Process Clause."  *Id.* at 1240.  On the question of whether "an opportunity to resist the eviction proceedings" in court satisfied due process, the Court reasoned it did not because the issue of eviction was distinct from the issue of ownership of the tenants' belongings.  *Id.*  The state court judgment only "sets in motion an eviction process."  *Id.* Meanwhile, the abandonment depended on other conditions, including the failure "to remove property given an opportunity to do so," and consequently, the tenant might contest abandonment "with any number of defenses not adjudicated in" the eviction proceeding.  *Id.* (quoting *Finberg v. Sullivan*, 634 F.2d 50, 58 (3d Cir. 1980) (en banc)).  This reasoning applies equally to the plaintiffs' experience.  Whether they had a right to stay in the home is legally and factually distinct from whether they intended to abandon their possessions.  As in *Mombro*, the plaintiffs' eviction hearing did not provide any opportunity to be heard on the latter question.[10]

---

[10] The City argues *Mombro* is distinguishable because the Delaware tenants had no opportunity to remove their possessions after they failed to appear for their eviction hearing.  Here, the City argues, the plaintiffs had plenty of time to remove their belongings after the eviction hearing because the court granted them a stay of execution of the judgment.  This distinction is immaterial. The court's reasoning in *Mombro* did not turn on the absence of a pre-eviction period for removal; rather, it turned on insufficient notice of the risk of abandonment and inadequate procedures to contest abandonment.  526 F. Supp. at 1241–42.  As explained above, the plaintiffs in this case likewise did not receive adequate notice of the risk of abandonment.   It therefore does not matter that they had time to remove their belongings.

Beyond the eviction hearing, the City points to other pre-deprivation state court procedures it contends were available to the plaintiffs.  It asserts that the plaintiffs could have appealed the judgment of possession, moved for the state court to alter or amend its judgment under Md. Rule 3-534, or moved for the court to use its revisory power under Md. Rule 3-535 to extend the stay of the judgment of possession.  None of these procedures suffices.  They suffer from the same defect as the eviction hearing.  If the plaintiffs had appealed from the judgment of possession, moved the state court to alter or revise it, or moved for an extension of the stay, they might have delayed their eviction.  But that issue is distinct from the issue of abandonment, and these procedures would not have provided the plaintiffs with an opportunity to contest the state-ordered abandonment of their possessions.  Second, due to inadequate notice of when their eviction was scheduled for, the plaintiffs reasonably believed they had until August 2 to move out and thus had no reason to initiate procedures that only could have delayed their eviction.

The City next argues the plaintiffs could have filed a separate action in state court to declare their rights to their personal property under Md. Code Ann., Cts. & Jud. Proc. § 3-401 *et seq.* and sought a temporary restraining order in the interim.  This, too, does not suffice.  As a pre-deprivation procedure, this course of action would be possible only if the plaintiffs had known their rights to their possessions were in jeopardy.  As explained above, they did not.  And even if they did, a declaration of property rights before the eviction would not have prevented the elimination of those rights by § 8A-4 upon the eviction.  A declaratory action initiated post-deprivation also would have been insufficient.  The relevant statute cited by the City permits any person "whose rights, status, or other legal relations are affected by a . . . municipal ordinance" to "obtain a declaration of rights, status or other legal relations under it."  *Id.* § 3-406.  If the plaintiffs had sought a declaration of their rights to the possessions after their eviction, the state court would

have had to declare that the possessions were deemed abandoned by operation of § 8A-4.  The declaration could not have restored the plaintiffs' ownership rights or otherwise cured the erroneous deprivation.  Furthermore, as a general rule, post-deprivation remedies are sufficient to satisfy the requirements of due process only when the value of pre-deprivation procedures is negligible, as where the deprivation is caused by the unauthorized conduct of a state official.  *Burch*, 494 U.S. at 128–29.  The deprivation here was not random or unauthorized.  It was caused by a City ordinance and was therefore both predictable and preventable.  In such cases, the value of pre-deprivation procedures is substantial, rendering a post-deprivation declaration action, with no possibility of restoring ownership rights, insufficient.

Because there were no procedures through which the plaintiffs could have contested the erroneous deprivation of their possessions, this case is distinct from three cases on which the City heavily relies: *Rockville Cars*, 891 F.3d 141; *Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008); and *Tri County Paving*, 281 F.3d 430.  In these cases, the Fourth Circuit rejected § 1983 claims based on alleged procedural due process violations where the plaintiffs did not take advantage of various procedures available to them.  The Fourth Circuit reasoned the procedural due process "violation actionable under § 1983 is not complete . . . unless and until the State fails to provide due process."  *Rockville Cars*, 891 F.3d at 149 (quoting *Mora*, 519 F.3d at 230) (internal quotation marks omitted).  The plaintiffs in these cases ignored available procedures in their "rush to federal court[,]" so the Court "ha[d] no reason to believe that the state process . . . was constitutionally inadequate."  *Id.*  In *Tri-County Paving*, the plaintiff could have petitioned a state court for a writ of mandamus to compel the county to issue a building permit, applied for a hardship variance from the County Planning Board, or filed an inverse condemnation action.  281 F.3d at 438.  In *Mora*, the plaintiff could have invoked Maryland's statutory right to the return of property

rightfully taken by police but wrongfully withheld after there is no further need for its retention. 519 F.3d at 230 n.2.  And in *Rockville Cars*, the plaintiff could have appealed its permit suspension through the local Board of Appeals, sought an injunction to block the suspension, or sought a declaration of its rights that the local appellate process was unconstitutional.  891 F.3d at 149. These cases involved challenges to discretionary decisions of state actors.  In such cases, an appeal or a declaration of rights could determine the state actors' decisions were erroneous and thus vindicated the plaintiffs' rights.  Here, conversely, Todman and Gattis challenge the non-discretionary operation of an ordinance.  They did not, as did the plaintiffs in *Rockville Cars*, *Mora*, and *Tri-County Paving*, request that a state actor take some action and have their request denied; rather, the City ordinance deprived them of their personal property, and they now challenge it. Even though Todman and Gattis did not pursue the procedures identified by the City, those procedures would not have prevented or corrected the erroneous deprivation of their possessions. They needed some procedural means to challenge the operation of the ordinance, and none was available.  The holdings in *Rockville Cars*, *Mora*, and *Tri-County Paving* do not extend to Todman and Gattis' claim because, in this case, the roads not taken led nowhere.

This is a rare case in which there were no opportunities to be heard and no procedural safeguards, making the risk of error unacceptably high.  *See Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 326 (4th Cir. 2021).  The value of additional procedures is likewise high since the current procedural scheme starts at zero.  Even a short reclamation period would substantially mitigate the risk of erroneous deprivations under § 8A-4, if tenants were notified sufficiently in

advance of when such a period began and ended.[11]   The record here shows the plaintiffs could have taken advantage of a period of even a few hours, as they returned to the leased property immediately after learning about the eviction from Collins, only to be prevented from removing their possessions.

The second *Mathews* factor weighs strongly against the current procedural scheme.

### iii.  Government interests

The third *Mathews* factor is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335; *see also Miranda v. Garland*, 34 F.4th 338, 364 (4th Cir. 2022) ("[T]he third *Mathews* factor is the government's interest in using the current process, including the burdens it would incur in using additional or substitute process.").  The City asserts the function of § 8A-4 is twofold: (1) to prevent eviction chattels from being ejected onto public property to safeguard public health and safety, protect tenants' dignity, and reduce cleaning expenses; and (2) to quickly return possession of the leased premises to the landlord to support the efficient use of real property and comply with state law.

It is difficult to imagine how any additional procedural safeguard would burden the City's interest in keeping public property clear of eviction chattels.  Indeed, the plaintiffs do not challenge the provision in § 8A that prohibits the removal of eviction chattels onto public property; they challenge the provision that allows landlords to take possession of chattels and dispose of them in other ways.  Certainly, some additional procedures could increase the City's expenses and

---

[11] Prince George's County provides tenants with up to four hours to salvage and transport their possessions after an eviction.  Prince George's Cnty., Md., Code § 13-164(b).  Most states provide reclamation periods that are much longer in duration.  *See, e.g.*, Idaho Code Ann. § 6-316(2) (3 days); 14 M.R.S.A. § 6013 (7 days); Cal. Civ. Code § 1965 (18 days); Minn. Stat. Ann. § 504b.365 (60 days); Ind. Code Ann. § 32-31-4-5 (90 days).

potentially delay the landlord's return to unburdened possession of the leased property. A hearing on what possessions were left behind and whether they were properly abandoned, for example, would create significant delays. But a post-eviction judicial proceeding is not necessary to address the risk of erroneous deprivation posed by § 8A-4. A simple reclamation period would not significantly burden any of the City's interests. If the possessions are stored off-site, there is no greater delay before landlords are returned to unencumbered possession of the leased premises, and the costs of transportation and storage could be borne by landlords and/or evicted tenants. If possessions are stored temporarily in the leased premises, there would be no additional cost to the City. The landlord's return to possession might be delayed, but not necessarily for long—Prince George's County provides a reclamation period of four hours.[12] In the plaintiffs' case, a reclamation period would not have delayed the return of possession to Collins. There is no dispute that the leased premises remained vacant, with the plaintiffs' abandoned possessions inside, for months after their eviction.

The City takes the position that procedural safeguards such as a reclamation period or notice to tenants of the date of the eviction would impede the City's interest in quickly returning the landlord to unencumbered possession of the real property and would be contrary to state law. It argues RP § 8-402(b)(2)(i) requires the immediate return of possession of the real property to the landlord after the state court enters judgment. That statute provides that, if the state court grants possession to the landlord in an eviction action, then

> the court shall thereupon give judgment for the restitution of the possession of said premises and shall *forthwith* issue its warrant . . . commanding the tenant or person

---

[12] The Court does not suggest the procedures used in Prince George's County are constitutionally sufficient, as that issue is not before it. The comparison simply shows a reclamation period need not be long or burdensome to be meaningful when compared to nothing. It also bears emphasizing that, even if a reclamation period had been made available to the plaintiffs, due process would still have required them to receive adequate notice of the procedure beforehand.

> in possession *forthwith* to deliver to the landlord possession thereof in as full and
> ample manner as the landlord was possessed of the same at the time when the
> tenancy was made, . . . .

RP § 8-402(b)(2)(i) (emphasis added).  The "forthwith" language, according to the City, precludes giving tenants advance notice of the eviction date or offering them a reclamation period because doing so would not deliver possession of the premises to the landlord immediately.

There are several problems with this argument.  First, the City's interpretation of "forthwith" is not consistent with delays that already exist.  As a practical matter, the sheriff does not immediately execute the warrant of restitution upon its issuance.  As Collins said during the eviction hearing, it often takes at least two weeks.  There are also delays for procedural and fairness reasons.  In this case, for example, the state court granted a stay of execution of the judgment to allow the plaintiffs time to move into their new home, which meant Collins was not immediately delivered possession of the property after the judgment.  Additionally, tenants have 10 days to appeal the state court's judgment.  RP § 8-402(b)(2)(ii).  These existing delays support the conclusion that "forthwith" does not always mean immediately.  *See Kirk*, 987 F.3d at 328 (rejecting argument that additional procedures would frustrate a statutory obligation "to move quickly" where there had been other delays).  Second, even if additional delays are inconsistent with state law, the Constitution nonetheless has the final say.  The statutory requirement of a "forthwith" return of possession to the landlord must itself comport with the requirements of procedural due process—a fact the statute acknowledges by allowing a period for tenants to appeal the judgment of possession.  Finally, any potential inconsistency between state law and the requirements of due process is a problem of the City's own making because it ultimately can be traced to the City's decision to prohibit the placement of eviction chattels onto public property. The requirement that landlords be returned to possession of the real property "in as full and ample

manner" as they originally had was previously achieved by placing tenants' belongings onto the street, but now that the City has prohibited that, the requirement is achieved by terminating tenants' rights to their belongings. The City is essentially arguing that it should be excused from complying with due process because it must comply with a state law *in the way that it prefers*. No state law required the City to prohibit the removal of eviction chattels onto public property. While that prohibition may be sound and popular, it does not justify disregarding due process and extinguishing tenants' rights to their personal property.

The City, in its effort to keep evicted tenants' property off public streets and to restore unencumbered possession of real property to landlords quickly, increased the risk that tenants would be erroneously deprived of their personal property. Yet it did not implement any procedures that would reduce that risk. The City has not established that any fiscal or administrative burdens of modest procedural safeguards outweigh the need for such protections. *See id.* at 327–28 (concluding financial and administrative burdens were insignificant where "there [wa]s no need for complex evidentiary hearings or mini-trials" and a simpler procedure would suffice).

The third *Mathews* factor weighs in favor of the plaintiffs.

As each of the three *Mathews* factors weighs in favor of the plaintiffs, the Court concludes the Due Process Clause of the Fourteenth Amendment required, at a bare minimum, the City to provide the plaintiffs with an opportunity to retrieve, after the eviction, the possessions they did not intend to abandon. By failing to provide even the bare minimum, the City has impermissibly "destroy[ed] a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (citing *Bell v. Burson*, 402 U.S. 535, 542 (1971)). Because the plaintiffs did not receive any opportunity to be heard on the issue of abandonment and thus had no way to present their claim of entitlement, the

operation of § 8A-4 violated their procedural due process rights.  *See Helton*, 330 F.3d at 249 (affirming lower court's finding of a due process violation "because [the challenged law] authorize[d] the destruction of [personal property] with no process at all").

———————————

Procedural due process doctrine requires a careful balancing of competing private and public interests.  The analysis of what process exists and what process is due in a particular case fills many pages.  But at bottom, the rules are straightforward: Due process requires notice and an opportunity to be heard.  The application of these rules to the facts of this case is clear.  The plaintiffs did not intend to abandon their possessions.  They believed, based on statements made by a judge at their eviction hearing, that they had until August 2 to move out.  But they were evicted on July 31, and pursuant to § 8A-4, they immediately lost all rights to their belongings.  Once Collins retook possession, the plaintiffs had no way to contest the state-mandated abandonment of their personal property.  The operation of § 8A-4 violated their due process rights because they received inadequate notice and had no opportunity to be heard.[13]

_____

[13] The plaintiffs also assert a facial challenge to § 8A-4.  A facial challenge is "a claim that the law or policy at issue is unconstitutional in all its applications."  *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)).  "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid[.]'"  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  The Court cannot conclude that § 8A-4 violates due process on its face.  The law applies to all Baltimore City tenants who are evicted.  But the record before the Court concerns primarily holdover tenants, the class to which the plaintiffs belonged.  It may be that some, or even most, of the procedures available to each class of tenants are the same, but the record is largely silent on that point.  For example, while the plaintiffs' eviction hearing was expressly limited to four issues, there is no evidence regarding whether other types of eviction hearings are similarly limited.  Without knowing what notice and opportunities to be heard are afforded to other classes of tenants, the Court cannot determine whether § 8A-4 "is unconstitutional in all its applications."  *Bucklew*, 139 S. Ct. at 1127.

**B.  The City's liability**

Having concluded the plaintiffs' constitutional rights were violated, the Court turns to the second element of their § 1983 claim—whether the City was responsible.  *See Covenant Media of S.C.*, 493 F.3d at 436 (quoting *Collins*, 503 U.S. at 120).  On that question, a municipality's liability "arises only where the constitutionally offensive actions . . . are taken in furtherance of some municipal policy or custom."  *Walker v. Prince George's Cnty.*, 575 F.3d 426, 431 (4th Cir. 2009).

The City argues it is not responsible for the plaintiffs' losses because Collins, a private citizen and not a municipal employee, caused them.  For this proposition, the City cites the seminal case on municipal liability for Section 1983 claims, *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 695 (1978).  Relying on *Monell*, the City asserts the law is clear that "while local governments can be sued for § 1983 damages, the actions must be inflicted by an employee or agent of the local government pursuant to a law or policy of that government."  ECF 106, at 18.  *Monell* does not stand for this proposition.  That case concerned application of the doctrine of *respondeat superior*.  The Supreme Court stated: "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 694.  The Court later clarified that "[t]he 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. . . . [T]hat is, acts which the municipality has officially sanctioned or ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986).  Nothing in *Monell* or its progeny forecloses municipal liability when private actors are involved, so long as the municipality remains responsible for the conduct that caused the injury by virtue of a municipal

policy or custom.  *See, e.g.*, *Presley v. City of Charlottesville*, 464 F.3d 480, 482 n.1, 487–88 (4th Cir. 2006) (explaining when a city may be liable under § 1983 for private conduct in the Fourth Amendment context and finding § 1983 liability possible where the city published a trail map that led private individuals to cross the plaintiff's land); *Mombro*, 526 F. Supp. at 1240 (concluding the plaintiff's injury under an abandonment ordinance similar to § 8A-4 was "attributable to 'state action'" because it was "predicated upon a State court judgment and the issuance of a warrant of removal"); *Assocs. Com. Corp. v. Wood*, 22 F. Supp. 2d 502, 506 n.6 (D. Md. 1998) (citing cases and holding "there is sufficient participation by the State [in the towing of certain vehicles under the challenged law] to constitute state action and implicate due process" because the law "not only authorizes the seizure of eligible vehicles, but validates the transfer of ownership of the vehicle to the seizing party").

Here, the City's ordinance caused the plaintiffs to lose possessions they never intended to abandon.  Their injury may not have occurred without Collins, but § 8A-4 authorized Collins' actions and declared the plaintiffs' possessions abandoned.  The plaintiffs' eviction and the contingent loss of their possessions unfolded precisely how § 8A directed.  In such cases, the municipality's responsibility is obvious.  *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (holding a "policy or custom for which a municipality may be held liable can arise . . . through an express policy, such as a written ordinance or regulation"); *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) (stating "municipal 'policy' is found most obviously in municipal ordinances . . . which directly command or authorize constitutional violations").

Because there is no genuine dispute of material fact that the City was responsible for the constitutional violation, the Court denies the City's motion for summary judgment and grants the plaintiffs summary judgment as to liability on their § 1983 claim.  *See* Fed. R. Civ. P. 56(f).[14]

## IV.   State Law Claims Against Collins

Collins moves for summary judgment on the plaintiffs' state law claims, arguing that he is immunized by § 8A-4(b), which grants landlords immunity for loss and damage to property deemed abandoned by § 8A-4(a), and by his good-faith reliance on the validity of § 8A-4.  The plaintiffs argue § 8A-4 is unconstitutional and therefore void *ab initio*—as if it never existed— and, thus, that their possessions were never abandoned and Collins is not immune from liability.

### A.  The void *ab initio* doctrine

Historically, laws in violation of the Constitution were deemed void *ab initio*: "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."

*Norton v. Shelby Cnty.*, 118 U.S. 425, 442 (1886).   More recently, the Supreme Court has

> emphasized that the effect of a given constitutional ruling on prior conduct is
> subject to no set principle of absolute retroactive invalidity but depends upon a
> consideration of particular relations . . . and particular conduct . . . of rights claimed
> to have become vested, of status, of prior determinations deemed to have finality;
> and of public policy in the light of the nature both of the statute and of its previous
> application.

*Lemon v. Kurtzman*, 411 U.S. 192, 198–99 (1973) (quoting *Linkletter v. Walker*, 381 U.S. 618,

627 (1965) (quoting *Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374 (1940)))

---

[14] The plaintiffs moved for summary judgment only on whether their constitutional rights were violated, but the Court finds they also are entitled to summary judgment on the issue of the City's responsibility for the constitutional violation.  The City, however, is not responsible for conduct not authorized by the ordinance, such as Collins allegedly moving Todman's motorcycle from the street onto the leased premises so that he could assert that it was deemed abandoned.

(internal quotation marks omitted).  This shift reflects a recognition that the "actual existence of a statute," before a determination that it is unconstitutional, "is an operative fact and may have consequences which cannot justly be ignored.  The past cannot always be erased . . . ."  *Chicot Cnty. Drainage Dist.*, 308 U.S. at 374.

The pivotal Maryland case on the void *ab initio* doctrine is *Perkins v. Eskridge*, 366 A.2d 21 (Md. 1976), *overruled on other grounds by Parrott v. State*, 483 A.2d 68 (Md. 1984).   In *Perkins*, the Court of Appeals recognized the "decline and fall" of the void *ab initio* doctrine and the "modern trend" away from strict adherence to it.   *Id.* at 32.   The court followed the trend towards "more realistic views which have applied tests of reasonableness and good faith to determine the consequences flowing from conduct undertaken pursuant to an unconstitutional act" and held that it would not apply the void *ab initio* doctrine in all situations.  *Id.*  When the doctrine did not apply, the court blessed an alternative approach that reasons "one should not incur personal liability when relying upon a statute reasonably believed to be valid."  *Id.* at 29.

Collins argues the doctrine should not apply in this case because he acted in a manner authorized by § 8A-4 and believed the law to be valid.   The plaintiffs counter that void *ab initio* is still the presumptive rule and that this case is not analogous to any exception to that rule recognized in *Perkins*.   The plaintiffs describe the recognized exceptions to the void *ab initio* rule as applying "to arcane and murky questions" not of the kind presented here.  ECF 105, at 12.

*Perkins* offers limited guidance on when void *ab initio* should and should not apply.  The Court of Appeals discussed two cases where it had declined to apply a strict void *ab initio* approach.  *Perkins*, 366 A.2d at 31–32.   In *Kimble v. Bender*, 196 A. 409 (Md. 1938), the court held the actions of justices of the peace appointed pursuant to a statute later declared invalid were not "mere nullities" because "the law had been relied upon by the office holders as well as the

public." *Perkins*, 366 A.2d at 31 (citing *Kimble*, 196 A. at 416–17).  And in *Home Utilities Co. v. Revere Copper & Brass, Inc.*, 122 A.2d 109 (Md. 1956), the Court of Appeals held a Maryland law that conflicted with federal law was not void *ab initio* but rather "in effect merely unenforceable or suspended by the existence of the Federal legislation[.]"  *Id.* at 113.  As a result, after Congress amended the federal law and eliminated the conflict, the state law did not need to be reenacted to have an effect.  *Id.*

The *Perkins* court also identified three cases in which it was "appropriate to apply the [void *ab initio*] rationale."  *Perkins*, 366 A.2d at 32 n.7.  In *Barry Properties, Inc. v. Fick Bros. Roofing Co.*, 353 A.2d 222, 235 (Md. 1977), the court declared portions of a mechanics' lien statute unconstitutional and void *ab initio*.  Specifically, the court struck the part of the statute that allowed the imposition of a lien before a judicial determination.  *Id.* at 235.  It concluded that the party asserting the lien had not done so before a judicial determination, however, so even though a portion of the challenged law was void *ab initio*, the appellant had not suffered a due process violation.  *Id.* at 235–36.  In *State v. Ingel*, 308 A.2d 223 (Md. Ct. Spec. App. 1973), the Court of Special Appeals determined an unconstitutional criminal law was void *ab initio* and, thus, that a conviction under the law was illegal and invalid grounds for punishment.  *Id.* at 229.  And in *Johnson v. State*, 315 A.2d 524 (Md. 1974), the Court of Appeals held a criminal defendant did not have an absolute right of removal of his case to a different jurisdiction under the Maryland Constitution because his was not a capital case.  *Id.* at 528.  In doing so, the court rejected the defendant's argument that it should look to "unconstitutional provisions now in the Code authorizing the death penalty for certain crimes, for the classification of offenses to which the absolute right of removal is applicable."  *Id.*  Those laws were void *ab initio* and looking to them for guidance would result in "utter confusion."  *Id.*  To this list of cases, the plaintiffs add

*Residential Industrial Loan Co. v. Weinberg*, 369 A.2d 563, 565–66 (Md. 1977), which recognized the retroactive effect of the Court of Appeals' decision in *Barry Properties* declaring portions of the Maryland mechanics' lien law unconstitutional.  The court stated there was "no overriding concern" compelling it to give liens recorded under the law "any force unless and until a judicial determination takes place."  *Id.* at 566.[15]

It is difficult to deduce from these cases any principle to guide the Court's analysis in this case.  However, in the decades since *Perkins*, there appear to be no Maryland cases applying the void *ab initio* doctrine in the context of constitutional challenges to a law.  The plaintiffs do not cite any cases decided more recently than the 1970s on this issue, and the Court is aware of none.  Recent application of the void *ab initio* rule in the Maryland courts seems confined to cases involving challenges to contracts, deeds, marriages, and judgments.  *Facey v. Facey*, 246 A.3d 687, 699 (Md. Ct. Spec. App. 2021) (concerning state court judgment); *Fishman v. Murphy ex rel. Est. of Urban*, 72 A.3d 185, 193 (Md. 2013) (concerning deed); *Pease v. Wachovia SBA Lending, Inc.*, 6 A.3d 867, 878 (Md. 2010) (concerning loan agreement and guarantees); *Ledvinka v. Ledvinka*, 840 A.2d 173, 176 (Md. Ct. Spec. App. 2003) (concerning marriage).  This suggests the doctrine has fallen further out of favor.

Additionally, in recent years, courts have recognized a good-faith defense to private actors sued under § 1983 for conduct pursuant to state laws later held unconstitutional.  *See Akers v. Md. State Educ. Ass'n*, 990 F.3d 375, 378–80 (4th Cir. 2021) (joining other jurisdictions in recognizing

---

[15] Upon review of the limited case law in this area, the Court questions whether the void *ab initio* doctrine may apply at all in cases like this one where a law is held unconstitutional only as applied. The void *ab initio* cases cited by the parties appear to involve the application of the doctrine to facially unconstitutional laws.  The parties did not brief this issue, and Court need not answer the question.  Even if the void *ab initio* doctrine applies only to facially invalid laws, such a rule would not change the Court's conclusion, only the reasoning behind it.

good-faith defense against § 1983 liability for private actors).  Underpinning these cases is the Supreme Court's reasoning that "principles of equality and fairness may suggest . . . that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability, as do their government counterparts."  *Id.* (quoting *Wyatt v. Cole*, 504 U.S. 158, 168 (1992)).  While the plaintiffs do not bring a § 1983 claim against Collins, the rationale justifying a good-faith defense to private actors against § 1983 claims naturally extends to this case.  In both situations, the question is whether a private individual should be civilly liable despite a good-faith belief in the validity of law that authorized his conduct.

The Court concludes that the void *ab initio* rule does not apply in this case.  The doctrine was already on the decline in 1976, as reflected in *Perkins*, and it has fallen further out of favor, at least with regard to its application to unconstitutional laws.  This is particularly true when a private actor's liability is at stake.  As another state high court noted more than a century ago, in language quoted in *Perkins*, "[t]he vice" of the void *ab initio* doctrine "is that it fails to recognize the right of the citizen, which is to accept the law as it is written, and not to be required to determine its validity.  The latter is no more the function of the citizen than is the making of the law."  *Lang v. Mayor of Bayonne*, 68 A. 90, 92 (N.J. 1907).  Collins is not a lawmaker, judge, or public official. He is a private citizen, and like all citizens, he should trust in and presume the validity of laws passed pursuant to the regular processes of government.  Section 8A-4 did not require Collins to keep the plaintiff's possessions or to demand money for their return, but it did permit him to do so.  At the time of the eviction, the law was more than a decade old and had never been challenged, so Collins had no reason to doubt its propriety.  While Collins' conduct in withholding belongings that the plaintiffs clearly did not intend to abandon and demanding money for their return was

arguably inconsistent with "basic human decency," *Conner*, 571 F. Supp. 3d at 565 (criticizing landlord's behavior in withholding tenant's family heirlooms under similar law), it was permitted by the ordinance, and the Court will not hold him to a different standard than the one set by then-existing law.  Section 8A-4 was an "operative fact," and it "cannot . . . be erased . . . ."  *See Chicot Cnty. Drainage Dist.*, 308 U.S. at 374.

The Court grants summary judgment to Collins on the issue of his liability for loss or damage to property deemed abandoned by § 8A-4(a).[16]

## B.  Conduct outside the scope of § 8A-4(b)

The plaintiffs argue that, even if § 8A-4(b) immunizes Collins from liability for loss or damage to abandoned belongings, he is not immune from liability regarding Todman's motorcycle.  The plaintiffs claim Collins dragged the motorcycle from the street onto the rental property so it would be deemed abandoned by § 8A-4(a).  Because § 8A-4(b) affords immunity to landlords only for loss or damage to abandoned property, the questions of whether and when Collins moved the motorcycle onto the premises are material to his liability in tort.  On these questions, the parties offer conflicting testimony.  Todman testified that his motorcycle was on the street when he left for work on July 31.  Collins testified it was in the back yard.  At 10:46 a.m. on the day of the

---

[16] The plaintiffs argue Collins acted unreasonably and in bad faith by making representations at their eviction hearing that led them to believe they had more time than they did.  They also suggest a reasonable jury could infer Collins prevented them from receiving the mailed warrant of restitution because he had access to their mailbox.  These arguments miss the point.  The relevant question is whether Collins reasonably and in good faith believed § 8A-4 to be valid, not whether he acted in good-faith towards the plaintiffs.  *See Perkins*, 366 A.2d at 29.

Additionally, the plaintiffs' argument that mistake of law is not a defense to conversion and trespass to chattels is unpersuasive.  Collins was not mistaken about what § 8A-4 authorized him to do or the extent of his immunity.  And any injustice in allowing Collins to retain hypothetical benefits from his conduct, as the plaintiffs argue with regard to their unjust enrichment claim, does not override Collins' immunity.

eviction, Collins texted Todman a photograph of the motorcycle parked next to the house. A jury, not the Court, must decide whom to believe, as the Court cannot weigh the evidence or make credibility determinations on a motion for summary judgment. *Jacobs*, 780 F.3d at 569. When the evidence is viewed in the light most favorable to the plaintiffs, a reasonable jury could find that Collins moved the motorcycle from the public street onto the leased premises before, during, or after the eviction—and, thus, that it was not property deemed abandoned by § 8A-4. Because there is a genuine dispute of material fact as to whether and, if so, when Collins moved the motorcycle onto the property, Collins' motion for partial summary judgment on his liability for that alleged conduct is denied.

## V.      Conclusion

By operation of § 8A-4, the City violated the plaintiffs' procedural due process rights. The Court grants summary judgment in favor of the plaintiffs as to liability on their § 1983 claim. The City's motion for summary judgment is denied. Collins' motion for partial summary judgment is denied as to the constitutionality of § 8A-4 and his liability for loss or damages relating to Todman's motorcycle, but otherwise granted. A separate order shall issue.


DATED this 29th day of September, 2022.


                                                          Deborah L. Boardman
                                                          United States District Judge


46